PD-0124-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/5/2015 5:19:12 PM
Accepted 2/6/2015 3:34:11 PM
ABEL ACOSTA
CLERK

PD-0124-15

## IN THE UNITED STATES COURT OF CRIMINAL APPEALS

5TH Court of Appeals Number 05-14-00025-CR

Trial Court: County Court at Law No 2.  002-80051-3031, Honorable Barnett Walker

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### MELLANNISE HENDERSON

### PETITIONER

### V.

### THE STATE OF TEXAS

### RESPONDENT

_____

### PETITION FOR DISCRETIONARY REVIEW

Law Office of Mellannise Henderson-Love, P.L.L.C.

Mellannise Henderson-Love
Attorney for Petitioner State
Bar No. 0079674
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
Tel: (214) 638-8777
Fax: (214) 291-5331

FILED IN
COURT OF CRIMINAL APPEALS

February 9, 2015

ABEL ACOSTA, CLERK

## IDENTITY OF PARTIES AND COUNSEL

The following constitutes a list of all parties to the trial court's final judgment and the names and addresses of all trial and appellate counsel:


Petitioner                                                    Mellannise Henderson


Petitioner's trial counsel                              Kevin Brooks

Petitioner's appellate counsel                       Mellannise Henderson Love


Respondent                                               The State of Texas


Respondent's trial counsel                           Gregg Willis, District Attorney,

                                                                 2100 Bloomdale Road,

                                                                 McKinney Texas  75071


Respondent's appellate counsel                      Gregg Willis, District Attorney,

                                                                 2100 Bloomdale Road,

                                                                  McKinney Texas  75071

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL**……………………………………………………………2

**STATEMENT OF JURISDICTION**:..................................................................... - 4 -

**STATEMENT OF THE CASE:**................................................................................5

**ISSUE PRESENTED** .............................................................................................6

**STATEMENT OF FACTS** .......................................................................... ……… 6

**SUMMARY OF PETITIONER'S ARGUMENT** ……………………………………………8

**ARGUMENTS AND AUTHORITIES:** ..............................................................  8

**B.  DWI-Applicable Law:**............................................................................  8

**NO PROBABABLE CUASE TO ARREST:** ..........................................................13

**POINT OF ERROR: JURY DELIBERATIONS & ADDED EVIDENCE:** .......................................14

**JURY VERICT INSUFFICENT TO SUSTAIN A VERDICT OF GUILTY**...............................….17

**MIRANDA WARNINGS:** ......................................................................................17

**CONCLUSION AND PRAYER** ...........................................................................20

**CERTIFCATE OF COMPLIANCE**…………………………………………….. ……………… 20

## TABLE OF AUTHORITIES

*Amores v. State*, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991). ........................................................... 11

*Brown v. State, 279 S.W. 837 (1926)* ........................................................................................... 15

*Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997) ........................................................ 18

*Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996) ......................................................... 8

*Dowthitt*, 931 S.W.2d at 255. ..................................................................................................... 13

*Emerson v. State*, 880 S.W.2d 759 (Tex. Crim.App. 1994) ............................................................ 9

*Greer v. State, 32 S.W.2d 845 (1930);Teel v.. State, 283 S.W. 834 (1924).* .................................... 15

*Lewis v. State*, 951 S.W.2d 235, 237 (Tex.App.-Beaumont 1997, no pet.). ................................ 3,9

*Miranda v. Arizona*, 384 U.S. 436 (1966) . ................................................................................. 20

*Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App.1992), ...................................................... 8

*Resendez v. State, 860 S.W.2d 605 (Tex. App. - Corpus Christi, 1993);* ........................................ 15

*Resendez v. State, 860 S.W.2d 605 (Tex. App. - Corpus Christi, 1993);*

*Robinson V. State, 102 S.W.2 220 (1937)* .................................................................................... 17

*Stanley v. State, 625 S.W.2d 320 (Tex. Crim. App. 1981);* ............................................................. 17

*Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.--Austin 1992 ....................................................... 9

*Zuniga v. State*, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). ................................................... 17

### Statutes and other authorities

Article 38.22, §§ 2(a), 3(a)(1)-(2). ............................................................................................... 13

Tex. Code. Crim. Proc. Ann. art 38.22 (2011) ............................................................................... 13

18 U.S.C. § 3742 and 28 U.S.C. § 1291. ...................................................................................... 13

This is an appeal from a final judgment from the district court in a criminal case, and an order affirming the ruling from the 5th Court of Appeals. Jurisdiction is invoked to the Texas Court of Criminal Appeals pursuant to Article V of the Texas Constitution.

**STATEMENT OF THE CASE:**

This is an appeal from a conviction for the offense of Driving While Intoxicated, a Class B Misdemeanor, allegedly committed on December 1, 2012.  Petitioner, Henderson, hereinafter ("Henderson") pled not guilty to committing the offense of driving while intoxicated (DWI). (RR III 3 pg. 6). After a jury trial, the court sentenced Petitioner to ninety days confinement in the Collin County Jail and assessed a $ 500 fine. (CR.1, 2). The court suspended imposition of the sentence and placed Petitioner on twelve- month probation. (RR Vol. 4 39).Petitioner, Henderson, filed a Notice of Appeal on January 2, 2014, (CR 1). By this appeal, Petitioner presents the points of error below for the Court's review.

1. **Trial court information**:
   a. The Fifth Court of Appeals: Opinion by Justice O'Neill.
   b. Information about the trial court:  County Court al Law No 3, Collin County Texas
   c. "The trial court rendered a judgment in favor of Defendant"

2. **Court of appeals information**:
   a. The parties in the court of appeals: Mellannnise Henderson v.  State of Texas.

   b. The district of the court of appeals: The Fifth District Court of Appeals, Dallas Division).

   c. The names of the justices who decided the appeal: Before Justices O'Neill, Fillmore, and Chief Justice Thomas, Retired. The author of the court's opinion: Opinion by Justice O'Neill. The Court of Appeals affirmed the trial court's decision.

## ISSUE PRESENTED

1. Whether the manner in which the HGN was administered was sufficient to lead to probable cause to arrest Petitioner?

2. Whether the Court erred, when the Jury Charge presented two questions to the jury regarding the normal use of the mental faculties and the normal use of physical faculties?

3. Whether the Court erred during Jury deliberations when it allowed the prosecution to replay and control the enhancement aspects of the video for the jury?

4. Whether the prosecution controlling the video during jury deliberations was tantamount to added evidence?

5. Whether the jury verdict was against the great weight of the evidence, and thereby requiring the conviction to be overturned?

6. Whether the evidence was factually insufficient to show that Henderson was driving while intoxicated?

7. Whether the case should have been dismissed for failure to Mirandize Henderson after she was in police custody?

The facts in this case are not highly disputed. On November 30, 2014, Petitioner, Henderson left her downtown Dallas office after working late in preparation for a trial starting the following Monday[1]. (RR Vol. III pg. 20). After Midnight on December 1, 2012, Officer Corley with the Richardson Police Department pulled Henderson over for what he states was her "failure to maintain a single lane." (RR Vol. III pg. 19). It is undisputed that after seeing the Officer's flashing lights, Henderson promptly pulled over, when asked to retrieve her insurance card she complied and promptly exited the vehicle upon request. After the stop, Henderson explained that she saw emergency vehicle lights ahead, and was trying to determine if she needed to change lanes. (RR III 20, 47. 48). (RR Video Part 1) The Officer also corroborates the existence of this emergency vehicle, as he stated he was in route to assist an officer who was a quarter of a mile ahead of Henderson. According to both Henderson and the officer- from where Henderson was stopped, it could not be determined if the emergency vehicle was in the left or the right lane. (RR III 20, 47, 40). (RR Video Part 1) Officer Corley admits that Henderson responded appropriately to his strobe lights, and appropriately pulled over. Henderson followed his commands in a normal fashion, and was respectful to his commands throughout his exchange with her. (RR III 49, 50, 51), (RR Video Part 1). Officer Corley testified that there was no visible swaying by Petitioner Henderson.

At the trial, Officer Corley admitted that he administered only one field sobriety test- the HGN, during the administration of the test the Officer failed to follow some of the basic requirements for the test in making a determination to arrest Henderson. Namely, Corley admitted, that according to the National Highway Transportation Safety Administration student manual,

---

[1] Henderson was in route to her home.

(NHTSA) one of the requirement for the Horizontal Gaze Nystagmus test ("HGN") is to make sure the subject is not facing passing traffic while administering the test- as the headlights going back and forth could be a distraction for the subject. Notwithstanding this requirement, Corley had Henderson standing on a two- lane street facing traffic. Second, Corley admits that the NH TSA student manual states that in order to make a determination if someone is intoxicated, the Officer should perform *all three*-field sobriety test. (RR III 53-55). (RR III 20, 47, 40). Notwithstanding the Officer's knowledge of the NHTSA manual, and the proper way to administer the test, he purposefully disregarded the instruction and arrested Henderson for DWI. (RR III 39, 63). Throughout the trial, there was no testimony that Petitioner ***did not*** have normal use of her mental and physical faculties.

## SUMMARY OF PETITIONER'S ARGUMENT:

The court of appeals committed error when it affirmed the trial court's judgment in favor of the Respondent. Accordingly, this Court should grant review, and should hold that the evidence failed to show beyond a reasonable doubt that Petitioner Henderson was driving while intoxicated. Moreover, other than the Officer's uncorroborated subjective belief, there was no indication that Henderson exhibited poor balance, slow comprehension, or any other indicators that she was intoxicated[2]. On the other hand, throughout the initial stop, interrogation and the subsequent arrest, Henderson consistently maintained that she had to urinate, and repeatedly requested of the Officer for her to use the restroom ( (RR video Part I). Notwithstanding Henderson's request, she was repeatedly denied access to a restroom. Henderson then explained that until she used the restroom, she thought the continuation with the HGN testing could compromise her success. Contrary to the Officer's testimony, Henderson never refused field sobriety testing. Lastly, the HGN evidence

---

[2] Unless the court accepts the admittedly ill performed HGN test.

relied on to arrest Henderson was admittedly ill performed by the arresting officer. (RR III 20, 39, 40 47). In light of all the evidence presented during the trial, Henderson asserts to this high Court, that the jury verdict was against the great weight of the evidence, and the conviction respectfully should be overturned.

## I.
## ARGUMENTS AND AUTHORITIES:
## B. DWI-Applicable Law:

Under Texas law, a person commits DWI "if the person is intoxicated while operating a motor vehicle in a public place." Tex. Penal Code Ann. § 49.04 (Vernon 2008). A person is intoxicated if he does not have "the normal use of mental or physical faculties by reason of the introduction of alcohol ... or any other substance into the body." Tex. Penal Code Ann. § 49.01(2). Under chapter 49 of the penal code, proof of a culpable mental state is not required for a DWI conviction. Id. § 49.11; *Nelson v. State*, 149 S.W.3d 206, 211 (Tex.App.-Fort Worth 2004, no pet.). However, an essential element of DWI is voluntary intoxication. See *Lewis v. State*, 951 S.W.2d 235, 237 (Tex.App.-Beaumont 1997, no pet.).

Because the facts of this case do not support that Henderson was a person who was intoxicated by not having the "the normal use of mental or physical faculties by reason of the introduction of alcohol ... or any other substance into the body. (RR III 49, 50, 51), (RR Video Part 1). Consequently, the verdict in this case, is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and in the interest of justice should therefore be overturned. See *Lewis v. State*, 951 S.W.2d 235, 237 (Tex.App.-Beaumont 1997, no pet.).

**II.**
**The Officer Wrongly Performed HGN Test:**
**The Verdict was against the Great weight of the Evidence Presented:**

When reviewing the sufficiency of the evidence, the Court views the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) Henderson's conviction was based on the officer's testimony and his "administration" of the Horizontal Gaze Nystagmus Test ( "HGN"). Petitioner contends the conviction should not stand, because the officer admitted that he improperly administered the test. Notwithstanding the Officer's admission, the Appellate court ruled *that "Corley's decision to arrest Petitioner was made on more than the results of the HGN test.[3]"* The Petitioner contends that the Court of Appeals was wrong in its finding based on this Court's reasoning in *Emerson v. State*, 880 S.W.2d 759 (Tex. Crim. App. 1994).

This high Court addressed the HGN test in *Emerson v. State*, 880 S.W.2d 759 (Tex. Crim. App. 1994). The *Emerson* Court took judicial notice that the technique employed in the HGN test, and the theory behind the test are reliable for the purposes of Texas Rule of Evidence 702, and that the results from administration of the test by a police officer are admissible if the (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been applied properly on the occasion in question. *Id.* In the case at bar, prong three was compromised to Henderson's detriment.

As stated in the Emerson case, the Horizontal Gaze Nystagmus technique is applied properly when the officer follows the standardized procedures outlined in the Texas Driving While

---

[3] (Opinion Tab 1 page 7 ).

Intoxicated Detection Manual published by the National Highway Transportation Safety Administration. *Id.* According to the NHTSA Manual, the officer must administer the HGN test in a well-lit area or by use of a flashlight to illuminate the subject's face. The subject ***should not[4]*** face toward the blinking lights of a police cruiser or passing cars, which may cause optokinetic Nystagmus[5]. According to the NHTSA, after the HGN test is complete, the officer will conduct the Walk and Turn ("WAT") test and the One-legged Stand ("OLS") test. Then the officer will make the decision to arrest, release or take other action[6].

In the instant case, during officer Corley's testimony, he admitted that did not administer the test in accordance with the proper procedure. The officer specifically testified that he did not administered the HGN test in accordance with his training and the proper procedures; which essentially could have given a false positive according to the NHTSA[7]. (RR III 63).

Under redirect by his own counsel, Corley testifies that:

**Mr. ROLATER** Q: And when it comes to the passing lights, why is it that under ideal conditions you don't have someone face passing traffic when performing the H G N test?

**OFFICER CORLEY:** A: Under ideal conditions, if the traffic is heavy enough and cars are going by, the eyes can tend to follow the lights as it goes across. (RR III 63).

Under cross- examination, he testified as follows:

**MR. BROOKS** Q. What is the N H T S A student manual, officer?

**OFFICER CORLEY:** A. That is a manual that provides all the instructions to peace officers on how to perform field sobriety tests.

**MR. BROOKS** Q. It's basically a peace officer's bible for how to perform field sobriety tests?

---

[4] Emphasis added by Petitioner.

[5] Optokinetic Nystagmus is evident when an object that the eye fixates upon and objects moves quickly out of sight or passes quickly through the field of vision, such as occurs when watching utility pools pass by while in a moving car. 2006 NTHSA manual (defining optokinetic Nystagmus). ( Record Excerpt tab 4)

[6] National Highway Traffic Safety Administration, U.S. Department of Transportation, *Psychophysical Tests for DWI Arrests*, (2006 [hereinafter 2006 *NHTSA Study*].

[7] The record also contains the videotape showing the traffic stop and testing process.

**OFFICER CORLEY:** A. Yes.

**MR. BROOKS** Q. And in that -- is that the organization that certifies you to perform the H G N testing?

**OFFICER CORLEY:** A. Yes, sir, it is.

**MR. BROOKS** Q. There are certain things that they ask you to do prior to performing the H G N test?

**OFFICER CORLEY:** A. Yes, sir.

**MR. BROOKS** Q. One of the things they ask you to do is make sure that the subject is not facing passing traffic?

**OFFICER CORLEY:** A. Yes, sir.

**MR. BROOKS** Q. And that's so as to not be a distraction as far as those headlights going back and forth; correct?

**OFFICER CORLEY:** A. Yes, sir.

**MR. BROOKS** Q. To the same extent why you're supposed to take down your strobe lights[8]?

**OFFICER CORLEY:** A. Correct.

**MR. BROOKS** Q. And we know on this video, Ms. Henderson is facing the passing traffic?

**OFFICER CORLEY:** A. Correct.

**MR. BROOKS** Q. And they recommend that in order to make a determination as to whether or not someone is intoxicated, that you perform all three of those tests?

**OFFICER CORLEY:** A. Yes, sir. (RR III 53-55).

According to *Emerson v. State*, 880 S.W.2d 759 (Tex. Crim. App. 1994), the results from administration of the test by a police officer are admissible ***if*** the (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been applied properly on the occasion in question.

---

[8] Officer Corley turned off his headlights but keep on his headlights as the HGN was being performed. (RR CD part 01)

In this case, the officer admits that he failed to properly apply the technique in question- by not following the NHTSA Manual. (RR III 53-55). Petitioner Henderson was harmed because officer Corley never completed the HGN and did not conduct any further field sobriety tests before he concluded that Henderson was under the influence of alcohol[9]. Notwithstanding these facts, the jury returned a verdict of guilty. The ill preformed manner of the administration of the HGN resulted in having an injurious effect on Petitioner's substantial rights and had a substantial or injurious effect on the jury's verdict.

Based on the evidence above, the guilty verdict in this case, is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and therefore in the interest of justice, should be overturned.

### III.
### NO PROBABABLE CUASE TO ARREST:

The 5th Court of Appeals ruled that probable cause for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably *trustworthy information* are sufficient to warrant a prudent person as believing that an offense has been or is being committed. *Tex. Dep't of Pub. Safety v. Gilfeather*, 293 S.W.3d 875, 880 (Tex. App.—Fort Worth 2009, no pet.) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The error in the instant case was the facts were relied on to be *trustworthy* information.

If taking the evidence in the light most favorable to the Petitioner, If the HGN was admittedly flawed by Officer Corley, and he admittedly failed to comply with the NHTSA Manual, then the probable cause to arrest Henderson was compromised and therefore cannot be based on reasonably

---

[9] The HGN was the only test performed by officer Corley.

trustworthy information. Moreover, to make a full custodial arrest, an officer must have probable cause to believe the person he is arresting has committed or is committing an offense. *See Amores v. State*, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991). Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a particular person has committed or is committing an offense. *Id.* at 413.

Henderson was placed under arrest after an admittedly ill- performed HGN without any corresponding field sobriety tests. Henderson never said she would not take the test, only that she needed to use the restroom before she could continue. In the middle of the HGN, she is arrested according to the officer, after 4 cues of a possible six. (RR III)[10] The officer arguably had a reasonable suspicion to pull Henderson over, but clearly no probable cause to arrest.

Based on the evidence above, the guilty verdict in this case, is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and therefore in the interest of justice, should be overturned.

### IV. POINT OF RROR: JURY CHARGE:

The court of Appeals erred in in ruling there was no reversible error when the trial court allowed two separate questions on the impairment theory of intoxication. In affirming this issue, the court of appeals appears to have committed an error of law. This high Court should grant review and correct the lower court's error.

A trial judge's charge to the jury must set forth the law applicable to the case. Relying on Tex. Code Crim. Proc. art. 36.14 (Vernon Supp. 2004), the appellate court has held that a trial

---

[10] 2006 NHTA Manuel defining cues before arrest, up to 3 in one eye with a maximum of six cues. Record Excerpts Tab 4.

court is required to fully instruct the jury on the law applicable to the case and to apply that law to the facts presented. It is not enough for the charge to merely incorporate the allegation in the charging instrument. Instead, it must also apply the law to the facts adduced at trial. This is because the jury must be instructed under what circumstances they should convict, or under what circumstances they should acquit. Jury charges which fail to apply the law to the facts adduced at trial are erroneous. Tex. Code Crim. Proc. art. 36.14(Vernon Supp. 2004).

### a. The Law Applicable to DWI:

A person commits the offense of driving while intoxicated if the person is intoxicated while operating a motor vehicle in a public place. TEX. PENAL CODE ANN. § 49.04(a) (West 2012). The term "intoxicated" means (1) not having the normal use of mental and physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of those substances, or any substance into the body, or (2) having an alcohol concentration of 0.08 or more. *Id*. § 49.01(2)(A)—(B) (West 2011). Thus, section 49.01(2) provides two alternative methods for the state to prove intoxication. These are referred to as the impairment theory (loss of normal use of physical or mental faculties) or the per se theory (alcohol concentration of .08 or more). *See Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010).

In the case at bar, there is evidence that the state was able to present two questions to the jury regarding Henderson's alleged impairment and normal use of mental and physical faculties. Essentially, the Court in separating the normal use of mental and physical faculties, and allowing two separate questions, would alter Tex. Penal Code Ann. §section 49.01(2), to provide for three alternative methods for the state to prove intoxication, instead of two. The Court's charge to the jury read as follows:

**THE COURT**: Now, if you find and believe from the evidence beyond a reasonable doubt that on or about the should read -- "on or about December 1st, 2012, in Collin County, Texas, Mellannise Henderson did then and there operate a motor vehicle in a public place, while the said

*"Mellannise Henderson was intoxicated by, one, not having the normal use of her mental faculties by reason of the introduction of alcohol into the body,*

*or, two, not having the normal use of her physical faculties by reason of the introduction of alcohol into the body, then you will find the defendant guilty as charged"* (RR Vol.4 pg. 8-9). Presenting these two questions to the jury was reversible error.

In addition to the above, the Court initially indicated that no BAC would not be in the question

to the jury but included the language of the BAC in the definition portion of the charge. The Court's

charge to the jury read as follows:

**MR. WILSON**: Secondly, Your Honor, the state requests that in the application paragraph, bullet point number three, since no evidence was presented in regard to an alcohol concentration, we ask that the alcohol concentration paragraph be removed from the jury charge.

**THE COURT**: Any objections by the defense?

**MR. BROOKS**: Yes, Your Honor. I would object to that. I believe what's in there is following the statute.

**THE COURT**: **Well, it follows the statute. Why would it be necessary to put in? The jury couldn't find her -- there's not going to be any evidence, the state having rested and closed, there's no evidence of an alcohol concentration, so why isn't that just unnecessary language? (RR Vol 4 pg. 5)**

Notwithstanding the above exchange between the Court and Counsel, the Court used the BAC[11]

in the definition portion of the charge, which read as follows:

"**The word intoxicated means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances or any other substance into the body, or having an alcohol concentration of 0.08 or more of breath. "The term alcohol concentration as used herein means the number of grams of alcohol per 210 liters (RR Vol 4 pg. 8-9**)..

In this case, the record as a whole shows the trial court's error with the ambiguous jury

instruction caused Petitioner some actual harm by the use of the definition of the BAC. It is well

---

[11] Blood Alcohol Concentration

settled, that it is error for the trial court in its charge, to authorize a conviction on a theory that is not supported by the evidence. *See, Stanley v. State, 625 S.W.2d 320 (Tex. Crim. App. 1981);See, also, Ferguson v. State, 2 S.W.3d 718 (Tex. App. - Austin, 1999); Resendez v. State, 860 S.W.2d 605 (Tex. App. - Corpus Christi, 1993.* In this case, the BAC instruction was not supported by the evidence. As such, the err is such to cause harm to the Petitioner, and resulting conviction should therefore be overturned.

## V. POINT OF ERROR: JURY DELIBERATIONS & ADDED EVIDENCE:

There was error in affirming the decision to allow the prosecutor to control the replay of the video during jury deliberations. In affirming this issue, the court of appeals appears to have committed an error of law. This high Court should grant review, and correct the lower court's error.

After the close of the evidence and during jury deliberations, the Court essentially allowed the prosecution to control the review of evidence requested by the jury. (RR Vol. 4 pg.35). This is because there was not adequate equipment in the jury room for the jurors to see the replay video. (RR Vol. 4 g. 35). How this evidence was handled and *manipulated* was tantamount to additional or "other evidence." Under appellate rule 21.3, a defendant must be granted a new trial when "after retiring to deliberate, the jury has received other evidence." TEX. R. APP. P. 21.3(f). Specifically, the error is evidenced by the following exchange:

**THE COURT: "it requires that the prosecutor be here because the technology of this video allows whoever is playing it to switch microphones and to switch camera views. Sometimes you can see someone using the camera that shoots outside of the vehicle, sometimes there is a camera that's inside the vehicle and it can be shot. Someone has to manipulate those options. The state introduced the video. I'm going to let them play it in same exact manner, same camera views, and same audio, same microphones as you saw yesterday. Once it's been played, I'll have**

*the bailiff go up to you and meet you in the hallway. You can let the bailiff know if there's a section you need to see again or listen to again and we will bring you back in and let you see it or hear it as many times as necessary". (RR Vol. 4 pg. 35)*

The problem with the Court's account- the court could not control or determine if the prosecutor played the tape in the exact manner that it was played the day before- switching the camera and the audio at the exact time, or as the Court suggested "manipulate" the tape as it did the day before. Any variation in the review of the evidence is tantamount to "other evidence. Accordingly, appellate rule 21.3, is invoked and the Petitioner must be granted a new trial when "after retiring to deliberate, the jury has received other evidence.

Moreover, the Court of appeals erred when it held that the replaying of a video already admitted into evidence and seen by the jury did not constitute receipt of other evidence for purposes of Rule 21.3(f) citing *Thomison v. State*, No. 11-10-00368-CR, 2012 WL 5989193, at *3 (Tex. App.—Eastland Nov. 29, 2012, no pet.) (mem. op., not designated for publication). The error here- what was admitted into evidence was the prosecutor playing the video a specific way, without any "switched microphones or switched camera views". There is no way to determine if the tape was shown in the exact manner originally presented to the jury during the trial, or if as the court stated- if the prosecutor "switched microphones or switched camera views

Unfortunately, Petitioner's counsel failed to object to this issue at trial. However, Petitioner asserts that courts generally agree that they will consider waived arguments only under 'exceptional circumstances.' *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 n.9 (3d Cir. 1999). In this regard, most courts consider whether failing to address the argument would result in a manifest injustice and whether the argument involves a purely legal question that can be decided on the existing factual record. *Batiansila v. Advanced Cardiovascular Sys.*, 952 F.2d 893, 896 (5th Cir. 1992) (stating that it may consider waived argument if a 'miscarriage of justice' would

otherwise result and it raises a pure issue of law) with *Readco Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir. 1996) (stating that it may consider waived argument to avoid 'manifest injustice' or if argument presents pure issue of law) and *Universal Title*, 942 F.2d at 1314- 15) (stating that it may consider waived argument if resolution is 'beyond any doubt,' or if injustice might otherwise result or if it raises pure issue of law). Petitioner is asking the court to consider this argument in the interest of justice, in an effort to avoid a miscarriage of justice.

## VI.
## JURY VERICT INSUFFICENT TO SUSTAIN A VERDICT OF GUILTY

In reviewing the factual sufficiency of the evidence to support a conviction, the Court is to view all the evidence in a neutral light, favoring neither party. *See Zuniga v. State*, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Id*. at 484[12].

In the instant case, the jury verdict was against the great weight of the evidence, and should be overturned. As argued above, it is undisputed that after seeing officer Corley's flashing lights, Henderson promptly pulled over, and promptly and courteously complied with his commands. (RR Video part 1)  After being stopped, Henderson explained to officer Corley that she saw emergency vehicle lights ahead, and was trying to make a determination if she needed to change lanes.  (RR III 20, 47. 48). The existence of this emergency vehicle is too corroborated by officer Corley.  According to both Henderson and the officer, from where Henderson was stopped, one

---

[12] The Court  of Appeals used the Legal sufficiency standard- Although appellant's issues challenge the factual sufficiency of the evidence, we apply only one standard, for legal sufficiency, to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt. Temple v. State, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

could not determine if the emergency vehicle was in the left or the right lane. (RR III 20, 47, 40). Officer Corley admits that Henderson responded appropriately to his strobe lights, and appropriately pulled over. Henderson followed the Officer's commands in a normal fashion, and was respectful to his commands throughout his exchange with her. (RR III 49, 50, .51). Officer Corley further testified that there was no visible swaying by Henderson.

Notwithstanding the Officer's knowledge of the NHTSA manual, and the proper way to administer the test, he purposefully disregarded the instruction and arrested Henderson for DWI. (RR III 39). Further, there was no testimony outside of the admittedly flawed HGN that Henderson did not have the normal use of mental or physical faculties by reason of the introduction of alcohol ... To the contrary; the record is void of Henderson's failure to have the normal use of mental or physical faculties by reason of the introduction of alcohol...

Based on the evidence above, the guilty verdict in this case, is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and therefore in the interest of justice, should be overturned.

## VII.

## OFFICER'S FAILURE TO READ HENDERSON

## MIRANDA WARNINGS:

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the U.S. Supreme Court concluded that during custodial interrogation, a suspect is entitled to the Fifth Amendment right against self-incrimination and the right to have counsel present during such interrogation. The Court held that before questioning, a suspect must be informed of these rights.

**Whether Defendant Was Entitled to Miranda Warnings**

Petitioner was "in custody" during the questioning and her answers on her willingness to take a Breathalyzer or a blood specimen (RR Part 1). Miranda protections do not attach unless both the custody and interrogation prongs are satisfied. Because Petitioner was "in custody" for the purposes of Miranda, she was entitled to Miranda warnings as a matter of law. *Id.*

Based on the above, Petitioner is asking the court to consider this argument, to avoid a miscarriage of justice.

## CONCLUSION AND PRAYER

Petitioner respectfully prays that because of the errors set forth above Court will reverse and set aside the conviction herein and remand this case to the trial court for a new trial.

## CERTIFICATE OF SERVICE

The undersigned Counsel hereby certifies that on January 31, 2015, a true and correct copy of *Petitioner's Initial Brief* was served via electronic mail on Collin County District Attorney Gregg Willis, 2100 Bloomdale, Counsel for Respondent, McKinney Texas 75071.

/s/ *Mellannise Henderson-Love*

## CERTIFCATE OF COMPLIANCE

Pursuant to TRAP 9.4(i)(1 the undersigned Counsel, hereby certifies that this document brief/petition was prepared with Microsoft Word 2013, and that, according to that program's word-count function, the sections covered by TRAP 9.4(i)(1) contain 4,488 words.

/s/*Mellannise Henderson-Love*

REPORTER'S RECORD
VOLUME 1 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 002-80051-2013
COURT OF APPEALS CASE NO. 05-14-00025-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE COUNTY COURT |
| | ) | |
| VS. | ) | AT LAW NUMBER TWO |
| | ) | |
| MELLANNISE HENDERSON | ) | COLLIN COUNTY, TEXAS |

_____

**MASTER INDEX**

_____

On the 2nd and 3rd days of December, 2013, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Barnett Walker, Judge Presiding, and a jury, held in McKinney, Collin County, Texas.

Proceedings reported by computerized stenotype machine.

**A P P E A R A N C E S**

**Mr. Justin B. Wilson**
SBOT NO. 24080521
**Ms. Geeta Yadav Singletary**
SBOT NO. 24060862
Office of Greg Willis, District Attorney
Suite 100
2100 Bloomdale Drive
McKinney TX 75071
Telephone:  972-548-4323
Facsimile:  972-548-3622


                              Attorneys for The State of Texas


**Mr. Kevin Brooks**
SBOT NO. 03070735
Attorney at Law
Suite 2475
325 N. Paul
Dallas TX 75201
Telephone:  214-922-0212
Facsimile:  214-922-0294

                              Attorney for The Defendant

VOLUME 1

MASTER INDEX

----------------------

VOLUME 2

Jury Trial - Voir Dire of Jury Panel

December 2, 2013

|                                          | PAGE | VOL. |
|------------------------------------------|------|------|
| Pretrial Hearing                         | 4    | 2    |
| Court's Remarks to the Jury Panel        | 5    | 2    |
| Jury Voir Dire by Mr. Wilson             | 35   | 2    |
| Jury Voir Dire by Mr. Brooks             | 93   | 2    |
| State Challenge for Cause                | 133  | 2    |
| Defendant Challenge for Cause            | 135  | 2    |
| Jury Impaneled                           | 139  | 2    |
| Jury Sworn by the Court                  | 140  | 2    |
| Jury Admonished                          | 141  | 2    |
| Reporter's Certificate                   | 144  | 2    |

VOLUME 3

Trial on the Merits

December 2, 2013

|  | PAGE | VOL. |
|---|---|---|
| Arraignment ................................. | 6 | 3 |
| Opening Statement by Mr. Wilson ............. | 7 | 3 |

| WITNESS: | DIRECT | CROSS | V. DIRE |
|---|---|---|---|
| CLIFTON CORLEY | | | |
| By Mr. Wilson | 10 v3 | | |
| By Mr. Brooks | | 45 v3 | |
| By Mr. Wilson | 60 v3 | | |
| By Mr. Brooks | | 63 v3 | |

|  | PAGE | VOL. |
|---|---|---|
| State rests ............................. | 66 | 3 |
| Defendant rests .......................... | 67 | 3 |
| Both Sides Close .......................... | 67 | 3 |
| Reporter's Certificate ................... | 71 | 3 |

VOLUME 3

**ALPHABETICAL INDEX OF WITNESSES**

|                   | DIRECT  | CROSS   | V. DIRE |
|-------------------|---------|---------|---------|
| Corley, Clifton   | 10 v3   | 45 v3   |         |
| Corley, Clifton   | 60 v3   | 63 v3   |         |

VOLUME 3

**INDEX OF EXHIBITS**

Use is indicated as follows:
J - Jury     R - Record Only     D - Demonstrative
W/D - Withdrawn   ID - Identification Only    C- Court

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | USE |
|---------|-------------|---------|----------|-----|
| SX 1 | DVD | 22 v3 | 22 v3 | J |
| SX 2 | DIC 24 form | 42 v3 | 42 v3 | J |

VOLUME 4

Trial on the Merits

December 3, 2013

|  | PAGE | VOL. |
|---|---|---|
| Charge Conference .......................... | 4 | 4 |
| Charge Read to the Jury ..................... | 7 | 4 |
| Closing Statement by Mr. Wilson ........... | 13 | 4 |
| Closing Statement by Mr. Brooks ........... | 18 | 4 |
| Closing Statement by Mr. Wilson ........... | 22 | 4 |
| Jury Note Received ........................ | 29 | 4 |
| Verdict ................................... | 36 | 4 |
| Punishment Phase .......................... | 38 | 4 |
| Both Sides Close .......................... | 39 | 4 |
| Sentencing ................................ | 39 | 4 |
| Reporter's Certificate .................... | 43 | 4 |

STATE OF TEXAS        )

COUNTY OF COLLIN      )


     I, Marigay Black, Official Court Reporter in and for the County Court at Law Number Two, County of Collin, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     Signed this 26th day of March, 2014.


                          /S/  Marigay Black

                          MARIGAY BLACK, Texas CSR 351
                          Official Court Reporter
                          County Court at Law Number Two
                          Suite 10344
                          2100 Bloomdale Road
                          McKinney, Texas 75071
                          Tel:  972-548-3823
                          FAX:  972-548-3828
                          Expiration:  12/31/2014
                          mblack@co.collin.tx.us

REPORTER'S RECORD
VOLUME 2 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 002-80051-2013
COURT OF APPEALS CASE NO. 05-14-00025-CR

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE COUNTY COURT |
| | ) |
| VS. | ) AT LAW NUMBER TWO |
| | ) |
| MELLANNISE HENDERSON | ) COLLIN COUNTY, TEXAS |

_____

**JURY TRIAL**

_____

On the 2nd day of December, 2013, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Barnett Walker, Judge Presiding, and a jury, held in McKinney, Collin County, Texas.

Proceedings reported by computerized stenotype machine.

**A P P E A R A N C E S**

**Mr. Justin B. Wilson**
SBOT NO. 24080521
**Ms. Geeta Yadav Singletary**
SBOT NO. 24060862
Office of Greg Willis, District Attorney
Suite 100
2100 Bloomdale Drive
McKinney TX 75071
Telephone:  972-548-4323
Facsimile:  972-548-3622

                          Attorneys for The State of Texas

**Mr. Kevin Brooks**
SBOT NO. 03070735
Attorney at Law
Suite 2475
325 N. Paul
Dallas TX 75201
Telephone:  214-922-0212
Facsimile:  214-922-0294

                          Attorney for The Defendant

VOLUME 2

Jury Trial

December 2, 2013

|                                          | PAGE | VOL. |
|------------------------------------------|------|------|
| Pretrial Hearing                         | 4    | 2    |
| Court's Remarks to the Jury Panel        | 5    | 2    |
| Jury Voir Dire by Mr. Wilson             | 35   | 2    |
| Jury Voir Dire by Mr. Brooks             | 93   | 2    |
| State Challenge for Cause                | 133  | 2    |
| Defendant Challenge for Cause            | 135  | 2    |
| Jury Impaneled                           | 139  | 2    |
| Jury Sworn by the Court                  | 140  | 2    |
| Jury Admonished                          | 141  | 2    |
| Reporter's Certificate                   | 144  | 2    |

(Proceedings occurring in open court, commencing at 9:32 A M. Defendant present.)

THE COURT: Does either side have any motions we need to take up before we bring the panel in?

MR. WILSON: Not from the state, judge.

MR. BROOKS: Judge, I had filed some pretrial motions, primarily discovery motions. I'm going to represent to the court that the state has turned over the copies of the offense reports as well as the video recordings. I'm not aware of anything else.

THE COURT: Do you have anything else that you intend to admit other than, you know, like photos or anything of that nature?

MR. WILSON: No, Your Honor.

THE COURT: Any reports, supplements?

MR. WILSON: Everything that we have was given to defense and all we plan to offer are the videos and the D I C 24.

THE COURT: All right. And you've received both of those; correct?

MR. BROOKS: Yes, sir.

THE COURT: All right. Fantastic. Do we have a list yet, bailiff?

THE BAILIFF: Yes, just received it, judge.

THE COURT: All right.

(Unrelated docket matters heard, after which the following proceedings were had in open court. Jury panel seated. Defendant present.)

THE COURT: Good morning, ladies and gentlemen. As you enter the courtroom, everyone is standing to pay their respects to you so you may feel free to have a seat. Thank you.

Everyone else may be seated.

Bailiff, report, please.

THE BAILIFF: The panel is all present and accounted for, Your Honor.

THE COURT: Thank you, bailiff. Good morning, ladies and gentlemen. Welcome to Collin County Court at Law Number Two. My name is Barnett Walker, and I'm honored to be your elected judge of this court.

The reason we've asked the 24 of you to come here this morning is we need six of you to sit on the jury and decide the facts in this case.

One of the first questions that I often hear from people is, number one, how long is this going to take? I don't know any more about the case than you do right now. I know the defendant's name, I know what the charge is.

The system is intentionally designed so that I don't know any more than you so I don't start prejudging

the evidence just as we don't want you to start prejudging it. But I have asked the attorneys and both sides assure me they believe this case will be concluded today.

So based on that information, is there anyone here who, for some reason or another, cannot give us their undivided attention for the remainder of the day, possibly let's include tomorrow up unto, say, 12:00 o'clock? Anyone have any plane tickets, caring for -- is anyone caring for someone who's sick? Are you sick yourself? Do you -- are you the single childcare provider for a child under 12? Any of those things apply, raise your hand, please. Okay. Great. Thank you.

One of the other questions I get is, Well, if you only need six of us, why are there 24 of us here? In certain cases, people come to jury service and all have had different experiences, life experiences. Some cases more than others generate emotions.

For instance, this is a D W I trial. For different reasons, some of you may have very strong feelings about D W I. That might be because you had someone in your family who struggled with alcoholism, it might be that you know someone or someone you cared for was injured by a drunk driver, and because of that, we need to make sure that whichever people we put on the jury are not encumbered by feelings that would make them lean towards

one side or the other.  Does that make sense?

What we're going to do here this morning is called voir dire.  You've taken an oath so far.  And that oath was not to follow the law.  Okay.  You've only taken an oath to be truthful about your feelings and express those feelings.  That's going to become very important because the first six of you on the jury are on the front row right now, beginning with Ms. -- is it Radice?

*VENIREPERSON:*  Radice.

*THE COURT:*  Radice.  Ms. Radice.  Ms. Radice, all the way to Ms. Stelling-Parker.

*VENIREPERSON:*  Yes.

*THE COURT:*  Y'all are the jury.  The six of you right there on the front row.  As time goes on and the lawyers start asking questions, one of them may strike you.  Each side is allowed to strike three people.  They can strike you for any reason whatsoever except gender, race and national origin.  Okay?  But if one side hears a response from you and -- that causes them concern, they may decide to strike you.  If they struck one of you, then Kelly Mercer, you would be, sir, on the jury.  And it goes on down the row.

Now, the reason I tell you that is because sometimes people feel a little shunned if they're in the back row and the four of you on the back row because you

don't get asked as many questions as, say, the people on the front two rows and I wanted you to understand why that is. Because eight out of 10 times, the jury is picked within the first 15 or 16. So, David Christopher, raise your hand? Everybody to Mr. Christopher's right and everybody on the front row, you're in the splash zone at Sea World. You're most likely going to get picked. The people, though, to the left of Mr. Christopher, don't fall asleep. About one out of every eight or nine times, we don't even get six people with the 24 that are here. All right.

Is there anyone here that speaks another language besides English? Carbajal?

*VENIREPERSON:* Yes, sir.

*THE COURT:* What do you speak?

*VENIREPERSON:* Spanish.

*THE COURT:* Thank you. Did I butcher your name? Did I say your name wrong?

*VENIREPERSON:* No, it's right.

*THE COURT:* It's correct. Okay. Thank you.

Anyone else? Mr -- is it Noi-Mingle?

*VENIREPERSON:* Yes.

*THE COURT:* Mr. Noi-Mingle, what languages do you speak?

*VENIREPERSON:* It's a local dialect. Gan.

THE COURT: I can't hear you.

VENIREPERSON: It's a local dialect. Gan.

THE COURT: Okay. And the reason I ask that is because, before I became a lawyer, I was in the military for 22 years. And one of the first things they do is they want to find out if you're someone that can learn a second language quickly. I took the test. I was anxious to get the results. I came back and said, How did I do? And they said, We're shocked you can even speak English. You're terrible. You don't have the gift of hearing those subtle, you know, words. And so for those of you who speak more than one language, I really, really wish I had that ability. But I don't know how long you've been speaking English.

When we get through with the process today, if you -- if you have had trouble understanding what was said, let me know. Okay? We don't want to put you on a jury if you're having trouble understanding what's taking place. But if you are able to understand, we would love to have you. Does that sound fair?

VENIREPERSON: Yes. Because I feel like I not understanding a lot of English. You know, I feel like I understand sometimes a few but it's not 100 percent. My English is --

THE COURT: Well, your English is better

than my Spanish, I'm sure.

VENIREPERSON: I'm going to try. If I feel like I'm going to --

THE COURT: You're the best person to know. So when we're done, before -- before we pick the jury, I'll ask you, Ms. Carbajal, were you able to keep up and understand everything? And you'll let me know. And if you are, great; and if you're not, then we'll excuse you.

VENIREPERSON: Sure.

THE COURT: Okay? All right. Thank you both very much.

Okay. We're going to go over some things that also causes sometimes people to have some reservations. I want to explain this to you. What our goal is is not to exclude you from jury service. That's not our purpose. Our purpose is to keep from putting you in a position where we feel like you're going to have to violate your conscious. Okay?

And by that, I mean, I went to law school with someone who thinks -- and still this day, I run into him and he still feels this way. He thinks that this country has spent entirely too much money criminalizing the use of marijuana. And he thinks the marijuana laws are just dumb. That it causes young people to have a criminal record. That this smoking marijuana is no different than

alcohol. And so if he were called to be on a jury and then the jury will take a second oath and that oath will be that you will follow the laws that I give you. Okay? He would have a very difficult time being on a marijuana trial because he believes that law is just retarded. Okay?

So if he really believed the state proved their case and the person was in possession of marijuana, he would be in a conflict between what he thinks he should do and what he's taken an oath to do. He would want to find the person not guilty because he thinks the law is unethical and unfair but he took an oath to follow that law.

If you have any conflicts like that, that's what we're just trying to find out from you. People ask me all the time in social gatherings -- it happened over Thanksgiving -- Hey, you're a judge, how do I get out of jury duty? I don't know how to tell you to get out of jury duty but I can tell you how to get on the jury. All right?

Both sides are going to be listening for things that cause them concerns. If you sit there and you're quiet, welcome to the luxury seats because no one is going to strike you. Okay? So this is your time to be honest about how you feel, express yourself, there are no right or wrong answers whatsoever.

Now, this is a criminal case so that means

the State of Texas -- and I'll introduce the parties to you in just a moment -- has the 100 percent burden in this case. That means that they are going to have to prove certain things to you. Those things are like a checklist of elements that constitute the offense of driving while intoxicated. And if they do not convince you beyond all reasonable doubt of all of those elements, then you are required to vote not guilty.

Does everyone understand that?

Okay. Now, here are the parties. First of all, to the right is my bailiff, Danny Jones. I've already introduced myself. I'm Barnett Walker. The woman to my left is my court reporter, Marigay Black.

Representing the State of Texas today is assistant district attorney, Justin Wilson.

MR. WILSON: Morning, everybody.

VENIREPERSONS: Morning.

THE COURT: Assisting Mr. Wilson is assistant district attorney, Ms. Geeta Singletary.

MS. SINGLETARY: Good morning.

THE COURT: The defense attorney in this case is Mr. Kevin Brooks.

MR. BROOKS: Good morning.

VENIREPERSONS: Morning.

THE COURT: Mr. Brooks' client and the

defendant in this case is Ms. Mellannise Henderson-Love.

THE DEFENDANT: Good morning.

VENIREPERSONS: Good morning.

THE COURT: Does anyone recognize or know any of the parties that I've just mentioned?

Yes, sir. Is it Mr. Kendall? Or, no. Mr. Brown?

VENIREPERSON: I recognize the bailiff, Your Honor.

THE COURT: You recognize the bailiff?

VENIREPERSON: Yeah.

THE COURT: How do you know him?

VENIREPERSON: I'm a deputy sheriff in Collin County.

THE COURT: What do you think about him?

VENIREPERSON: He's a pretty good egg.

THE COURT: Is he all right? Okay. Good. Anything about the relationship between you and my bailiff that would be unfair to the other side, that cause you to lean one way or the other?

VENIREPERSON: No, Your Honor.

THE COURT: Okay. Thank you.

Anyone else?

Is there any -- now, look to your right and left. I know it feels kind of funny to stare at someone

right next to you.  Look behind you.  Do you recognize anyone else on the panel?

It's not that unusual.  About one out of every six or eight times, we'll have either co-workers, husband and wife, boyfriend/girlfriend, that kind of thing.  And that's perfectly fine for those to serve on the same jury provided that you're comfortable arguing with that person.  Okay?  If you're not, then that would be unfair.  So I'm glad no one knows anyone.

Now, one of the things that kind of comes up is, you know, it's almost unavoidable, that one of the attorneys, or both, are going to ask you questions that may seem like it's prying into your private life.  They're not trying to embarrass you.  They just want to know a little bit more about you.  If you're asked a question and the answer does apply to you, for instance, Have you or someone in your family ever been, you know, arrested for D W I, if that applies to you, you're required to raise your hand.  However, if they say, Well, do you want to talk about the particulars, you are not required to do that in front of 23 of your newest friends.  Okay?  You can just say, I don't want to discuss the details of it in public, and we'll bring you back in when it's just the attorneys and myself.  Is that fair?  All right.

Who here knows what the Fifth Amendment is,

just a basic -- well, that went quick.  Ms. White.  What is it?

*VENIREPERSON:*  It's the right to due process.

*THE COURT:*  Close.  That's the Sixth Amendment.

*VENIREPERSON:*  Fifth.  Yeah.  The due process.  You have your rights and your --

*THE COURT:*  It falls under the umbrella but what specifically is the Fifth Amendment?

*VENIREPERSON:*  Well, that's what I thought it was.

*THE COURT:*  You're within what they call the umbrella level.

Yes, sir.

*VENIREPERSON:*  You have the right not to incriminate yourself.

*THE COURT:*  Correct.  Okay.  We have three different types of trials in this country.

We have civil cases.  If you sue someone or they sue you, you can absolutely make them go up on the -- up on the witness chair and testify and ask them questions under oath.  If that's the -- that's the civil cases.

Then we have family law cases.  That's generally when there's divorces or C P S is getting

involved about whether they're going to take a child out of a home. Once again, you can put that parent up on the stand, the State of Texas can call that parent, make that parent answer questions under oath.

The only case at trial where you cannot force someone to testify is in a criminal case. Okay. So if you're a defendant and you've been accused of a crime, the State of Texas has absolutely no right whatsoever to call you as a witness at your own trial. That was an amendment to our constitution.

Ms. White, why do you think that our forefathers wanted to give special protection to someone in a criminal case?

VENIREPERSON: Because when the British were in our country, we didn't have the same rights.

THE COURT: That's right. Who knows what the number one fear in America is? Every year they do a poll and it's number one every time.

VENIREPERSON: Being accused of something you didn't do.

THE COURT: Close. Yes, sir?

VENIREPERSON: Mr. Jones, the bailiff, earlier stated that he thought it was public speaking.

THE COURT: Mr. Jones is going to get a beatin' at lunch.

(Laughter)

THE COURT: Yes. Thank you, Mr. Jones. Appreciate you.

It is. It's public speaking. All right.

And here's the problem and here's the reason why our forefathers said, you know what, whenever there is a criminal case, we are going to give special protection to the person accused for this reason.

Everybody on the front row, get ready with your answer, here's your question: Suppose that you are sitting in the audience and the person who gets up to speak is extremely nervous. What would you see or hear that would tell you that that person is nervous?

Ms. Radice?

VENIREPERSON: Stuttering.

THE COURT: Stuttering. Fantastic.

Is it Sbaiti?

VENIREPERSON: Sbaiti.

THE COURT: Sbaiti. Mr. Sbaiti?

VENIREPERSON: I think they would probably fidget a lot.

THE COURT: Perfect.

Ms. Simonson.

VENIREPERSON: Same thing. They would be shaking a little.

THE COURT: Tremoring, uh-hum.

What do you think, Mr. Campbell?

VENIREPERSON: Shaky voice, shaky hands.

THE COURT: Thank you.

Ms. Walker?

VENIREPERSON: They're fidgeting, the stuttering, the vibes --

THE COURT: And what?

VENIREPERSON: They're pausing in their speech.

THE COURT: Kind of trying to grasp their next thought?

VENIREPERSON: Correct.

THE COURT: What do you think, Ms. Sterling-Parker?

VENIREPERSON: It's Stelling. There's no R in it.

THE COURT: Oh, I'm sorry.

VENIREPERSON: That's okay. Normally, I would -- my first thought would be sweaty.

THE COURT: Sweating.

VENIREPERSON: Yeah.

THE COURT: Okay. Mr. Mercer?

VENIREPERSON: I would say fidgeting, maybe avoiding eye contact.

THE COURT: Looking down. All right.

Is it Byther?

VENIREPERSON: Byther.

THE COURT: Mr. Byther?

VENIREPERSON: Just kind of loss of coherency, just be distracted and nervous obviously.

THE COURT: In law school, I saw someone get called on, one of the first days of criminal law class, and there's 450 people, and we had a reading assignment and the professor was just drilling this young lady. She got so nervous, she just threw up. It was pretty clear that she was nervous.

What do you think, Ms. Carbajal?

VENIREPERSON: Like I am now?

THE COURT: Like you are now?

(Laughter.)

THE COURT: I can't tell if you are. You're smiling. Is that a nervous smile?

VENIREPERSON: Yes.

THE COURT: Okay. Ms. White?

VENIREPERSON: The fidgeting, sweating, avoiding eye contact, everything they were saying.

THE COURT: And here's the problem. Mr. Cassedy, what are all of those also a sign of?

VENIREPERSON: Guilt.

THE COURT: Lying. Right?

VENIREPERSON: I didn't do it.

THE COURT: Yeah. People start to sweat, they're stuttering, they're fidgeting, they won't look you in the eye, they, you know, start to seem really nervous. Could someone mistake that, Mr. Cassedy, as lying?

VENIREPERSON: Certainly.

THE COURT: Okay. And our forefathers understood that. They're, like, you know what, we don't want to put someone in a position where their freedom is at stake and they're put on the stand and the jury might see these type of outward signs, and hear the stuttering and the shaking and the loss of concentration and refusal to look them in the eye and think that, oh, that's a sign the person is lying. So under the rules of our state and under the rules of our constitution, a defendant is never required to testify.

Now, that brings up a problem because my mother is a trial court T V show junkie. And she loves to watch, and then she'll call and ask me all of these questions. And she doesn't understand the whole Fifth Amendment, in my opinion. So I explained it to her just like I explained it to you. And then she says, I don't think you understand, I understand what you're saying, you're not understanding what I'm saying.

Who here has small children at least two, under the age of 15?  Mr. Sbaiti.  How old are your children?

VENIREPERSON:  Seven months and two and-a-half years.

THE COURT:  I need somebody a little bit older.  Mr. -- is it Kieffer?

VENIREPERSON:  Yes, sir.  My kids are nine and 11.

THE COURT:  Perfect.  The nine-year-old comes in to you and says, Daddy, daddy -- is the 11 boy or girl?

VENIREPERSON:  11 is a girl.

THE COURT:  Daddy, daddy, she hit me.  You bring your 11-year-old daughter in and you say, What did you do, tell me your side of the story.  She says, Father, I do not wish to discuss it.  What do you infer from that?

VENIREPERSON:  I would infer that my nine-year-old is lying because he's the one that would hit her.  I wouldn't think she had done it.

THE COURT:  She denied it; right?

VENIREPERSON:  Yeah.

THE COURT:  That's my mom, like, that's how I raised you three boys and your sister.  I bring you all in, I ask questions, and then I get to the truth.  And what

my mom is trying to say is, Look, I get what you're saying, but just because I walk through a door and somebody puts a sign outside that says Collin County Court at Law Number Two, I can't stop being Jan Walker. I'm 60 some odd years old. This is how I feel. If you don't -- you're not guilty, you should be willing to stand up and answer questions. Okay? I can't stop the fact that that's how I feel. Okay. Just because -- and turn that off just because I walk into a courtroom.

And then I understood. Okay, for her, she's the type that would say, you know what, I'll get to a mountaintop, rooftop, and shout my innocence. But she doesn't have a fear of public speaking. Okay? What that comes down to is, my mom would be a fantastic juror because she's very fair, she's very thorough, she has great instincts, but she can't sit on a criminal case because she has, honestly -- and we're all required to be honest about it -- said, Listen, if the defendant doesn't get up and testify, it might affect how I decide the case because I feel like innocent people would be willing to testify.

So with that in mind, who's kind of -- on the first row. We'll go row by row. Who's kind of like my mother? If the defendant does not testify, it might -- I'm not saying it would -- but it might affect how you decide a case? Would you raise your hand. We'll go one at a time.

Ms. Stelling-Parker.

VENIREPERSON: Very good.

THE COURT: Tell me your feelings.

VENIREPERSON: I understand the not wanting to get up and talk because I'm the same way. I'll have the nervous hands and all. But I'm kind of like your mom. If I haven't done something, I'm going to make sure that everybody around knows it.

THE COURT: Okay. Perfect. Let me come back to you.

Who else? Mr. -- is it Byther?

VENIREPERSON: Byther.

THE COURT: Mr. Byther, tell me your feelings.

VENIREPERSON: I would be anxious to tell my story, my side of the story.

THE COURT: Mr. Byther, where were you on August 26th about 4:00 o'clock this year?

VENIREPERSON: August 26. I don't remember.

THE COURT: You don't have any information you can give me?

VENIREPERSON: No.

THE COURT: Okay. I'll come back to you too then.

Who else? Ms. White, did you have your hand

up?

VENIREPERSON: Yes, I did.

THE COURT: Okay. Tell me --

VENIREPERSON: Well, it's just being a teacher and it's been my experience because kids won't speak because --

THE COURT: Okay.

VENIREPERSON: Feel like people don't want to stand up and speak up for themselves, they're hiding something.

THE COURT: I'm going to give everyone a chance because we're going to go through a couple of scenarios. If your answers change, now I want to raise my hand, or, hey, I raised my hand before but I want to change my answer, just let me know.

On the second row, if the defendant doesn't testify, could it possibly affect how you decide this case? Raise your hand. No? All right.

On the third row, if the defendant doesn't testify, it might cause you to rule one way or the other. Raise your hand. All right.

Now, I've been both a prosecutor in this county and I've been a defense attorney in this county. I will tell you that as a defense attorney, I had lots of clients who wanted to testify that I didn't want to

testify. Okay? Because they don't come across very good. I've also had people that I said, You can't go testify because I can't support perjury and you're guilty so you have to sit here and just be quiet. Okay? But here's the problem.

On the second row, how do you respond to this? How does a person who's innocent, how would they act, what would they feel like if they got up here to testify because they've been falsely accused of a crime? How do you think that person with would act, Mr. Cassedy?

VENIREPERSON: Might be angry.

THE COURT: Angry.

What do you think, Mr. Lewis?

VENIREPERSON: I would think they would be nervous that if -- that they might say something that could be misconstrued.

THE COURT: Okay. What about Ms. Parker? How would an innocent person who's testifying, how do you think they would act?

VENIREPERSON: I think they would be angry.

THE COURT: You think they would be angry. Would you be angry?

VENIREPERSON: I would be very angry.

THE COURT: Okay. Is it Sennett?

VENIREPERSON: Sennett.

THE COURT: Mr. Sennett, what would you expect them to act like?

VENIREPERSON: You know, if I was in that situation, I would try to be more composed. I would think you would want to be composed to kind of show the truth.

THE COURT: Okay. So you're kind of confident that in the end, the system is going to work everything out?

VENIREPERSON: Yeah.

THE COURT: Perfect. Mr. Kieffer?

VENIREPERSON: I would think you would try to act composed but I would think that you would be nervous, I think you would act nervous.

THE COURT: Okay. Nervous.

Mr. Christopher.

VENIREPERSON: I might put myself in that situation. Underneath certainly would be perturbed, angry, distraught but I agree, I would act as composed as possible and concise and hope that the facts would reveal themselves and the jury sees them.

THE COURT: Thank you.

Mr. Kendall.

VENIREPERSON: Well, I think that they would be almost too reserved, afraid to speak if they were falsely -- if they were falsely accused and they're already

in that predicament, then I would -- I myself probably would be -- would hold back, afraid that something else was going to go wrong that I didn't expect.

THE COURT: Okay. So you're going to -- you would expect to kind of proceed cautiously.

VENIREPERSON: Right. Tread lightly.

THE COURT: All right. Mr. Brown.

VENIREPERSON: Your Honor, it could be various, you know, from anger to reservation to being scared. Could be all the emotions.

THE COURT: Could run the whole gamut.

Mr. Pate.

VENIREPERSON: I think someone would be maybe angry, maybe a little bit nervous, maybe passionate about their innocence which may come across as anger.

THE COURT: Sure.

Is it Burdick?

VENIREPERSON: Yeah.

THE COURT: What do you think, Mr. Burdick?

VENIREPERSON: If it was me, I would be angry that I was up there.

THE COURT: Why would you be angry?

VENIREPERSON: Because I knew I was innocent if I knew and I would be argumentative --

THE COURT: Okay.

VENIREPERSON: -- to the person asking certain questions.

THE COURT: I think I'm kind of like you, I get argumentative if I feel strongly about something sometimes.

Mr. Noi-Mingle, how do you think a person would act?

VENIREPERSON: Mixed emotions.

THE COURT: Mixed emotions?

VENIREPERSON: Yes.

THE COURT: Mr. Moore?

VENIREPERSON: I think it would be pretty hard for most people not to be nervous.

THE COURT: Is it Spruiell?

VENIREPERSON: Spruiell.

THE COURT: Spruiell.

VENIREPERSON: Uh-huh.

THE COURT: Ms. Spruiell, how do you think an innocent person would react up there?

VENIREPERSON: Depending on the male or female. I think a female that was innocent, I mean, I would, I would boo hoo.

THE COURT: You would cry?

VENIREPERSON: Oh, yeah.

THE COURT: I want to come back to that.

About 12 times I've asked this question and that's the first time someone has said that.

Mr. Fried?

VENIREPERSON: Freed (phonetic).

THE COURT: Freed.

VENIREPERSON: I guess a combination of being angry and being frightened that it might go wrong even though I'm innocent.

THE COURT: Now, raise your hand if you -- if you saw Ms. Fried -- I'm sorry -- Ms. Spruiell on the stand and she was crying, who thinks that that might be because she's guilty? Yeah.

VENIREPERSON: That's iffy. I would probably cry along with her.

THE COURT: See, therein lies the problem and why I would tell my clients a lot of times, Look, I'm not sure I want you to testify, because people have all types of different images in their mind of what an innocent person would act like. They want to see you composed because this is going to work itself out. They want to see you angry because you've been falsely accused. They're crying.

You know, I don't know how you're going to meet all of these expectations, you know. And I would tell them, you know, it's just like a doctor/patient

relationship.  When you're the patient, you're in charge, not the doctor.  But if you go to see a surgeon -- Mr. Pate, let's say you go see a surgeon, he tells you you need surgery.  You might go to get two or three other opinions, but if they all said you needed surgery, you think you might tend to listen to them?

*VENIREPERSON:*  I think so.

*THE COURT:*  Same thing with the lawyers.  Sometimes the lawyers might say, You know what, I don't want you to testify, you don't come off right, you're too angry, you're too hostile, you're too this, too that, whatever, you're too talkative, that kind of thing.  So sometimes the attorney says, you know, there's just no need.

The State of Texas has the complete burden to prove the case.  By our law, Mr. Brooks and his client can sit here and play Angry Birds, Words With Friends, take a nap, they can do anything they want.  She's done everything she's required to do under the law just by being here.  But for a lot of people like my mom, that's not enough.  You ought to be willing to stand up and defend yourself.  Okay.  The law doesn't require it.  My mom requires it.  That make sense?

We're also going to want to talk to you about your prejudices and biases.  And when I say

prejudices and biases, I'm not talking about racial prejudice or racial bias. We're talking about things that you really, really like or really dislike.

For instance, I am very biased towards my father. I love my dad. We've got a fantastic relationship. If my dad tells me he caught a bass and it was this big and it was in the river behind the house, then that's it. I don't need to see the bass, I don't need a witness, I don't need a photograph. My dad caught a bass, it was that big and it was in the river behind my house.

The State of Texas could come in here, nine of the world's leading oceanographers and say, Bass don't even swim in that river. That just means dad caught the last one. Okay? It doesn't change the fact that I'm going to believe what my father says.

Some people have, not to that degree but to a large degree, they have those kind of feelings about law enforcement because they have people in their families that are law enforcement maybe. Someone who's in law enforcement has saved their lives or saved someone who's close to their lives. So we want to talk about that kind of thing.

I'm going to let the attorneys talk to you now. They're going to take about 30, 45 minutes. Share your feelings with them. In between, we're going to take a

break.  I'll give you a 15-minute break.  Now here's the rules for the break.

You need to call someone, tell them that you're serving on a jury, or that you're doing jury service, that's fine.  Do not tell them what kind of case this is.

Why do you think I don't want them to know what kind of case this is, Mr. Pate?

VENIREPERSON:  They could possibly tell you something that --

THE COURT:  Let me tell you what I know about D W I.

VENIREPERSON:  Yeah.

THE COURT:  Let me tell you how many drinks you can have before you're drunk.  That kind of thing.  Both sides in a case have had -- have equal access to the evidence in the case.  They have witnesses, they've picked the case, they designed their case, can't combat what somebody is telling Mr. Pate over the telephone.  Okay?  So don't tell anybody what kind of case it is.  They're going to want to talk to you and share their wealth of knowledge.

Secondly, do not become a detective on your own.  We had a case where someone used their smartphone to go and check some information out.  The witness said that the road was one way going east and one lane going west,

and the person on the jury thought that wasn't correct. So they used Google maps on their phone. And sure enough, it was two lanes going east, two lanes going west, that person was a liar.

Mr. Christopher, have you seen any construction going on in Collin County?

*VENIREPERSON:* Quite a bit.

*THE COURT:* At the time of the offense, it was one lane going each way, not any more. Okay? So do not go and get your own information. We'll bring the evidence to you. That is unacceptable and causes a mistrial.

Also, when you're outside, don't come back in, wait until the bailiff brings you in. The reason for that is we don't want someone to see us talking to you and wonder what's going on. We want to keep everything on the up and up.

Please take a good look at where you're seated because you have to sit in those exact same chairs. The reason is both sides are going to take a copious amount of notes. And it is important that they make sure that they assign those notes to you.

Lastly, we do not have a definition in the State of Texas for what beyond all reasonable doubt means. The attorneys are not going to be able to give you a

definition. They're going to give you what it doesn't mean, that kind of thing.

I can tell you, Ms. Radice, if you're on this jury, it means whatever you say it means. When there's been enough evidence that you don't have any reasonable doubt left in your mind, then they reached that burden.

Mr. Sbaiti, you may require more evidence than she does. Ms. Simonson, she may require more evidence than both of you. It's an individual standard. But when you don't have any reasonable doubt left, the state has met their burden. If you do have a reasonable doubt left, they state has not met their burden. All right? Any questions before we begin?

All right. You have to speak -- you're going to be doing voir dire with the state first. They get to go first. Please do not talk to -- Mr. Wilson, are you going to do voir dire?

*MR. WILSON:* Yes, sir, I am.

*THE COURT:* Please don't talk to where just Mr. Wilson can hear. Okay? Because I have to hear everything that's said. Because one side may object and I have to make a ruling.

That brings me to my last point. For the six of you that are chosen for this jury, we have -- you

and I have very different jobs. You will be listening to the witnesses, you will be examining the evidence, you will be talking and discussing the case with one another when the case is over and trying to decide what evidence is believable, what testimony is believable, that kind of thing. I will not be up here doing that. I will not be judging the credibility of the witnesses or examining the evidence. I will handle all of the legal issues. When one side objects, I'll decide whether or not that objection should be overruled or sustained. Okay? So I'll handle all the legal issues. That may require that I have you leave the room so that the attorneys can talk freely. It doesn't make any sense for one side to object to certain evidence and I agree that that evidence should not be admitted and you're sitting in here listening to it. Does that make sense?

All right. Thank you.

Mr. Wilson, you have the panel.

**JURY VOIR DIRE**

*MR. WILSON:* Thank you judge. May I use the projector, please.

*THE COURT:* Yes, sir.

*MR. WILSON:* Good morning, everybody.

*VENIREPERSONS:* Morning.

*MR. WILSON:* As the judge introduced me

earlier, my name is Justin Wilson. And I have the pleasure of representing the State of Texas today. And before we -- as we're kind of waiting for the projector to come on here, I'm going to start talking to you a little bit about the phases of a trial.

And the first phase that we're in right now is called voir dire. Voir dire is where I get the opportunity to explain a little bit of the law to you, ask you some questions that hopefully Bailiff Jones has not already given you the answers to. And then we'll -- then we also get a chance to, I guess, determine who's going to be the best fit for the six people who wind up on our jury.

In addition to that, since I'm going to be asking you some questions that will be somewhat personal later on, I figure it's only fair if I tell you a little bit about myself.

Before going to law school, I was a film professor at Baylor University and taught cinematography, editing classes; moved out to Los Angeles and worked in the film industry out there as an editor and cinematographer for music and music videos and things you've probably never seen or heard of. And then came back to Texas. Went to law school. And here I am today.

So the second phase that we have going on in this process is the trial phase. And I want to make it

clear to you that during the trial phase, you are going to be looking at a snapshot in time. Basically the facts and events that are surrounding the particular event that the defendant has been charged with. You will not be allowed to consider what happened before that snapshot, or after that snapshot in time.

So, for instance, the defendant could be the nicest person in the world, she could be the meanest person in the world. Those sort of things don't matter. What matters is what happened during that particular slice in time.

Punishment. During the punishment phase, which is the final phase of our process today, if things get to that point, and if the defendant has -- if she winds up electing for the jury to assess punishment, if it gets to that point, then that is a time where sympathy can be considered. But only during that punishment phase.

So next. Who here has ever seen somebody drunk before? Is it Ms. Radice?

VENIREPERSON: Yes.

MR. WILSON: Am I saying your name right?

VENIREPERSON: Yes.

MR. WILSON: Ms. Radice, have you ever seen somebody drunk before?

VENIREPERSON: Yes.

MR. WILSON: What did they look like?

VENIREPERSON: Falling down, sometimes belligerent, red eyes, acting like a fool.

MR. WILSON: Great answers.

Mr. Sbaiti, you see anything different?

VENIREPERSON: Yeah. People can be sort of functionally drunk or they can be dysfunctionally drunk. There's sort of a range.

MR. WILSON: What do you mean by that, functional versus dysfunctional?

VENIREPERSON: They may not be falling down but their cognitive decision-making capacities are impaired. You have to maybe talk to them to realize, okay, this person actually is drunk. There wouldn't necessarily be -- wouldn't be falling over, incapable of general motor skills.

MR. WILSON: So you talking about, you would be talking to the person, are you referring to, like, asking them questions, things like that?

VENIREPERSON: Sure. Asking them questions or trying to have a conversation.

MR. WILSON: What would that conversation be like?

VENIREPERSON: You could pick up that they weren't necessarily all there.

MR. WILSON:  Answers to questions might not be quite what you expect?

VENIREPERSON:  Right.

MR. WILSON:  Okay.  And let's see, Ms. Simonson, any other things that you've noticed?

VENIREPERSON:  They could be loud.  Somebody that even from the other side of the room, people would notice or could tell, you know, that they've been drinking a lot.

MR. WILSON:  Otherwise, other than being loud, might you see anything different with their speech?

VENIREPERSON:  Not that I personally have noticed.

MR. WILSON:  Okay.

Well, Mr. Campbell, have you ever noticed anything about a drunk person's speech?

VENIREPERSON:  I haven't personally been involved with someone who's drunk.  But symptoms could be misleading.  Sometimes their mental status because of some accident could make them appear they are intoxicated.  So it's very difficult on outward signs to determine whether someone is drunk or not.

MR. WILSON:  Okay, so an accident.  You mentioned an accident.  What type of -- Are you talking about somebody who sustained a head injury or something

like that?

VENIREPERSON: Yeah. In fact, in the case of doing triage on someone, you're looking for airway, looking for excessive bleeding, you're looking for their mental status. Their mental status may look like they are intoxicated when it could be because of the accident.

MR. WILSON: Ms. Stelling-Parker, have you ever noticed anything about a drunk person's speech before?

VENIREPERSON: Sometimes they're more in control than they look like they really are. They are making an effort to sound calm and control what they're saying.

MR. WILSON: Okay. Well, now, Mr. Sbaiti, going back to what you were saying, we got functional drunks and dysfunctional drunks. You talked about a dysfunctional drunk being somebody who might not necessarily be falling over, passing out, as Ms. Radice suggested, but someone whose cognitive functions are not normal.

Do we want to wait until that point to make it illegal for somebody to drive?

VENIREPERSON: Wait until they're falling over?

MR. WILSON: Well, either falling over -- yeah, wait until they're falling over before we say it's

illegal to drive?

VENIREPERSON: My understanding of when it's illegal to drive is when there's a certain amount of alcohol in the blood level, not a qualitative analysis of the person's behavior.

MR. WILSON: Okay. Well, we're going to come back to that here in a little bit, in a minute.

Mr. Lewis, I notice you shaking your head back there. Do you think that we should wait until someone is falling down drunk before we make it illegal for them to drive?

VENIREPERSON: No. The effect of alcohol can be so -- you know, in the earlier stages of the affectation, you know, people can sort of function but, depending on the amount of alcohol that they've taken in, it's going to start hitting heavier and heavier and heavier and, if they're really beyond legally drunk, you know, it's going to -- it's going to take an effect but it may take a little bit more time.

MR. WILSON: Exactly. Exactly. The main thing is that a person can be -- even when they're that dysfunctional drunk that Mr. Sbaiti is talking about, they can still be dangerous up to that point in time.

So, judge mentioned to you earlier that we as the state have a certain checklist of elements that we

have to prove to you beyond a reasonable doubt.  Those elements are that this defendant, on or about a certain date, in Collin County, Texas, did operate a motor vehicle, in a public place, while intoxicated.

Now, Mr. Mercer, can you tell from that list we have up there which element is the one we argue about the most?

*VENIREPERSON:*  I'm going to assume it's the while driving.

*MR. WILSON:*  Exactly.  While intoxicated.  Now, since that is the thing that we argue about the most, the State of Texas has given us not one but three different definitions of what it means to be intoxicated.  This is going to go back to what Mr. Sbaiti was saying.

I'm going to skip ahead here.  Mr. Sbaiti mentioned that the defendant having an alcohol concentration of .08 or greater, that can be read from a person's blood or from their breath.  That's not the only definition that the state is given.  The state has also provided us with definitions that someone does not have the normal use of their mental faculties due to the introduction of alcohol, a drug, a dangerous drug, or some combination thereof into their body.  Or we have another definition:  That the individual does not have the normal use of his or her physical faculties due to the

introduction of alcohol and so on.

Now, Mr. Mercer, you noticed the conjunctions that we have in between those words, the "or." What does that mean to you?

*VENIREPERSON:* That it could be either of the three, either/or of the three.

*MR. WILSON:* Exactly. Exactly. And that's the great thing about our system, is that you don't have to believe beyond a reasonable doubt that all three of those definitions were, I guess, active in the defendant at the time of the arrest.

What you need to -- what you have to do is believe beyond a reasonable doubt that one of those definitions, at least one of them, apply. And you don't all have to agree. So, Ms. Radice and Mr. Sbaiti, if you guys were on the jury, then you might think -- you might believe beyond a reasonable doubt that the defendant did not have the normal use of her mental faculties. And Ms. Simonson and Mr. Campbell, the two of you might believe beyond a reasonable doubt the defendant did not have the normal use of her physical faculties. And then Ms. Walker and Ms. Stelling-Parker, the two of you might believe beyond a reasonable doubt that the alcohol concentration was a .08 or higher. As long as whichever six of you wind up in the jury box believe beyond a reasonable doubt that

at least one of those definitions applies, then the state is entitled to a guilty verdict.

So some key things that we've been talking about in these definitions, we want to go over a little bit. So you heard mental and physical faculties. Let's see here.

Mr. Byther, what would you say would be an example of a mental faculty?

VENIREPERSON: Judgment. Speed that somebody is driving, the way they're driving, watching for the other people, things like that. Normal activities that you engage in in the process of driving a motor vehicle.

MR. WILSON: Okay. So if you're talking about the way somebody is driving in relation to other people, you're talking about how their cognitive skills are working. Maybe how they are processing the speed of other cars around them. Their reaction time. Would that be fair to say? That reaction time would be a big mental faculty?

VENIREPERSON: I would say yes.

MR. WILSON: Let's see. Ms. Carbajal, how about someone's ability to follow instructions, would that be a mental faculty?

VENIREPERSON: If they are driving with alcohol, I don't think they will be able to respond because they are slow, they move slow, they are not -- I don't know

how to explain.

MR. WILSON:  Well, it kind of all ties into that slowed reaction time --

VENIREPERSON:  Yes.

MR. WILSON:  -- that we were talking about?  Right.

VENIREPERSON:  Yes.  And from my opinion, I have a son and I have a husband and always telling them, don't drive, I'm always thinking about them, they haven't done but at the same time they -- you know, they -- by themselves, they are not safe and there are others going on.

MR. WILSON:  And then they might have to come see me and nobody wants to do that.

Well, now, Ms. White, what do you think about someone about following directions and how that would play into mental faculties?

VENIREPERSON:  Under the influence of alcohol?

MR. WILSON:  Yes.

VENIREPERSON:  Usually they can't follow the directions as well and the responses might be slower.

MR. WILSON:  Right.  Communication difficulties, that kind of thing?

VENIREPERSON:  Right.

MR. WILSON: Okay. Now let's talk about some examples of some physical faculties.

Mr. Cassedy, anything you have in mind about physical faculties? What would be an example?

VENIREPERSON: We talked about extreme, you know, maybe stumbling, falling down.

MR. WILSON: Right. How about something that's not so extreme?

VENIREPERSON: I think your reaction time example is probably another physical symptom.

MR. WILSON: So like fine motor skills, for instance? How about being able to manipulate your fingers with control, whether you're trying to reach for things or going -- trying to handle small objects? Would that be one?

VENIREPERSON: It's possible.

MR. WILSON: How about placing your foot, moving your foot from the accelerator to the brake pedal, would that be a physical coordinated movement?

VENIREPERSON: Entirely possible.

MR. WILSON: All right. Another term that came up in our discussion of these definitions is the idea of normal use.

One thing that you all need to understand very clearly is that when we talk about normal use, we are

not talking about what is normal for this individual defendant. It would be impractical for every police officer out on the streets to know exactly what is normal for each individual based on, you know, our athletic ability or overall sense of balance or ability to communicate. What we do is instead we apply a standard of the average non-intoxicated person.

So seeing how it's probably around 10:00 in the morning, something like that, I'm assuming that none of you guys are intoxicated right now. So all of you would collectively be the average non-intoxicated person. So what is normal for you in regard to your mental faculties and your physical faculties is the standard that you will apply to the defendant.

Another thing to talk about is what is drunk versus intoxicated. We've been kind of putting out those two terms a little bit this morning. And as you know, the State of Texas has given us the three different definitions of intoxication. But we don't exactly have a definition of drunk. So one thing you can think about is, let's say right here where I'm standing, if this beam right here represents a spectrum, from me being completely sober, not having had a drop of alcohol, to here, if I walk down to the other end, this is going to be the, I'm stumbling down, you know, on the verge of passing out drunk like Ms. Radice

suggested.  Now, if I come to around, say, right here, I place my pen right here.  This is the demarcation saying that this is the last sip of alcoholic I can have and still maintain the normal use of my mental and physical faculties.

Now, Mr. Mercer, how many steps can I go beyond this point before I'm legally intoxicated?

VENIREPERSON:  Well, as you pointed out, it depends on the person.

MR. WILSON:  Well, let's just say that we're talking about the average non-intoxicated person.  And this is -- as the average non-intoxicated person, this is the point where, you know, he or she can, last sip of alcohol, still maintain those normal mental and physical faculties.  So what would happen if I take that one more sip?  And I no longer have the normal use of my mental and physical faculties?  I would be intoxicated, right, by the definition --

VENIREPERSON:  I suppose so-- by the definition.

MR. WILSON:  Yes.

VENIREPERSON:  You would be intoxicated, yes.

MR. WILSON:  So in the State of Texas, as long as I take -- if I take one step past this point of

having the normal use of my mental and physical faculties, then I'm intoxicated. It may not be how you define drunk, you know, drunk can be anything, however you choose to define it, but at this point, I am now legally intoxicated.

Here's an example for you. Think about it. Let's say that after jury selection is done, let's say that Ms. White, Ms. Carbajal and Mr. Byther, the three of you don't make it on the jury. And you are so excited about not having to spend the day on jury duty, that you go out to happy hour, let's say you go to Gloria's down the road, and you stop off at Gloria's, and you have some food, you have some drinks.

And maybe, Ms. White, when the bill comes out and it's time for you to calculate up the tip, it's taking you a little bit longer to do those calculations than you normally might. And you are looking all over the place for your keys, you can't find them anywhere. And they've been in your pocket the whole time. The whole time you've been in there, they are in your pocket.

Ms. Carbajal, let's say when you stand up from the table, you know, you're a little bit -- a little bit tipsy on your feet, balance isn't quite so good.

And, Mr. Byther, let's say you are so excited about not having to spend your day on this jury that you just go crazy and you become the one who is

stumbling, about to be passed out on the floor.

Now, Mr. Mercer, you have a couple of young children; correct?

VENIREPERSON:  Yes.

MR. WILSON:  Which, if any, of your three fellow perspective jurors do you want driving your young children back home or to wherever they might be?

VENIREPERSON:  None of them.

MR. WILSON:  None of them.  Because they are all intoxicated in one shape or form.

So let's talk about driving.

Ms. Parker, what are some of the things that you're thinking about when you're driving?

VENIREPERSON:  Usually just watching the signs and thinking where I need to go and watching the street signs.

MR. WILSON:  Okay.  So watching signs and thinking where you need to go.  Are you looking at the cars around you at all?

VENIREPERSON:  Yeah.

MR. WILSON:  Are there -- you know, sometimes if you're on the freeway and traffic is moving real fast, you have to watch out for that time would come where you come up and everybody is now dead stopped on the freeway and you have to hit your brakes fast.

Did you see any construction on your way to the courthouse this morning?

VENIREPERSON: Yes.

MR. WILSON: So you have to watch out for construction workers, for --

VENIREPERSON: Construction, people to the left, people to the right, to have to just stay off the zones and just concentrate.

MR. WILSON: Right. So there's a lot of things going on. It's a divided attention task.

Now, has anyone ever here -- let's see, Mr. Kieffer, have you ever barely avoided a car accident before?

VENIREPERSON: Yes.

MR. WILSON: And tell us about that, one of those times.

VENIREPERSON: Just driving and not paying attention and, you know, somebody stops or there's a car and you're on a two-lane road, somebody is turning left and there's a car in front of you, that person passes on the median and that guy stops right in front of you.

MR. WILSON: Right.

VENIREPERSON: You're going the speed limit but you have a little bit of time to react, just enough to swerve around.

MR. WILSON: So you mentioned a little bit of time to react. Like you had to make a split second decision. Well, what if that split second decision turns into something more like (Snaps fingers twice), you think you would have avoided that accident?

VENIREPERSON: No. I wouldn't have been able to put the brakes on fast enough nor swerve fast enough.

MR. WILSON: Exactly. And that's the whole purpose of D W I laws. In the State of Texas, we want people -- when people are using our roads, we want them to be bringing their A game because we want to make sure that reaction time, things like that, are safe for everybody else that's on the road.

So now we've kind of been talking about the law. Getting you guys up to speed on that. But now it's the time for the personal questions.

So, first off, I got this scale up on the board right now. And we would like to know about your drinking habits. You can think of, you know, zero for not at all. One, I know it says, one, a couple of times a month, but maybe you think about yourself like one meaning that you -- maybe you go out on a weekend or something, you just have some drinks every now and again.

Two, for people who have, maybe, you know,

it could be anywhere from glass of wine with dinner on a consistent basis to, you know, you're going out pretty regularly during the week, having some drinks.

So, Ms. Radice, how would you rate yourself?

VENIREPERSON:  A one.

MR. WILSON:  All right.  Mr. Sbaiti?

VENIREPERSON:  One.

MR. WILSON:  Ms. Simonson?

VENIREPERSON:  One.

MR. WILSON:  Mr. Campbell?

VENIREPERSON:  .5.

MR. WILSON:  .5.  Fractions are acceptable.

Ms. Walker.

VENIREPERSON:  Two.

MR. WILSON:  Ms. Stelling-Parker?

VENIREPERSON:  I'm a .5.

MR. WILSON:  .5, all right.

Mr. Mercer.

VENIREPERSON:  One.

MR. WILSON:  One.  Anybody here for .75?  Mr. Byther?

VENIREPERSON:  I would be a three.

MR. WILSON:  Three.  All right.  You can exceed the scale too if you would like.

Let's see.  Ms. Carbajal?

VENIREPERSON: Very little.

MR. WILSON: We'll call you a .25. How about that?

Ms. White?

VENIREPERSON: .25.

MR. WILSON: All right. Mr. Burdick?

VENIREPERSON: Two.

MR. WILSON: Two.

Mr. Pate?

VENIREPERSON: Two.

MR. WILSON: Mr. Brown?

VENIREPERSON: Two.

MR. WILSON: Let's see. Mr. Kendall.

VENIREPERSON: A zero.

MR. WILSON: Mr. Christopher?

VENIREPERSON: Zero these days.

MR. WILSON: Mr. Kieffer.

VENIREPERSON: One.

MR. WILSON: A one?

VENIREPERSON: Uh-hum.

MR. WILSON: Okay. Mr. Sennett?

VENIREPERSON: One.

MR. WILSON: Ms. Parker?

VENIREPERSON: Zero.

MR. WILSON: Zero.

Mr. Lewis?

*VENIREPERSON:* .5.

*MR. WILSON:* And Mr. Cassedy?

*VENIREPERSON:* Two.

*MR. WILSON:* Mr. Noi-Mingle?

*VENIREPERSON:* .5.

*MR. WILSON:* Mr. Moore?

*VENIREPERSON:* Zero.

*MR. WILSON:* Ms. Spruiell?

*VENIREPERSON:* .5.

*MR. WILSON:* And Mr. Fried?

*VENIREPERSON:* One with an asterisk by definition, no more than twice a month.

*MR. WILSON:* Okay. Now, for my next question here. Do you think that D W I is a problem in our society?

Zero, not at all. One, that it's a moderate problem. And two, that you think it's -- that D W I is a serious problem in our society.

Ms. Radice?

*VENIREPERSON:* One.

*MR. WILSON:* One.

Mr. Sbaiti?

*VENIREPERSON:* I didn't understand the question. It's asking whether it's a problem when it

happens or is it happening too often?

MR. WILSON: Well, the thing about it, just in general, do you think that -- you can think of it that way or people -- do we have too many people driving while intoxicated? Is it -- is our -- do our laws keep D W I under control adequately, or is this something that we need to address more seriously?

VENIREPERSON: I would say I'm a .5 then.

MR. WILSON: Okay. Ms. Simonson.

VENIREPERSON: One.

MR. WILSON: One.

Mr. Campbell?

VENIREPERSON: Two.

MR. WILSON: Ms. Walker?

VENIREPERSON: One.

MR. WILSON: Ms. Stelling-Parker?

VENIREPERSON: Two.

MR. WILSON: Mr. Mercer?

VENIREPERSON: One.

MR. WILSON: Mr. Byther?

VENIREPERSON: Two.

MR. WILSON: Ms. Carbajal?

VENIREPERSON: Two.

MR. WILSON: Ms. White?

VENIREPERSON: Two.

*MR. WILSON:* Mr. Burdick?

*VENIREPERSON:* One.

*MR. WILSON:* Mr. Pate?

*VENIREPERSON:* Two.

*MR. WILSON:* Mr. Brown?

*VENIREPERSON:* One.

*MR. WILSON:* Mr. Kendall?

*VENIREPERSON:* One.

*MR. WILSON:* Mr. Christopher?

*VENIREPERSON:* One.

*MR. WILSON:* Mr. Kieffer?

*VENIREPERSON:* Two.

*MR. WILSON:* Mr. Sennett?

*VENIREPERSON:* One.

*MR. WILSON:* Ms. Parker?

*VENIREPERSON:* Two.

*MR. WILSON:* Mr. Lewis?

*VENIREPERSON:* Two.

*MR. WILSON:* Mr. Cassedy?

*VENIREPERSON:* One.

*MR. WILSON:* Mr. Noi-Mingle?

*VENIREPERSON:* One.

*MR. WILSON:* Mr. Moore?

*VENIREPERSON:* Three.

*MR. WILSON:* Ms. Spruiell?

*VENIREPERSON:* Two.

*MR. WILSON:* And Mr. Fried?

*VENIREPERSON:* Two.

*MR. WILSON:* Okay. So here's one that's probably one of the more personal questions we'll ask.

Has anyone here -- I'm just going to start on the first row. Anyone here have your life impacted somehow by a drunk driver?

Ms. White.

*VENIREPERSON:* Yes.

*MR. WILSON:* What happened with you?

*VENIREPERSON:* It was a friend of mine from high school was driving drunk and was killed in the accident.

*THE COURT:* I'm sorry, ma'am. I can't hear you.

*VENIREPERSON:* I'm sorry. A friend of mine was driving drunk and he died -- he wrecked his car and died.

*MR. WILSON:* I'm sorry to hear that. But thank you -- thank you for sharing and being honest with us.

Mr. Sbaiti, were you going to raise your hand?

*VENIREPERSON:* I did raise my hand. High

school class mate of mine killed in a drunk driving accident. She was not the drunk or the driver. But I've also defended a couple of dozen D U I cases in Dallas courts so I've been on the other side of that.

THE COURT: I'm sorry. You did what, sir?

VENIREPERSON: Defended a couple of dozen D U I cases in trial.

THE COURT: Are you an attorney?

VENIREPERSON: Yes, sir.

THE COURT: Thank you.

MR. WILSON: All right. Thank you for sharing that with us.

Ms. Simonson.

VENIREPERSON: I had a cousin and also a niece that died because of a D W I.

MR. WILSON: Well, again, I'm sorry, very sorry, to hear that. I feel bad, I know when I say I'm sorry to hear it, I know that it's kind of hard to really adequately express and address how serious these incidents impact your life. I just want you to know I'm not trying to come off as insincere or flippant or anything like that but I do really appreciate the gravity of what happened and also am very sorry for the things that happened in your lives. Thank you for sharing.

Anybody else on the front row?

Second row? Mr. Kieffer?

VENIREPERSON: One of my friends at college and I were going back from a bar in Fort Worth and he got pulled over for D U I. Totaled the car.

MR. WILSON: Any other, I guess, result other than getting pulled over?

VENIREPERSON: He went to trial and did all of his stuff, you know, cost him a lot of money, and I got an M I P.

MR. WILSON: Okay. And then, let's say, anybody else on the second row here?

Anybody on the back row? Okay.

Well, thank you all for sharing your stories with me.

Next question I've got is kind of on our same scale pattern here. How do you feel about the D W I laws?

Do you think they are either zero, that the laws are too strict; two, that they're not strict enough; or, one, that they're just right?

Ms. Radice.

VENIREPERSON: One.

MR. WILSON: Mr. Sbaiti?

VENIREPERSON: One.

MR. WILSON: Ms. Simonson?

VENIREPERSON: One.

MR. WILSON: Mr. Campbell?

VENIREPERSON: Two.

MR. WILSON: Ms. Walker?

VENIREPERSON: One.

MR. WILSON: Ms. Stelling-Parker.

VENIREPERSON: Two.

MR. WILSON: Mr. Mercer?

VENIREPERSON: One.

MR. WILSON: Mr. Byther?

VENIREPERSON: It's really two questions there. I think that the net to me, it seems like it's a little bit excessive. The severity, though, when people are repeat offenders and all of that stuff, I think it's a terrible problem. And I don't think that those instances are strict enough.

MR. WILSON: All right. Thank you.

Ms. Carbajal.

VENIREPERSON: One.

MR. WILSON: All right. Ms. White.

VENIREPERSON: I'm a one.

MR. WILSON: And Mr. Burdick?

VENIREPERSON: A one.

MR. BROOKS: Counsel. I didn't hear Ms. White.

VENIREPERSON: I'm sorry. I need to speak up. One.

MR. WILSON: And, Mr. Burdick, you said one?

VENIREPERSON: Yeah.

MR. WILSON: Mr. Pate?

VENIREPERSON: One.

MR. WILSON: Mr. Brown?

VENIREPERSON: One.

MR. WILSON: Mr. Kendall?

VENIREPERSON: One.

MR. WILSON: Mr. Christopher?

VENIREPERSON: One.

MR. WILSON: Mr. Kieffer?

VENIREPERSON: One.

MR. WILSON: Mr. Sennett?

VENIREPERSON: One.

MR. WILSON: Ms. Parker?

VENIREPERSON: One.

MR. WILSON: Ms. Lewis?

VENIREPERSON: Two, especially for repeat offenders.

MR. WILSON: Okay. Mr. Cassedy?

VENIREPERSON: One.

MR. WILSON: Mr. Noi-Mingle?

VENIREPERSON: One.

MR. WILSON: Mr. Moore?

VENIREPERSON: Two.

MR. WILSON: Ms. Spruiell?

VENIREPERSON: Two.

MR. WILSON: And Mr. Fried?

VENIREPERSON: One.

MR. WILSON: Okay. All right. And this is probably the most invasive of our questions.

Has anyone here -- I'll go row by row again. Anyone on the first row ever been arrested, charged or convicted of a D W I?

Ms. Walker.

VENIREPERSON: (Indicating.)

MR. WILSON: And so was yours in Collin County?

VENIREPERSON: No. It happened in California.

MR. WILSON: Okay. And when was that?

VENIREPERSON: It's been about 15 years ago.

MR. WILSON: Do you remember if that case went to a jury for punishment at all?

VENIREPERSON: No. No.

MR. WILSON: No?

VENIREPERSON: I did my -- the things you're supposed to do and paid my fine and that was that.

MR. WILSON: Okay.

VENIREPERSON: But it was horrible.

MR. WILSON: Well, now, so based on that --

VENIREPERSON: You have to go to those classes and, you know, it's -- it just -- it's so demeaning. I was so ashamed.

MR. WILSON: So based on how you've described that experience, then, is it fair to say that you would be a little biased towards the state and the police officers in that whole process there?

VENIREPERSON: No. Not towards them. More towards myself --

MR. WILSON: Okay.

VENIREPERSON: -- putting myself in that predicament.

MR. WILSON: Okay. So then you're saying that based on, even though that you've gone through that experience, that if you were to be on the jury today, you would be able to set that experience aside and just evaluate the information, the facts that are presented here?

VENIREPERSON: I just know that what I went through, I would have to see the similarities.

THE COURT: You would have to see what?

VENIREPERSON: The similarities of possibly

what she was -- where she was at or what she was doing or what amount she had to drink probably in comparison to my own because, you know, it happened to me.

MR. WILSON: Okay.

VENIREPERSON: I mean, it's kind of hard to separate, for me to separate the two.

MR. WILSON: Okay. And that's very understandable. So it's fair to say, then, that you would have a hard time separating what happened to you --

VENIREPERSON: Uh-hum.

MR. WILSON: -- from what happened to this defendant --

VENIREPERSON: Yes.

MR. WILSON: -- and that the two experiences would come together then?

VENIREPERSON: Yes.

MR. WILSON: Okay. Well, thank you, Ms. Walker. I appreciate you sharing that.

Anybody else here on the front row? Okay.

How about on the middle row?

Mr. Burdick.

VENIREPERSON: Yes.

MR. WILSON: I guess did this happen in Collin County?

VENIREPERSON: No.

MR. WILSON: Which -- was it in Texas at all?

VENIREPERSON: No. North Carolina.

MR. WILSON: All right. And about when did yours happen?

VENIREPERSON: Almost 30 years ago.

MR. WILSON: 30 years ago. Okay. And do you remember if it went to a jury at all?

VENIREPERSON: I went through a first offenders program.

MR. WILSON: Okay.

VENIREPERSON: Found not guilty, went to class.

MR. WILSON: Okay. So do you feel like you were -- Based on that experience, do you feel like you have any sort of bias against the state or the police officers?

VENIREPERSON: Not from my particular case, no. I was under age for drinking. I was 16 years old at the time. And, yeah, I was underaged, I was arrested for underage drinking and D W I, even though I didn't feel like at the time that I was drunk.

MR. WILSON: Okay.

VENIREPERSON: But they didn't -- basically -- basically when I went to court, that option came to me without even going through anything: Would you like to go

through the first offenders program?

MR. WILSON:  Okay.  Do you feel like you were treated fairly in the process?

VENIREPERSON:  Yes.

MR. WILSON:  And would you be able to leave that experience behind you and just consider the facts and evidence presented to you today?

VENIREPERSON:  Yes.

MR. WILSON:  Okay.  Anybody else on the second row?  Okay.

Anybody on the third row?

All right.  And I'm going to ask the same question -- and I know a moment ago, Mr. Kieffer told us about a college friend.  When I ask this question, I'm not talking about somebody like a college friend.  I'm talking about somebody -- let's say, you know, a family member, spouse, somebody that you are very close with that you would have kept under -- I guess kept track of the intimate details of what went on in the case and the proceedings and everything.  Do you know anybody like that who has ever been arrested, charged or convicted of a D W I?  And I'll start with the first row.

VENIREPERSON:  You're talking about D W I.  Not drunk in public; right?

MR. WILSON:  Correct.

VENIREPERSON: Then no.

MR. WILSON: Okay. And Mr. Byther?

VENIREPERSON: Yes. Both my sons and friends. It was while they were in college down in Austin.

MR. WILSON: Okay.

VENIREPERSON: Just past all of that now.

MR. WILSON: Well, would you say that based on those experiences, things that you observed, that is it fair to say you would be biased, though, against the police and against the prosecution today?

VENIREPERSON: I think -- this is what -- I think the net is too wide. I think there's a lot of people that are functional who may be technically inebriated who get caught. By the same token, I think it is a problem and I understand why it's done, I understand that.

MR. WILSON: Okay. So I guess -- Is it fair for me to say from what you're telling me that you feel like the -- in terms of a first arrest, not for repeat offenders, but for first arrest, that you feel like the law as it stands has cast a net that's a little bit too big and it might be difficult for you to follow all of the different definitions of intoxication that our law provides?

VENIREPERSON: Yeah, I think it's a nebulous thing. It was -- metabolism affects us. I just think that

everybody is not the same. Everybody doesn't react the same. I was in the Navy so I know what drunk is. And there's all kinds of -- you know, there's a whole array of things like we were talking about before. You know, you can drink and you can drink and you can be functional. And a lot of people deal with that quite effectively. You know, I drink frequently, glass of wine every night. It's not a big deal. And I never get drunk. I don't want to get drunk. And -- but I don't know about blood alcohol concentrations, I have no idea.

But having said that, the problem of drunk driving is serious. I think it is very serious problem. I understand that we're just trying to deal with that.

MR. WILSON: Right. But even though it's -- even though you do think that drunk driving is a bit of a -- is a serious problem--

VENIREPERSON: Yeah.

MR. WILSON: -- that it's fair to say, though, that you have a hard time following the letter of the law as the state provides it currently, given the specific definitions and about not only the alcohol concentration but the normal use of mental faculties and the physical faculties?

VENIREPERSON: I mean, I just have to hear the evidence and just make a judgment on that. I can't

really say --

THE COURT: Mr. Byther, here's the problem. Remember when we talked before about the court doesn't want to put you in a position where you later feel like you have to violate your conscious? We need to know if you can guarantee both sides that you could follow the law as the law currently exists because we don't want you to have to, at the end of this trial, say, You know what, I thought I could but this is one of those situations where I'm not comfortable following the law. So we kind of have to nail you down right now.

You may disagree. If you were on the legislature, you might write the law differently, but what it really boils down to is, you have the definitions, the loss of mental faculties due to the introduction of alcohol, or the loss of normal physical faculties due to the introduction of alcohol, or blood alcohol concentration of 0.08.

If the state proves any one of those three definitions to you beyond all reasonable doubt, can you return a guilty verdict?

VENIREPERSON: I think I can.

THE COURT: All right. Will you return a guilty verdict if that's proven to you beyond all reasonable doubt?

*VENIREPERSON:* I believe I can, yes.

*THE COURT:* Okay. Now I'm not trying to pick on you. This is like that whole thing, let's say you and I are going to fly to Vegas. We're getting to take our seats. The pilot is there. And we go, you know, You can fly us there safe, right? I think I can.

I'm getting off.

*(Laughter.)*

*THE COURT:* We need 100 percent guarantee. If you can't give a guarantee, that's okay. If you're, like, I don't know, but I really -- the best answer I can do is, I think I can, then that's not going to -- it's not going to be fair.

Because, imagine yourself sitting here and you're on the jury -- you know, you're the defendant. Someone says, I think I could be fair but I'm not sure, you really wouldn't want that person on your jury. So the law requires that anyone who's going to be on the jury be able to follow the law.

Can you, can you with 100 percent certainty, say that if you're convinced beyond all reasonable doubt that the state's proved their case, that you'll find the person guilty?

*VENIREPERSON:* I think I can. I --

*THE COURT:* No --

VENIREPERSON:  Yes, I can.

THE COURT:  You can do it?

VENIREPERSON:  I can.

THE COURT:  All right.

MR. WILSON:  All right.  Was there anybody else on the front row that I didn't get to?

Okay.  Ms. Simonson.

VENIREPERSON:  My daughter had a D W I.

MR. WILSON:  Okay.  And when was that?

VENIREPERSON:  20 years ago.

MR. WILSON:  Okay.

VENIREPERSON:  She was 21.

MR. WILSON:  And do you feel like, based on that experience, that you have any bias against the state or the police?

VENIREPERSON:  No.  They probably caught her right when she was pulling out of a place and if she had gotten past them, maybe she would have had a wreck.  There was no wreck.  But she did get pulled over.

MR. WILSON:  So do you feel like she was treated fairly in the process?

VENIREPERSON:  Yes.

MR. WILSON:  Did that experience, even though it might have been bad at the time, did it have a positive effect on your daughter at all?

VENIREPERSON:  On her, yes, it did.

MR. WILSON:  Okay.  Thank you.

Anybody else that I didn't get to?  Yes, sir.

VENIREPERSON:  Stepson before he was my stepson.

MR. WILSON:  Okay.  And do you feel like he was treated fairly in the process?

VENIREPERSON:  Yeah.  I think the financial penalty as well as the breathalyzer in the vehicle were the appropriate measures to take.

MR. WILSON:  Okay.  Thank you, sir.

Anybody else on the second row?

VENIREPERSON:  What was the question again?

MR. WILSON:  The question is, do you have anybody that you are -- like a family member, a spouse or a child, something like that, who -- that you've been -- you would have followed the case extremely closely who had been arrested, charged or convicted of D W I?

VENIREPERSON:  Yes.

MR. WILSON:  And who was that?

VENIREPERSON:  Family members.

MR. WILSON:  Okay.  And based on those experiences and what you know, is it fair to say that you have some bias or some mistrust of the police or the

prosecution?

VENIREPERSON: No.

MR. WILSON: No? You feel like they were treated fairly in the process, then?

VENIREPERSON: Yes. I feel like they were.

MR. WILSON: Okay. Thank you, Mr. Burdick.

Anybody else on the second row?

And the third row? Yes, Ms. Spruiell.

VENIREPERSON: My daughter.

MR. WILSON: And I guess how long ago was that?

VENIREPERSON: She's had two. Her first one she was 16, and that was nine years ago.

MR. WILSON: Okay.

VENIREPERSON: And when she turned 18.

MR. WILSON: And how is that -- how is that -- Was she treated fairly in the process, do you think?

VENIREPERSON: Yes.

MR. WILSON: And what kind of -- did it have a positive effect on her at all?

VENIREPERSON: It did.

MR. WILSON: It did? And so would you feel that given those experiences that you have been associated with, would you have any difficulty leaving those behind or treating both the state and the defense fairly today?

VENIREPERSON:  I wouldn't have any difficulty.  I would like to say that I am the law's biggest cheerleader.

THE COURT:  Ma'am, can't hear you.

VENIREPERSON:  I am the law's biggest cheerleader.

THE COURT:  Biggest -- okay.  Thank you.

MR. WILSON:  Thank you, Ms. Spruiell, appreciate that.

Okay.  Well, thank you all for sharing all of this information.  I know it's kind of tough.  Here's a question that's not so personal.

Just what kind of evidence would you -- what kind of evidence would you like to see brought forth in a D W I trial?

Mr. Campbell, what kind of evidence would you be looking to see?

VENIREPERSON:  I would say from the officer that arrested the individual, stopping the individual, also breathalyzer testing information, probably blood alcohol test, either through blood test or breathalyzer.

MR. WILSON:  Okay.  So would you say you'd have to have the breath test or blood tests results?

VENIREPERSON:  Not always.

MR. WILSON:  Okay.

VENIREPERSON: I think some of the mental and the physical faculties and seeing -- hearing the information on that from the officer could be enough.

MR. WILSON: Now, if somebody were to have the opportunity to take one of these tests, I mean, you know that we're not required to -- let me state the law this way.

In the State of Texas, we have something called the implied consent law. And what that means is that by signing your name on a driver's license, you've given implied consent to offer a specimen of your breath or your blood if a police officer requests it.

MR. BROOKS: Your Honor, may we approach?

THE COURT: Yes, sir.

(Sidebar conversation between the Court, Mr. Brooks, Mr. Wilson and Ms. Singletary.)

MR. WILSON: So as I was explaining, we have this implied consent law in the State of Texas. Say you are required to give a specimen of your breath or blood, but there's still a kind of a caveat to that law which states that if you -- you have the option to refuse and as a result of the refusal, the police can -- the state can basically suspend your driver's license for up to 180 days.

So given the different definitions of intoxication that we have and the type of evidence that you

might receive, I guess I'm looking to know, would any of you here be able to -- would you require that the state present to you either evidence of a blood test or a breath test?

Ms. Radice?

*VENIREPERSON:* Yes.

*MR. WILSON:* Yes, you would require a blood or breath test?

*VENIREPERSON:* Yes.

*THE COURT:* Counsel, state your question again so they understand.

*MR. WILSON:* Okay. Thank you, judge.

Just to make sure, you know, there's -- so that it's clear. You have -- you have -- of all the different evidence that you are presented with and how that evidence applies to the three different definitions of intoxication that we have, you'll be presented with evidence of regarding mental faculties, physical faculties, and alcohol concentration.

The question that I'm asking you is, in order to convict someone, do you feel like you need evidence of a blood test or a breath test before you could go ahead and convict somebody?

Ms. Radice, your answer was yes.

*VENIREPERSON:* Yes.

*MR. WILSON:* Is that still a yes?

*VENIREPERSON:* Yes.

*THE COURT:* Ms. Radice.

*VENIREPERSON:* Yes.

*THE COURT:* If you were convinced beyond all reasonable doubt that someone lost the normal use of their mental faculties or the normal use of their physical faculties because they ingested alcohol, but there was no breath or blood test but you were convinced they were intoxicated because you thought that they had lost their mental and physical faculties, you would still vote not guilty? Is that what you're trying to say? That's what the question is asking.

You know, sometimes we don't have a breath or a blood test. Some people require that in order to be comfortable enough to find someone guilty. So the question really comes down, if the state proves to you, whatever your level of proof is, beyond -- and you were convinced beyond all reasonable doubt, that the defendant was intoxicated due to the introduction of alcohol and that she had lost either her normal physical faculties or she had lost her normal mental faculties but, for whatever reason, there was no breath or blood test, would you find the person guilty or not?

*VENIREPERSON:* No.

THE COURT: You would not find them guilty?

VENIREPERSON: No.

THE COURT: So even if you thought she was intoxicated beyond all reasonable doubt, you would still require a blood test before you could find someone guilty?

VENIREPERSON: Or a breathalyzer.

THE COURT: One of the two?

VENIREPERSON: Yes.

THE COURT: And you understand in the State of Texas, when -- if someone is asked to provide one, they don't have to provide one.

VENIREPERSON: No, I did not know that.

THE COURT: Does that change your answer at all?

VENIREPERSON: Yes.

THE COURT: Okay. Would you require one?

VENIREPERSON: No.

THE COURT: Okay.

MR. WILSON: Okay. So all of that being said, let's see, Mr. Sbaiti, would you require a blood or a breath test?

VENIREPERSON: Now, the given -- no as a bright line -- my answer is no as a bright line. I think what a lot of people are struggling with, I can hear them sort of talking around, I think a lot of people are having

a difficult time, I was having a difficult time the way it was originally posed with how would I find someone had lost their faculties beyond a reasonable doubt without the test, so assuming there's other evidence that establishes that, no, I don't require that as a baseline.

MR. WILSON: Okay. That's correct. That's a good way of putting it, is you have other evidence, just not the breath or blood evidence but you've got other evidence to be able to believe beyond a reasonable doubt.

And the question is, do you still need that blood or breath test. Ms. Simonson?

VENIREPERSON: No.

MR. WILSON: No? Okay.

Mr. Campbell?

VENIREPERSON: No.

MR. WILSON: No?

Ms. Walker?

VENIREPERSON: No.

MR. WILSON: Ms. Stelling-Parker?

VENIREPERSON: Actually I have a question.

MR. WILSON: Okay.

VENIREPERSON: May not be able to give me an answer. But I know that some people have medication they take all the time; alcohol reacts differently with them than it would somebody who doesn't take medication. How is

that considered or you don't care?

MR. WILSON: Well, I can't really get into--

VENIREPERSON: Yeah, general is fine.

MR. WILSON: Well, as far as our -- well, what I can just tell you basically, for this general question right now, just assume that there's no other medications or other --

VENIREPERSON: Factors.

MR. WILSON: Head injuries. Other factors going on.

VENIREPERSON: Okay.

MR. WILSON: We're just dealing with alcohol.

VENIREPERSON: Then no.

MR. WILSON: Okay. Mr. Mercer?

VENIREPERSON: No.

MR. WILSON: Mr. Byther?

VENIREPERSON: No.

MR. WILSON: Ms. Carbajal?

VENIREPERSON: No.

MR. WILSON: And Ms. White?

VENIREPERSON: No.

MR. WILSON: Mr. Burdick?

VENIREPERSON: No.

MR. WILSON: Mr. Pate?

VENIREPERSON:  No.

MR. WILSON:  Mr. Brown?

VENIREPERSON:  No.

MR. WILSON:  Mr. Kendall?

VENIREPERSON:  No.

MR. WILSON:  Mr. Christopher?

VENIREPERSON:  No.

MR. WILSON:  Mr. Kieffer?

VENIREPERSON:  No.

MR. WILSON:  Mr. Sennett?

VENIREPERSON:  No.

MR. WILSON:  Ms. Parker?

VENIREPERSON:  Yes.

MR. WILSON:  Yes, okay.

THE COURT:  Ms. Parker, you would require a breath or blood test even if you were convinced that they've lost the normal use of their mental or physical faculties due to introduction of alcohol?

VENIREPERSON:  Yes.

THE COURT:  Thank you.

MR. WILSON:  Mr. Lewis?

VENIREPERSON:  No.

MR. WILSON:  Mr. Cassedy?

VENIREPERSON:  No.

MR. WILSON:  Mr. Noi-Mingle?

VENIREPERSON:  No.

MR. WILSON:  Mr. Moore?

VENIREPERSON:  No.

MR. WILSON:  Ms. Spruiell?

VENIREPERSON:  No.

MR. WILSON:  And Mr. Fried?

VENIREPERSON:  No.

MR. WILSON:  Okay.  So last kind of long, convoluted question for you guys, and then we'll be done with the inquisition here.  So this is another kind of long question, sort of similar to what we were talking about, but what I want you guys to -- I'll pose it to you this way.

Let's say that the state brings you evidence and you believe beyond a reasonable doubt that the defendant does not have the normal use of her mental faculties due exclusively to the introduction of alcohol. Whatever evidence you need to believe that, you've got it. But the state produces -- the state brings you no evidence regarding physical faculties, no evidence regarding alcohol concentration, but again, you have all the evidence you need to believe beyond a reasonable doubt that the defendant does not have normal use of her mental faculties. I want to know what would your verdict be?

Ms. Radice?

If it's not clear, I'll add this to you. You have the definitions on the board right there.

If the state proves to you -- the scenario as I'm putting it is that the state has given you evidence and proved to you beyond a reasonable doubt that definition number one applies. The defendant does not have the normal use of her mental faculties due to the introduction of alcohol into her body. And we're only dealing with alcohol right now.

What we're saying is that the state has not offered any evidence regarding definition number two, for physical faculties, or definition number three, for alcohol concentration. But you have all the evidence that you need to believe beyond a reasonable doubt that definition number one applies. The defendant does not have the normal use of her mental faculties.

So my question to you is, given that information, what would your verdict be?

VENIREPERSON: Guilty.

MR. WILSON: Okay. Mr. Sbaiti?

VENIREPERSON: I'll be honest. I'm having a very hard time separating -- separating out the realities of what it would mean to lose their mental faculties but there's no evidence that they didn't lose their physical faculties?

MR. WILSON: Well, in a reality --

VENIREPERSON: Yes, it's very hypothetical. I get it. I'm not trying to problematize [sic] it. I mean, obviously, if you could prove the first one, legally, it should be a guilty verdict. And I'm trying to be loyal to that. I'm having a hard time imagining what this would actually look like.

MR. WILSON: Well, you know, just the scope of this hypothetical is really just breaking down those definitions. I know that in reality, it is -- you know, mental faculties and physical faculties seem to work together typically, but assuming that somehow in this -- in this hypothetical universe we're speaking about right now, let's just assume that somebody could not have the normal use of her mental faculties, but still have -- and you know what, the thing is, maybe they have normal physical faculties, maybe not. We've just not offered any evidence about it in our hypothetical case.

VENIREPERSON: You're asking whether I have a touchstone of the other two definitions of intoxication before I convict. The answer is no. So I would convict if only one of them was there. If that satisfies you.

MR. WILSON: It does.

Ms. Simonson.

VENIREPERSON: Just based on not having any

mental because of intoxication, I would say guilty.

MR. WILSON: Okay. Mr. Campbell?

VENIREPERSON: Guilty.

MR. WILSON: Ms. Walker?

VENIREPERSON: Guilty.

MR. WILSON: Ms. Stelling-Parker?

VENIREPERSON: Guilty.

MR. WILSON: Mr. Mercer?

VENIREPERSON: Guilty.

MR. WILSON: Mr. Byther?

VENIREPERSON: Guilty.

MR. WILSON: Ms. Carbajal?

VENIREPERSON: I don't understand that.

MR. WILSON: I'll come back to you in a moment then.

Ms. White?

VENIREPERSON: Are you saying you can prove she had alcohol?

MR. WILSON: Yeah, in this hypothetical, we're saying that you got -- you've been presented with evidence --

VENIREPERSON: Uh-hum.

MR. WILSON: -- that shows you beyond a reasonable doubt --

VENIREPERSON: Uh-hum.

MR. WILSON: -- that the defendant did not have the normal use of her mental faculties --

VENIREPERSON: Right.

MR. WILSON: -- due to the introduction of alcohol.

VENIREPERSON: All right. You've proven that she's been drinking --

MR. WILSON: Correct.

VENIREPERSON: -- in this case.

MR. WILSON: Yes. In this hypothetical.

VENIREPERSON: Would be tough but maybe guilty.

MR. WILSON: Maybe guilty?

VENIREPERSON: I don't know. It's hard to--

THE COURT: I can't hear her.

VENIREPERSON: -- without more evidence --

THE COURT: I can't see her either.

VENIREPERSON: -- I need more than just --

THE COURT: The hypo is you've already been convinced. Whatever it took to convince you that she drank alcohol and that she became intoxicated and lost her normal mental faculties. So whatever evidence that is.

VENIREPERSON: About her being drunk or drunk and driving?

THE COURT: I'm sorry?

VENIREPERSON: Am I just convicting her of being -- of drinking?

THE COURT: There's three definitions.

VENIREPERSON: Am I just convicting her saying, yes, she's drunk -- she was drunk?

THE COURT: Not drunk; intoxicated.

MR. WILSON: Right. Remember we're dealing with intoxication because that's what we've got the definitions of.

VENIREPERSON: Intoxication, I'm sorry.

MR. WILSON: So all you're looking at is you've got the evidence that you need to say that the defendant was -- had -- she's -- in this hypothetical, assume that the defendant was driving.

VENIREPERSON: Uh-hum.

MR. WILSON: And that you've got all the evidence you need to believe beyond a reasonable doubt that the defendant was driving, did not have the normal use of her mental faculties --

VENIREPERSON: Uh-hum.

MR. WILSON: -- due to the introduction of alcohol. But you don't have any evidence regarding physical faculties or alcohol concentration. What would your verdict be?

VENIREPERSON: I guess -- I mean, I should

say guilty but I just don't know.  Guilty.

THE COURT:  Why do you say you don't know?

VENIREPERSON:  Because I just need more than that.  Than just the -- What is her normal?

THE COURT:  Okay.  We don't know.

VENIREPERSON:  All of that.

THE COURT:  But you're convinced that she's intoxicated.  That's what the hypo says.

VENIREPERSON:  She's intoxicated and she drove.  That's all -- and I'm convinced of that on this scenario?

THE COURT:  Uh-hum.  And I don't know why you don't have physical.  Maybe the officer didn't give the person physical.  Maybe the person was injured and couldn't do the physical tests.  Maybe they refused them.  There's lots of hypos.  But for whatever the reason, there just is no evidence of physical loss.

VENIREPERSON:  Then I can convict.

MR. WILSON:  All right.  Mr. Burdick?

VENIREPERSON:  Yes.  If you can show me the evidence with either questions, video, yes, I can convict.

MR. WILSON:  Okay.  Mr. Pate.

VENIREPERSON:  Guilty.

MR. WILSON:  Mr. Brown.

VENIREPERSON:  Guilty.

*MR. WILSON:* Mr. Kendall?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Mr. Christopher?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Mr. Kieffer?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Mr. Sennett.

*VENIREPERSON:* Guilty.

*MR. WILSON:* Ms. Parker?

*VENIREPERSON:* Not guilty.

*MR. WILSON:* Okay. Mr. Lewis?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Mr. Cassedy?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Mr. Noi-Mingle?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Mr. Moore?

*VENIREPERSON:* Guilty.

*MR. WILSON:* Ms. Spruiell?

*VENIREPERSON:* Guilty.

*MR. WILSON:* And Mr. Fried?

*VENIREPERSON:* Guilty.

*MR. WILSON:* All right. So that is the end of our questions. I'll quickly kind of go through the rest of our presentation here.

Beyond a reasonable doubt, you've heard us talk about that ad nauseam. And as the judge told you, the State of Texas does not provide you with a definition of what beyond a reasonable doubt actually means, but what we can tell you are some things that it doesn't mean.

For one, it does not mean beyond any doubt. It doesn't mean beyond a shadow of a doubt. It doesn't mean beyond all possible doubt. It's not a 100 percent standard either.

A good example to provide you would be this. Let's see, Mr. Campbell, can you tell me what those puzzle pieces represent right now?

VENIREPERSON: No.

MR. WILSON: No. Can you tell me what they represent now?

VENIREPERSON: Yes, I know.

MR. WILSON: What is it? Shark?

VENIREPERSON: A shark.

MR. WILSON: A shark, yeah. So do you believe beyond a reasonable doubt that that's a picture of a shark up there?

VENIREPERSON: Yes.

MR. WILSON: Do you have 100 percent of the puzzle pieces filled in?

VENIREPERSON: No, I don't.

MR. WILSON: No, but you know beyond a reasonable doubt that that's a shark.

VENIREPERSON: Correct.

MR. WILSON: That's basically a good way to think of when you're talking about what beyond a reasonable doubt is.

A few things that the state does not have to prove: We don't have to prove that the defendant lost all mental or physical faculties. Remember it's just based on that average non-intoxicated person standard. What's normal for the average non-intoxicated person.

We don't have to show that the defendant knew she was intoxicated. Again, it's only those definitions that we've discussed.

The rights that the defendant has: She has a right to a jury trial, has the Fifth Amendment right not to testify today, and also has equal subpoena power as the state. Meaning, you know, they have just the same power to subpoena witnesses, have them testify on her behalf just as we can bring witnesses and have them testify on our behalf.

Any final questions today? All right. Well, thank you all very much. I'll look forward to working with the six of you that we select for the jury later on.

THE COURT: All right. Ladies and

gentlemen, I'm going to give you the break that I promised you.  Remember the instructions I gave you.  Come back in as a group.  Wait until the bailiff brings you in.  Don't discuss with anybody, even amongst yourselves, anything about D W I or anything about this case.  Don't use your phone or anything to look anything up.

Bailiff, take charge of the jury.  We'll be out for 15 minutes.

*THE BAILIFF:*  Yes, Your Honor.  All rise.

*(Recess at 11:50 A M, resuming at 12:13 P M.*

*Defendant present.)*

*THE BAILIFF:*  All rise.

*(The jury panel enters.)*

*THE COURT:*  Thank you.  Everyone may be seated.

Bailiff, report.

*THE BAILIFF:*  Panel is all present and accounted for, Your Honor.

*THE COURT:*  Thank you, ladies and gentlemen.  If you will please now give that same attention to the defense counsel, Mr. Brooks.

**JURY VOIR DIRE**

*MR. BROOKS:*  Thank you, judge.  Morning folks.

*VENIREPERSONS:*  Morning.

*MR. BROOKS:* How is everybody?

*VENIREPERSONS:* Good.

*MR. BROOKS:* Good holiday? Glad to be here?

*VENIREPERSONS:* Yes. Sure.

*MR. BROOKS:* Want some more time off?

*(Laughter.)*

*MR. BROOKS:* My name is Kevin Brooks and I am representing Ms. Henderson-Love in this trial. And like Mr. Wilson, I'll let you know a little bit about myself.

Born and raised in Indianapolis, Indiana; attended law school, undergraduate university at Indiana University. I've been married to the same woman for 27 years so far. Three children. One dog. On very short leash right now based upon some things he chewed up over the holiday. And I'm proud to be here representing Ms. Henderson-Love.

We know what this trial is all about at this point. You understand that this is a D W I trial. What I'm going to ask you to do at the outset is to do a couple of things.

The first thing I'm going to ask you to do is not try and remedy any of society's problems through this case. If you're selected to be on the jury, address this case based upon the facts of this case and based upon the law, not based upon what you perceive to be problems

out in the world outside of this courtroom.

Can y'all agree to do that?

*VENIREPERSONS:* Yes.

*MR. BROOKS:* The other thing I'm going to ask you to do is -- and this is not something you can give me a verbal response to, but I'm going to ask each one of you to look into your hearts and ask yourself this one question: If I was charged with a crime, would I want someone like myself, my viewpoints, my opinions, my biases, sitting on this jury panel? Because all of us have those. And as the judge had pointed out earlier, some cases just may not be appropriate for you.

One of the examples we use all the time down at the courthouse is, you're coming down here for jury duty and as you head to your garage, you see that your car is broken into. You make your way down here. You find yourself in the courtroom. And guess what? You're down here on a burglary of a motor vehicle case.

Now, I think all of you would agree in that scenario that you would probably not be the right juror for that case on that particular day. Anybody disagree with that?

*VENIREPERSON:* Yeah.

*MR. BROOKS:* Mister?

*VENIREPERSON:* Sennett.

MR. BROOKS: Sennett? You disagree with that?

VENIREPERSON: Yes.

MR. BROOKS: Why is that?

VENIREPERSON: Because I feel for myself personally I could be fair in that type of situation you mentioned.

MR. BROOKS: Okay. And that's fair. Anybody else agree with Mr. Sennett? Mister?

VENIREPERSON: Fried.

MR. BROOKS: Fried?

VENIREPERSON: Yeah. I think I could be fair on that case.

MR. BROOKS: So Mr. Sennett, Mr. Fried, agree that even if they had experienced something like that that morning they could still be fair. Anybody else agree -- feel the same way? It's fine if you do, it's fine if you don't.

VENIREPERSON: I think I could.

VENIREPERSON: I think I could.

MR. BROOKS: And that's Mr. Kendall?

VENIREPERSON: Correct.

MR. BROOKS: And Mr. Christopher?

VENIREPERSON: Uh-hum.

MR. BROOKS: Okay. Now, one of the things

that I want to talk to y'all about is, this is a D W I trial, I do not want anyone to think that either I or my client are down here in defiance of D W I laws. We both drive the same streets, the same highways as y'all. I have three kids who are on those same streets. So this is not about we disagree with D W I, we disagree with the law as it's applied. We simply have a difference of opinion with respect to the facts of this case.

Mr. Mercer.

VENIREPERSON: Yes, sir.

MR. BROOKS: I noticed on your questionnaire, or your juror information card, that you are a high school coach?

VENIREPERSON: Yes.

MR. BROOKS: What sport?

VENIREPERSON: Football.

MR. BROOKS: Are you a head coach or position coach?

VENIREPERSON: I'm a position coach, offensive coordinator.

MR. BROOKS: Would you agree with me that there are times in the course of the game that you see calls that you feel are the wrong calls?

VENIREPERSON: Yes.

MR. BROOKS: Would you agree with me that

there are times or have you seen for yourself on occasions where, based upon instant replay, you saw that the ref made the wrong call?

VENIREPERSON: Yes.

MR. BROOKS: How many of us have gotten traffic tickets in here?

(Show of hands.)

MR. BROOKS: How many of us have believed that every traffic ticket we've gotten, we deserved to get that traffic ticket?

(Show of hands.)

MR. BROOKS: How many of us believe we got a traffic ticket we didn't deserve to get?

(Show of hands.)

MR. BROOKS: Now, when you got that traffic ticket, Mr. -- I apologize, folks, I'm not real good with names. Mr. Byther?

VENIREPERSON: Yes.

MR. BROOKS: You got the ticket at a time when you probably deserved the ticket, and you probably got the ticket at a time when you felt you didn't deserve the ticket. Correct?

VENIREPERSON: That's right.

MR. BROOKS: Would you agree with me in terms of the decision to give you that ticket was based

upon the opinion of that officer?

VENIREPERSON:  It was, yes.

MR. BROOKS:  And anybody disagree with that? That the decision whether or not to give you a traffic ticket is based solely on the opinion of that officer? Correct?

VENIREPERSON:  Yes.

MR. BROOKS:  Mr. Brown?

VENIREPERSON:  Sir.

MR. BROOKS:  Mr. Brown, can two people see the same thing and have a different opinion about what they've just witnessed?

VENIREPERSON:  Yes, sir.

MR. BROOKS:  And you've seen that in your course as -- you're currently a law enforcement officer?

VENIREPERSON:  Currently deputy sheriff, Collin County.

MR. BROOKS:  So you would agree with me that two people can see the same thing, have a different opinion about what they've seen?

VENIREPERSON:  Yes, sir.

MR. BROOKS:  Or a different interpretation about what they've seen?

VENIREPERSON:  Yes, sir.

MR. BROOKS:  Now, the judge and the state

have done a real good job in terms of explaining the law so my comments to you won't be hopefully -- will take less time than what the state has taken so far this morning, but we have a standard in this country for -- in terms of how a person can be convicted of an offense. That's already been explained to you as beyond a reasonable doubt. We have several standards in our judiciary system.

The first standard are what we call burdens of proof. The first standard is reasonable suspicion.

Now, because I have a law enforcement officer on the panel, I'm going to ask you, what is your definition of reasonable suspicion, Mr. Brown?

VENIREPERSON: When a normal person believes a crime is -- is or is likely to be committed.

MR. BROOKS: Reasonable suspicion. A reasonable person, under circumstances based upon specific and articulable facts, suspects that a crime has been committed. Sound about right?

VENIREPERSON: Yes, sir.

MR. BROOKS: And that's the standard by which a law enforcement officer has the ability to basically stop you and detain you. And if they have reason to believe a crime has been committed, based upon that reasonable suspicion, they can arrest you.

Is that a fair statement, Mr. Brown?

VENIREPERSON:  Yes, sir.

MR. BROOKS:  Now, the other standard that we have:  Probable cause.  Probable cause is information sufficient to warrant a prudent person's belief that an individual has committed a crime or that evidence of a crime would be found in a search.

That's the standard that's basically used if they want to get a search warrant for your house, your car, things of that nature.  They would have to have probable cause and swear by an affidavit to a judge the facts that outline that probable cause.

Next standard that we have, and this is one that we often see in civil cases:  Preponderance of the evidence.  Usually applied in civil cases.

And Mr. -- Mr. Sbaiti--

VENIREPERSON:  Sbaiti.

MR. BROOKS:  Sbaiti, I'm sorry, sir.

VENIREPERSON:  Sure.

MR. BROOKS:  Typically in a lawsuit, a civil situation, what are they fighting over?

VENIREPERSON:  Money.

MR. BROOKS:  Money.  So in a lawsuit where the only issue at stake is money, the standard of proof, one side has to prove it beyond -- by a preponderance of the evidence, which is basically, if they tip the scale

however slightly in their favor, they win.  A lot of times what we refer to as 51 percent.

Did I describe that correctly, Mr. Sbaiti?

VENIREPERSON:  I would say so.

MR. BROOKS:  Now, the next standard -- or, the burden of proof, I should say:  Clear and convincing evidence.  This is the burden of proof the judge touched upon that you normally will see in child custody cases, that the State of Texas is trying to remove your children from your home.  And the definition for that burden of proof is evidence must be highly and substantially more probable to be true than not.

So I've gone through the standards or burdens of proof from the very lowest up to this point to the second highest.  The third highest burden of proof is beyond a reasonable doubt.

Now, can anyone tell me, based upon what you've heard this morning, after listening to the definitions for the burdens of proof that you've heard, including the definition for the burden of proof that would have to be shown to take your children, what's different about this burden of proof?

Mr. Sennett.

VENIREPERSON:  I mean, to me, beyond a reasonable doubt, I think it's a bit higher.  You know, I'm

familiar with the previous one as my wife worked for Child Protective Services for a number of years, so I understand that and going to the next level on the criminal, I think it's kind of the next step but I couldn't give you a firm definition of what that would be.

MR. BROOKS: Right. And that goes to my point exactly. The highest burden of proof that we have in our judicial system, we don't have a definition for. Anything below that, we have a definition, but for the highest burden of proof, the burden of proof that allows a jury to convict someone of an offense, there is no definition. And as the judge said, beyond a reasonable doubt means what it means to you, and it's going to mean something different to each and every one of you. But I just wanted, in terms of education, let you see that every other burden of proof has a definition with the exception of the highest burden of proof.

We talked a little bit -- or, y'all talked a little bit earlier about presumption of innocence.

Ms. White, why do you think we have a presumption of innocence?

VENIREPERSON: Why do we presume someone innocent? I don't understand. Why do we presume someone is innocent?

MR. BROOKS: Why do you think the law

provides for that, as she sits here right now, she is presumed innocent?

VENIREPERSON:  Because you're presumed innocent until proven guilty.

MR. BROOKS:  And so if everything stopped right here --

VENIREPERSON:  Uh-hum.

MR. BROOKS:  -- right now --

VENIREPERSON:  Uh-hum.

MR. BROOKS:  -- and all you heard is what you've heard up to this point --

VENIREPERSON:  Uh-hum.

MR. BROOKS:  -- six of you go back and vote, what would your verdict have to be?

VENIREPERSON:  Not guilty.

MR. BROOKS:  Because?

VENIREPERSON:  I haven't heard any evidence.

MR. BROOKS:  Let's talk about the purpose of a jury in a criminal trial.

Ms. Stelling-Parker.

VENIREPERSON:  Yes, sir.

MR. BROOKS:  What do you think the purpose of a jury is in a criminal trial?

VENIREPERSON:  To come to a consensus on what the verdict as far as not one person's opinion.  It's

a group of people coming up with a joint opinion.

MR. BROOKS: Mr. Lewis, what do you think is the purpose of a jury in a criminal trial?

VENIREPERSON: Well, I think it's -- in many cases, it gives the -- it gives the defendant a more fair opportunity that six people, not just one person or not just the judge, have to be convinced and proved that whatever verdict is fair.

MR. BROOKS: That's a good answer.

How many people think the purpose of a jury in a criminal trial is to determine if the defendant is guilty or not guilty? Anybody think that's the purpose of a jury in a criminal trial? That's fine if you do. There's no right or wrong answer.

Mr. Fried.

VENIREPERSON: Legally defined purpose that they are supposed to make a determination.

MR. BROOKS: If you recall at the start of the case, I think the court let you know that the State of Texas has the burden to prove the charges beyond a reasonable doubt. Six of you will be called upon not to determine the defendant's guilt or innocence, but to determine, is the evidence presented at trial proof beyond a reasonable doubt that the accused committed a crime with which she is charged?

Can y'all see the difference between proving whether she's guilty or not or proving whether the evidence got -- proves beyond a reasonable doubt that the accused committed the crime as charged?

*VENIREPERSON:* Well, what I meant, it would be by that standard.

*MR. BROOKS:* Yes, sir. And again, there's no right or wrong answer here.

Ms. Radice? Radice?

*VENIREPERSON:* Radice.

*MR. BROOKS:* Do you understand the distinction between those two statements?

*VENIREPERSON:* I think the evidence has to be there --

*MR. BROOKS:* Yes, ma'am.

*VENIREPERSON:* -- to either show that the person is innocent or guilty.

*MR. BROOKS:* Okay. And whose burden is that?

*VENIREPERSON:* The jury.

*MR. BROOKS:* No. Whose burden is it to prove that the person --

*VENIREPERSON:* Oh, I'm sorry. The state.

*MR. BROOKS:* Right.

*VENIREPERSON:* The State of Texas.

MR. BROOKS: So the question not for you if you're a juror is -- the question is not, is she guilty or not guilty. The question is: Has the state proven this case by the evidence presented beyond a reasonable doubt? If you believe that they have proven it, obviously, your answer is guilty. If you believe they haven't proved it, your verdict is not guilty.

What's more important, y'all? Should we enforce laws and support law enforcement or protect innocent people from being wrongly convicted?

Mr. Burdick?

VENIREPERSON: I think they're both equal.

MR. BROOKS: Have you ever heard a phrase: Better a thousand men go free than one innocent person go guilty, something to that effect?

VENIREPERSON: Heard it somewhere.

MR. BROOKS: So if we look at the question: What's more important, enforcing the law and supporting law enforcement or using our system to protect innocent people from being wrongly convicted, which one would you think is more important?

VENIREPERSON: Protect the innocent people from being wrongly convicted.

MR. BROOKS: Does anybody disagree with that? Mr. Campbell?

VENIREPERSON: Well, with your second statement, you put a quantity on there.

MR. BROOKS: Okay.

VENIREPERSON: And that's kind of weighted to one side more than the other. I would tend to agree with his first answer, that they're equally important.

MR. BROOKS: Okay. Anybody else agree with Mr. Campbell?

VENIREPERSON: I do.

MR. BROOKS: Ms. White. And that would be Ms. --

VENIREPERSON: Stelling-Parker.

MR. BROOKS: Stelling-Parker. Thank you, ma'am.

How could a person be wrongfully convicted or confused -- accused. I'm sorry. How could a wrong -- how could a person -- blah -- how could a person be wrongfully accused of a crime?

Ms. Parker. How is it possible, or is it possible, for that to happen?

VENIREPERSON: Without enough evidence.

MR. BROOKS: Well, I could see how you would answer that. I'm simply pointing out, let's start with being wrongfully accused versus wrongfully convicted.

VENIREPERSON: Wrongfully accused.

MR. BROOKS: Yes, ma'am.

VENIREPERSON: Well, possibly the officer may look at an individual, the way they're acting, and determine it by physical attributes that they may be intoxicated.

MR. BROOKS: And that question, I'm not asking a question just based upon what we're here for today, but just in general, in the criminal justice system.

VENIREPERSON: Based on what they see or how that person is acting.

MR. BROOKS: Mr. Moore? What do you think?

VENIREPERSON: Overzealousness, inexperience on the part of the officer.

MR. BROOKS: Okay. Ms. Spruiell.

VENIREPERSON: I think it would have a lot to do with the situation at the time.

MR. BROOKS: Okay. You say it would have a lot to do with the situation at the time. So honest mistake? Would that --

VENIREPERSON: Sure.

MR. BROOKS: Or human error?

VENIREPERSON: Yes, sir.

MR. BROOKS: Let's talk about a guilty verdict versus a not-guilty verdict.

Guilty verdict obviously means that the

charge has been proven beyond a reasonable doubt. We all agree on that; correct? A not-guilty verdict obviously includes but is not limited to innocence.

MR. Sbaiti, you understand the distinction in that statement?

VENIREPERSON: Sure.

MR. BROOKS: Would you agree that obviously a not-guilty verdict, it could be innocent but a not-guilty verdict could also mean that there just was not enough evidence presented to support that the state proved the case beyond a reasonable doubt.

VENIREPERSON: Right.

MR. BROOKS: Mr. Pate.

VENIREPERSON: Yes.

MR. BROOKS: You see that distinction?

VENIREPERSON: Yes.

MR. BROOKS: Now, that leads us to the premise that a perfectly valid and lawful arrest can lead to a perfectly valid and lawful not-guilty.

I'm going to pick on you. What do you think about that?

VENIREPERSON: Slightly confusing but I can see in the end where it would be possible.

MR. BROOKS: Well, let's start with where we go back to when we were talking about the burdens of proof

and the lowest level --

VENIREPERSON: Right.

MR. BROOKS: -- in terms of burden of proof we talked about was reasonable suspicion.

VENIREPERSON: Matches the description.

MR. BROOKS: Well, reasonable suspicion as we said, a person -- a reasonable person under circumstances based upon specific and articulable facts would suspect that a crime has been committed.

VENIREPERSON: Right.

MR. BROOKS: That's the lowest burden we have. So the question for the officer at that time, his burden is much lower than your burden as a juror.

VENIREPERSON: Based on the evidence. Correct.

MR. BROOKS: Because you have to base it upon the evidence.

VENIREPERSON: Uh-hum.

MR. BROOKS: So if you take those two burdens of proof, you can see how a perfectly valid --

VENIREPERSON: Yes.

MR. BROOKS: -- and lawful arrest could lead to a perfectly valid and lawful not-guilty. Does that make sense?

VENIREPERSON: (Nods head.)

MR. BROOKS: Now, something that has not been talked about and I do want to talk about is misdemeanor offenses versus felony offenses.

Anyone know the difference off hand? You don't count.

(Laughter.)

MR. BROOKS: Anyone other than our police officer know the difference?

VENIREPERSON: I know there's a distinction between the two.

MR. BROOKS: Ms. White.

VENIREPERSON: I'll try my best. Misdemeanor is kind of a minor crime. And a felony is a -- a bigger charge.

MR. BROOKS: Well --

VENIREPERSON: A bigger offense.

MR. BROOKS: Well, I don't want to downplay any classification in our criminal justice system. Let me put it to you this way: A misdemeanor offense is punishable by jail time, county lockup.

VENIREPERSON: Okay.

MR. BROOKS: Felony convictions are punishable by prison time.

VENIREPERSON: Okay.

MR. BROOKS: That's the difference.

Misdemeanor case, the most you could go to jail is up to one year. A felony, depending on what felony it is, you could spend anywhere up to the rest of your life in prison. That's the functional difference.

Now, how do you get there, misdemeanor versus felony, is also a difference. Because, you see, in a felony case, all felony charges go before grand jury.

Anybody here ever served on a grand jury? Anybody know what a grand jury is?

Mr. Christopher?

*VENIREPERSON:* Yes.

*MR. BROOKS:* Okay. What is a grand jury?

*VENIREPERSON:* It's a group of people similar to this that's convened prior to charges being made, I guess, to see if there's enough evidence for charges to be made.

*MR. BROOKS:* That's close. Basically the way it's works is, if you're arrested on a felony charge, that case is forwarded for filing with that jurisdiction's grand jury. And that's 12 citizens and they review the case. They don't make a decision as to guilt or innocence. They just make a decision as, is there enough here for this to continue on in the criminal justice system? If they believe that, they issue what's called an indictment. If they don't believe that, the case is dropped.

And the distinction between that process and the misdemeanor, there is no other review after the officer files the charge. There is no independent review by another group of citizens to assess whether or not there's enough here that this case should continue in the criminal justice system. That's the difference.

We've already kind of talked about -- or, actually, you guys have -- right against self incrimination. I'm just going to ask you, you had a break and you had a chance to think about how you feel about a person exercising their Fifth Amendment privilege not to testify.

Is there anybody that, based upon that break and having a chance to sit and think about it, changing their answer from what they previously advised the court and the prosecutor? Anybody change their mind on what they previously said or felt?

(No responses.)

MR. BROOKS: We'll move on.

Now, judge gave some excellent reasons for why a person on trial would not want to testify. Another reason, I would suggest to you, is what if on advice of counsel? And the lawyer has said they have not proven their case. Would that be a valid reason?

Ms. White?

VENIREPERSON: Yes.

MR. BROOKS: Mr. Christopher?

VENIREPERSON: Sure could.

MR. BROOKS: Okay. Let's talk about -- I know the state had touched a little bit on scientific testing and I just want to ask you about the breath test.

How many in the room thought that in a given hypothetical you're pulled over, officer asks -- or, how many of you -- strike that. Let me ask it to you this way.

Who in here thought that you had a right to consult with an attorney prior to saying, yes, I will give a breath test, or, no, I won't give a breath test? Did anyone think you had that right to do so?

VENIREPERSON: I knew you had the right to decline.

MR. BROOKS: You have the right to decline, that's correct. But did you think that that -- you had the right to consult with someone in terms of making that decision?

VENIREPERSON: I never thought about it.

MR. BROOKS: Is there anyone here surprised to find out you do not have the right to consult with an attorney prior to making that decision?

Ms. Radice?

VENIREPERSON: What was the question?

*MR. BROOKS:* How would you feel about that?

*VENIREPERSON:* I think it's okay that you don't have that right.

*MR. BROOKS:* Is there anyone that thinks it would be -- Let me put it to you this way, different from what's posed on the board.

Would it be abnormal for a person to have reservations about submitting to a test they know nothing about?

Ms. Simonson?

*VENIREPERSON:* Would it be abnormal?

*MR. BROOKS:* Yes, ma'am.

*VENIREPERSON:* Well --

*MR. BROOKS:* Let me ask it to you this way: Do people normally set about and agree to tests that they are not familiar with or don't know anything about? Is that a normal human reaction?

*VENIREPERSON:* Right. And the law doesn't require it, so I'm guessing most people are going to say, no, I don't want the test.

*MR. BROOKS:* So can you see why some people would be hesitant about wanting to take the test, if they're not familiar with it or the process?

*VENIREPERSON:* Even if you had had one or maybe two drinks, people are going to say no because

they're not sure how that test is going to come out.

MR. BROOKS: That's a good answer.

Anyone disagree with Ms. Simonson?

Let me ask, Mr. Kieffer.

VENIREPERSON: Yes, sir.

MR. BROOKS: Hypothetically, you take the test, someone makes a mistake. Who pays the price?

VENIREPERSON: As stated there, the person who makes the --

MR. BROOKS: Let's start off with the machine makes an error. Who pays the price?

VENIREPERSON: Well, that's what I'm saying. If the machine makes the error, the person pays the price. If the reading is positive.

MR. BROOKS: What do you do for a living?

VENIREPERSON: I'm a sales person.

MR. BROOKS: But you're familiar with machinery, whether it's automobile, whether it's a power drill?

VENIREPERSON: Yeah.

MR. BROOKS: You ever seen a 100 percent infallible machine?

VENIREPERSON: (Shakes head.)

MR. BROOKS: Has anybody?

What about if the operator makes an error,

who pays the price?  Again, is it the operator?

VENIREPERSON:  No.

MR. BROOKS:  Does the -- or, does not taking the test in and of itself prove that someone is intoxicated?

Ms. Radice?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Sbaiti?

VENIREPERSON:  No, it does not prove they're intoxicated.

MR. BROOKS:  Did I butcher your name again?

VENIREPERSON:  It's Sbaiti.  It's okay. Took my wife a year to say it right.

(Laughter.)

MR. BROOKS:  Ms. Simonson?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Campbell?

VENIREPERSON:  No.

MR. BROOKS:  Ms. Walker?

VENIREPERSON:  No.

MR. BROOKS:  Ms. Stelling-Parker?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Mercer?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Byther?

VENIREPERSON:  No.

MR. BROOKS:  Byther, I'm sorry.

VENIREPERSON:  Byther.

MR. BROOKS:  Ms. Carbajal?

VENIREPERSON:  No.

MR. BROOKS:  Ms. White?

VENIREPERSON:  (Shakes head.)

MR. BROOKS:  Mr. Burdick?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Pate?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Brown?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Christopher, how do you feel?

VENIREPERSON:  I'm Kendall.

MR. BROOKS:  I'm sorry, sir.

VENIREPERSON:  No.

MR. BROOKS:  Mr. Christopher?

VENIREPERSON:  No.

MR. BROOKS:  Mr. Kieffer?

VENIREPERSON:  No.

MR. BROOKS:  How about you, Mr. Sennett?

VENIREPERSON:  No.

MR. BROOKS:  Ms. Parker?

VENIREPERSON: No.

MR. BROOKS: Was that a no?

VENIREPERSON: No.

MR. BROOKS: Mr. Lewis?

VENIREPERSON: No.

MR. BROOKS: Mr. Cassedy?

VENIREPERSON: No.

MR. BROOKS: And Mr -- I'm going to screw this up. Noi-Migle?

VENIREPERSON: Noi-Mingle.

MR. BROOKS: Noi-Mingle. I'm sorry.

VENIREPERSON: No.

MR. BROOKS: Mr. Moore?

VENIREPERSON: No.

MR. BROOKS: Ms. Spruiell, how do you feel?

VENIREPERSON: No.

MR. BROOKS: Mr. Fried?

VENIREPERSON: No.

MR. BROOKS: Do you feel that some people might not be willing to submit to a test knowing that they are innocent?

Mr. Pate?

VENIREPERSON: Yes.

MR. BROOKS: Anyone disagree with Mr. Pate?

(No responses.)

*MR. BROOKS:* Okay. I think we had also already talked about or gone over social drinkers versus non-drinkers. I think there was one person that said they don't drink. Was that you, Mr. Kendall? Mr. Kendall, Mr. Christopher? Was there a point in time where you did?

*VENIREPERSON:* Yes.

*MR. BROOKS:* Both of you?

*VENIREPERSON:* Yes.

*VENIREPERSON:* (Nods head.)

*MR. BROOKS:* Is there anyone else in the group who used to drink socially but no longer drinks?

*VENIREPERSON:* I don't drink at all.

*THE COURT:* Ma'am, I don't think he can see your hand.

*VENIREPERSON:* I don't drink at all.

*MR. BROOKS:* Okay. You don't drink at all. Thank you, Ms. Parker.

We've already touched upon has anyone been affected in anyway by a person with an alcohol or chemical dependency. Is there anyone in the group who didn't answer previously when the state was asking those questions but upon reflection now, wishes to answer that question?

Mr. Christopher.

*VENIREPERSON:* The state asked whether I had a family member affected by the crime of driving under the

influence or crime of driving while intoxicated, and my answer was no, but I have a sister who's an alcoholic. She's not been charged with -- knock on wood -- driving under the influence but she does have a dependency problem.

MR. BROOKS: Okay. Thank you for sharing that, sir.

Anyone else? Ms. White.

VENIREPERSON: My brother is a violent alcoholic and my brother-in-law.

MR. BROOKS: There was someone else who raised their hand down here. Mr. Lewis?

VENIREPERSON: Yes. When it was previously stated, there was no mention of chemical dependency but the answer to this question is, yes, my first wife had serious chemical dependency problems. In and out of rehab several times.

MR. BROOKS: How long have y'all been divorced?

VENIREPERSON: 12 years -- no, I'm sorry. 20 -- I lose track of years.

MR. BROOKS: Anything about --

VENIREPERSON: One of those old age things.

MR. BROOKS: Anything about that experience you think that would impact your ability to be fair in this trial?

VENIREPERSON: No. Because I didn't even -- had not even thought about it until just now when that question came up, but, no, it would not.

MR. BROOKS: Mr. Christopher. Anything about your experience impact your ability?

VENIREPERSON: No.

MR. BROOKS: Ms. White?

VENIREPERSON: No.

MR. BROOKS: No?

VENIREPERSON: (Shakes head.)

MR. BROOKS: I think you were asked this question also directly. Any of you been harmed directly or indirectly by person suspected of being drunk driver? Anyone who hadn't previously answered that question want to share anything now?

(No responses.)

MR. BROOKS: Okay.

Anyone on the first row have friends or family in law enforcement? Mr. Sbaiti?

VENIREPERSON: Yes.

MR. BROOKS: Who?

VENIREPERSON: I have friends in the Addison police department and Dallas police department.

MR. BROOKS: Are these casual acquaintances, are these get together, watch football type of

acquaintances?

VENIREPERSON:  They're guys I went to high school with, so I see them occasionally but not regularly.

MR. BROOKS:  And anything in terms of, if you ran into them and told them that you were a juror on a D W I case and that you felt that the evidence wasn't proven beyond a reasonable doubt, anything in that cause a concern in y'all's relationships?

VENIREPERSON:  No.

MR. BROOKS:  Who else on the first row?  Ms. White?

VENIREPERSON:  My brother-in-law -- different brother-in-law is an officer for city of Sachse.

MR. BROOKS:  I hope you have different brothers-in-law.

(Laughter.)

MR. BROOKS:  He's in Sachse?

VENIREPERSON:  Sachse officer.

MR. BROOKS:  Same question.  If you were to end up on this jury and based upon the evidence that you heard, you felt that the state had not proven their case beyond a reasonable doubt, would that cause you any issues between you and your brother-in-law?

VENIREPERSON:  No.

MR. BROOKS:  Anyone on the second row?  Have

friends or family in law enforcement?

Mr. Lewis.

*VENIREPERSON:* Yes. My father, for basically all of my life before he passed away, was a security policeman for a large -- large defense contractor in Fort Worth. He was security policeman for all of his life. So I -- I pretty much have a very, very strong --

*MR. BROOKS:* Law enforcement background?

*VENIREPERSON:* Law enforcement pro, you know, in my family.

*MR. BROOKS:* Let me ask you this then: Would you value the word of a police officer over others?

*VENIREPERSON:* Yeah, I have to say yes.

*MR. BROOKS:* So just so that we're clear, if a police officer were to testify, his testimony is going to start him off a little bit ahead in terms of credibility than any other witness?

*VENIREPERSON:* Yeah. Yeah.

*THE COURT:* I can't hear your answer, sir.

*VENIREPERSON:* Yes. Yes, that's just the way I was raised, the way I felt all my life.

*MR. BROOKS:* Thank you, sir.

Ms. Parker, I think you raised your hand.

*VENIREPERSON:* Fireman.

*MR. BROOKS:* Same question. Anything about

-- kind of a different question. Anything about you potentially being a juror and potentially finding someone not guilty that would affect that relationship?

VENIREPERSON: (Shakes head.)

MR. BROOKS: Was that a no?

VENIREPERSON: No.

MR. BROOKS: Okay. Anyone else on the second row?

Yes, sir. Mr. Kieffer.

VENIREPERSON: Friends in The Colony police department. And the second question, no, about the effect, if I had to give a guilty.

MR. BROOKS: Anyone else?

VENIREPERSON: (Indicating)

MR. BROOKS: I guess that's everybody you know. I'm not sure how to ask you that question.

(Laughter.)

MR. BROOKS: Okay. Anyone else -- I will give you a pass.

Anyone else on the third row? Mr. Fried.

VENIREPERSON: My brother's recently retired Philadelphia police officer.

MR. BROOKS: Anything about being a juror, potentially finding someone not guilty, that would affect that relationship?

VENIREPERSON: No.

MR. BROOKS: Thank you, sir.

VENIREPERSON: Can I add?

MR. BROOKS: Yes, ma'am.

VENIREPERSON: Well, the question is law enforcement. So to me I think, you know, sheriff people, not -- you know, in uniform but my father is retired Air Force and been in the security field for the Department of Defense and major contractors for the last 25 years. So, yeah, I'm kind of -- tend to side more with the cops.

MR. BROOKS: So a police officer, in terms of credibility, he's going to start off ahead of anybody else?

VENIREPERSON: Yeah.

MR. BROOKS: So you would view his testimony differently?

VENIREPERSON: Yes.

MR. BROOKS: Thank you, ma'am.

Did I miss anyone on that question? Thank you.

I'm almost finished, folks. Wrapping up.

Anyone on the panel -- let me go by row. First row, participated with Mothers Against Drunk Driving or has donated money to Mothers Against Drunk Driving? Anyone on the first row? Or Students Against Drunk Driving

as well.

Anyone on the second row?

Mr. Sennett.

*VENIREPERSON:* Yeah, I've donated before to MADD.

*MR. BROOKS:* To MADD or SADD?

*VENIREPERSON:* MADD.

*MR. BROOKS:* Was that recently?

*VENIREPERSON:* Probably five, six years ago.

*MR. BROOKS:* You ever do anything other than just donating, participating in workshops or anything like that?

*VENIREPERSON:* No.

*MR. BROOKS:* Anyone else? Mr. Fried.

*VENIREPERSON:* I donated to MADD in the past, not recently.

*MR. WILSON:* Okay. And Ms. Spruiell?

*VENIREPERSON:* Uh-hum. Donated.

*MR. BROOKS:* Basically have one last question, folks.

And the question is quite simply this: At the end of the testimony for those who end up on the jury, if at the end of the testimony, you feel that the state has probably proven their case but has not proven it beyond a reasonable doubt, what is your verdict? Again, at the end

of testimony, you believe they probably have proven their case but they have not proven it to you beyond a reasonable doubt.

VENIREPERSON: Guilty.

MR. BROOKS: Your verdict would be guilty?

VENIREPERSON: Guilty.

MR. BROOKS: Okay. I just want to make sure you understand what my question is. Probably but they have not proven it beyond a reasonable doubt. You would still vote guilty?

VENIREPERSON: Yes.

MR. BROOKS: Mr. Sbaiti?

VENIREPERSON: Not guilty.

MR. BROOKS: Ms. Simonson?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Campbell?

VENIREPERSON: Not guilty.

MR. BROOKS: Ms. Walker?

VENIREPERSON: Not guilty.

MR. BROOKS: Ms. Stelling-Parker?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Mercer?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Byther?

VENIREPERSON: Not guilty.

MR. BROOKS: Ms. Carbajal?

VENIREPERSON: I don't understand very well that question.

MR. BROOKS: We'll come back to you, Ms. Carbajal.

Ms. White?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Burdick?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Pate?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Brown?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Kendall?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Christopher?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Kieffer?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Sennett?

VENIREPERSON: Not guilty.

MR. BROOKS: Ms. Parker?

VENIREPERSON: Not guilty.

MR. BROOKS: Mr. Lewis?

VENIREPERSON: Not guilty.

*MR. BROOKS:* Mr. Cassedy?

*VENIREPERSON:* Not guilty.

*MR. BROOKS:* Mr. Noi-Mingle?

*VENIREPERSON:* Yes. Not guilty.

*MR. BROOKS:* Mr. Moore?

*VENIREPERSON:* Not guilty.

*MR. BROOKS:* Ms. Spruiell?

*VENIREPERSON:* Not guilty.

*MR. BROOKS:* Mr. Fried?

*VENIREPERSON:* Not guilty.

*MR. BROOKS:* Well, folks, I think that -- I want to thank you for your time. Now, before I sit down, is there anyone that has any questions of me? Because this is the only time -- for those of you who might end up on the jury, this is the only time we get to talk back and forth like this.

The six of you that get selected to sit in the box, let you know right now, there are going to be some times, even if this is just a very short trial, we may pass each other in the hallway, to and from the restroom. I let you know right now, I won't say anything to you. It's not because I think I'm better than y'all or anything like that. It's just that the rules down here require us to avoid any appearance of impropriety. I have yet to have a criminal case where it did happen. So we will pass each

other at some point in a short break. So don't get offended if I don't acknowledge your presence. Okay? If you don't have any questions of me, I'm going to sit down. I thank you for your time.

THE COURT: Before I release you to the hallway, Mr. Lewis, I need to understand your answer with regards to law enforcement.

Why would you give a police officer more credibility or believe them -- be more likely to believe them than some other person? Is it based on what?

VENIREPERSON: Just the fact that my father was a security police officer for all of his -- all of his adult career, all of his life, you know. I watched him put on his uniform and put on his gun every day, you know, and go to work. And come home from work. And he -- I just always have had -- felt just a high regard --

THE COURT: Okay.

VENIREPERSON: A higher regard for an officer.

THE COURT: All right. Thank you very much.

All right. Ladies and gentlemen, I'm going to release you into the hallway. The attorneys are going to strike their lists. When you come back in, you can sit anywhere you want, on any row, any side of the courtroom, just take the first available seat.

The reason, we've taken all the notes we're going to take about you, I'm going to announce the six of you who are going to be with us for the remainder of the trial.

The rest of you, you need a note showing you've been here, stay behind when I release everyone else and my bailiff will provide you the form.  All right?  Thank you very much.

Bailiff, take charge of the panel.

THE BAILIFF:  All rise.

THE COURT:  May I see the attorneys at the bench.

(The jury panel exits.)

THE COURT:  All right.  Let the record reflect that all of the panel members are outside.  All the parties are present.

Challenges for cause from the state?

MR. WILSON:  The state offers challenge for cause juror number one, Robin Radice.

THE COURT:  What says the defense?

MR. BROOKS:  Defense would agree.

THE COURT:  All right.  Struck by agreement.

MR. WILSON:  Juror number five, Loretta Walker.

THE COURT:  What says the defense?

MR. BROOKS: What grounds?

MR. WILSON: She said that she would not be able to separate her prior D W I experience from the defendant and that she would be comparing what the kind of drinking and location and circumstances of her arrest to what happened with the defendant.

MR. BROOKS: I agree.

THE COURT: Number five, Loretta Walker, is struck by agreement.

Next.

MR. WILSON: Number eight.

THE COURT: What says the defense?

MR. BROOKS: I think number eight, I think he rehabilitated himself, judge.

THE COURT: On what grounds?

MR. WILSON: Your Honor, my grounds are that he stated that he would need to hear from the defendant, hear her testimony, so he would have difficulty following the Fifth Amendment.

THE COURT: I've got him marked as on the Fifth Amendment as well.

MR. BROOKS: Yes, I see that on here. I agree, judge.

THE COURT: You agree to number eight being struck?

MR. BROOKS: Yes, I do.

THE COURT: Number eight struck by agreement.

Next.

MR. WILSON: Juror number 10, Cynthia White. She also was one who indicated a problem following the Fifth Amendment.

THE COURT: What says the defense?

MR. BROOKS: Agree, judge.

THE COURT: Struck by agreement.

Next.

MR. WILSON: Juror number 13, Michelle Parker, said that she would not be able to convict based on mental faculties and would also require a breath or blood specimen.

THE COURT: What says the defense?

MR. BROOKS: Agree, judge.

THE COURT: Number 13, Michelle Parker, struck by agreement.

Next.

MR. WILSON: That's all from the state, Your Honor.

THE COURT: Any from the defense?

MR. BROOKS: Juror number six, judge. She has said that law enforcement would have more credibility

with her from the outset than any other witness.

THE COURT: What says the state?

MR. WILSON: Your Honor, could we bring the juror number six back in and talk to her?

THE COURT: I think she was very clear about her law enforcement bias. Plus I have notes on her that she also raised her hand when I was explaining the Fifth Amendment.

MR. WILSON: Then we have no disagreement, Your Honor.

THE COURT: Number six is struck by agreement.

Any other challenges from the defense?

MR. BROOKS: Just one second, judge. No, Your Honor.

THE COURT: What about Mr. Lewis and his law enforcement bias?

MR. BROOKS: Oh, that's right. Yes, number 12.

THE COURT: What says the state?

MR. WILSON: Your Honor, I feel like Mr. Lewis has just said that he would -- he has a lot of respect for law enforcement, that he would give them credibility but I don't believe -- don't believe that we've heard enough to say that he would not be able to follow the

law.

THE COURT: Number 12 is struck for cause by the court.

And what did the attorneys say about Ms. Carbajal and her ability to understand the English language? I noticed during several questions she responded she doesn't understand the question.

MR. WILSON: Your Honor, I would -- the state would request that Ms. Carbajal be struck for cause.

MR. BROOKS: I mean, I would agree to release her, judge. I don't know if it's for cause but I agree.

THE COURT: She's struck by agreement.

Any others?

MR. WILSON: None from the state, Your Honor.

THE COURT: Anything else from the defense?

MR. BROOKS: No, sir.

THE COURT: All right. Check on that, the list of jurors. Looks to me like -- strike your list up to and including number 20.

Ms. Singletary, is that what the state shows?

MS. SINGLETARY: That's what I see, judge.

THE COURT: I beg your pardon?

138

MS. SINGLETARY: That's what I see.

THE COURT: Is that what you show as well, Mr. Brooks?

MR. BROOKS: Yes, judge.

THE COURT: All right. Let's go over it one more time to be clear. These are people struck by either cause or agreement. Number one is struck. Number five. Number six. Number eight. Number nine. Number 10. Number 12. Number 13.

Any objections to those from the state?

MR. WILSON: No, Your Honor.

THE COURT: Any from the defense?

MR. BROOKS: No, Your Honor.

THE COURT: Strike your lists up to and including panel member number 20, please.

(Recess at 1:06 P M, resuming at 1:17 P M. Defendant present.)

THE COURT: All right. Listen closely as I call over the ones I show you struck. I show the state has struck panel member number two, Mr. Sbaiti. Panel member number 11, Shawn Cassedy. And panel member number 19, Billy Pate. Is that correct?

MR. WILSON: Yes, Your Honor.

THE COURT: I show the defense has struck panel member number 14, Brian Sennett. Number 17, Jon

Kendall.  Number 18, Robert Brown.  Is that correct?

MR. BROOKS:  Yes, Your Honor.

THE COURT:  This will be your jury:  Number three, Carol Simonson.  Number four, David Campbell. Number seven, Kelly Mercer.  Number 15, Matthew Kieffer. Number 16, David Christopher.  And number 20, Michael Burdick.

Any objection to the array of the panel from the prosecution?

MR. WILSON:  No, Your Honor.

THE COURT:  Any from the defense?

MR. BROOKS:  No, Your Honor.

THE COURT:  All right.  Bailiff, would you bring them in.  Here's the list.

THE BAILIFF:  Yes, sir.  All rise.

(The jury panel enters.)

THE COURT:  When you come in, you can just have a seat anywhere in the courtroom.

All right.  Thank you.  Everyone else may be seated.

If I call out your name, please gather all of your possessions, come through the swinging doors, go up to the jury box, go in that swinging door.  You can sit on the front row or the back row, whichever you're more comfortable, but please go all the way down to the end of

the row just to make room for the other jurors that will be coming in behind you.

The jury will consist of: Carol Simonson; David Campbell; Kelly Mercer; Matthew Kieffer -- Is it Kieffer or Kiffer?

*VENIREPERSON:* Kieffer.

*THE COURT:* Thank you. David Christopher. And number 20, Michael Burdick.

To those of you who were not chosen, dry your eyes, don't be so sad. But in all seriousness, if we want our criminal justice system to work the way it was intended, then your service is just as important as those who were chosen this particular day. So with that, you are excused. This concludes your jury service. If any of you need a note, please see my bailiff and we'll provide one showing that you were here today.

Thank you for your service.

*THE BAILIFF:* All rise.

*THE COURT:* Not you.

*THE JUROR:* Not us.

*(The jury panel exits.)*

*THE COURT:* Everyone may be seated. As for the six of you who remain with us, please stand, raise your right hand, so I may administer your oath as jurors to you.

*(The court swears the jury.)*

*THE COURT:* Carol Simonson.

*THE JUROR:* Yes, I do.

*THE COURT:* David Campbell?

*THE JUROR:* Yes.

*THE COURT:* Kelly Mercer.

*THE JUROR:* Yes.

*THE COURT:* Matthew Kieffer?

*THE JUROR:* Yes.

*THE COURT:* David Christopher?

*THE JUROR:* I do.

*THE COURT:* Michael Burdick.

*THE JUROR:* Yes.

*THE COURT:* Thank you. You may be seated.

By the oath you've taken as jurors, you become officials of this court and active participants in the public administration of justice. In a moment, the bailiff is going to take you back to what will be called the jury deliberation room. That's where you will meet and discuss the case, but not until after all the evidence is presented and I've given you your written instructions.

This is very important, that you not discuss anything about this case or any other case until I've given you those written instructions. Okay? And then you can only do it after the evidence is closed and all six of you are together.

He's also going to give you a badge. That badge serves two very important purposes. One, it lets you gain access to the locked part of the courtroom so you can get back to your jury deliberation room. And it serves as a visual indicator that you're on a jury.

It won't surprise you that when I release you for lunch in a minute that you're going to go to some restaurant, there will be attorneys, other jurors, prosecutors, defense attorneys and defendants, and they're talking about cases. If you can hear anyone discussing a case in your presence, go up and let them know that you're a juror and let them know that you can hear the conversation.

I've never even heard of a situation where that didn't stop the conversation, but if it doesn't, just report to my bailiff what occurred and we'll take care of it. Okay? But you have to wear that juror badge on the outside of your clothing where everyone can clearly see it.

The bailiff is going to give you a security briefing also. You're in good hands.

It's now 1:30. Going to take him about 10 minutes to give you that briefing. I'm going to let you go to lunch. Be back here at 2:45. I want the attorneys and all parties present to be here at 2:40, five minutes early, so we're not keeping the jury waiting when they come back.

I still think we'll finish this in one day.

With that, follow the bailiff, and he'll give you your security briefing.

Thank you for your service.

THE BAILIFF:  All rise.

THE COURT:  When you come in, just come in; everyone will always be standing.  Just have a seat when you come in.

(The jury exits.)

THE COURT:  Everyone may be seated.  I'll see everyone back at 2:40.

(Recess at 1:25 P M.  Proceedings resume in Volume 3.)

(Jury Not Present)

STATE OF TEXAS )

COUNTY OF COLLIN )


I, Marigay Black, Official Court Reporter in and for the County Court at Law Number Two, County of Collin, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Signed this 26th day of March, 2014.


                              /S/  Marigay Black

                              MARIGAY BLACK, Texas CSR 351
                              Official Court Reporter
                              County Court at Law Number Two
                              Suite 10344
                              2100 Bloomdale Road
                              McKinney, Texas 75071
                              Tel:  972-548-3823
                              FAX:  972-548-3828
                              Expiration:  12/31/2014
                              mblack@co.collin.tx.us

REPORTER'S RECORD
VOLUME 3 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 002-80051-2013
COURT OF APPEALS CASE NO. 05-14-00025-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE COUNTY COURT |
| | ) | |
| VS. | ) | AT LAW NUMBER TWO |
| | ) | |
| MELLANNISE HENDERSON | ) | COLLIN COUNTY, TEXAS |

_____

**TRIAL ON THE MERITS**

_____

On the 2nd day of December, 2013, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Barnett Walker, Judge Presiding, and a jury, held in McKinney, Collin County, Texas.

Proceedings reported by computerized stenotype machine.

**A P P E A R A N C E S**

**Mr. Justin B. Wilson**
SBOT NO. 24080521
**Ms. Geeta Yadav Singletary**
SBOT NO. 24060862
Office of Greg Willis, District Attorney
Suite 100
2100 Bloomdale Drive
McKinney TX 75071
Telephone:  972-548-4323
Facsimile:  972-548-3622


                                Attorneys for The State of Texas


**Mr. Kevin Brooks**
SBOT NO. 03070735
Attorney at Law
Suite 2475
325 N. Paul
Dallas TX 75201
Telephone:  214-922-0212
Facsimile:  214-922-0294

                                Attorney for The Defendant

VOLUME 3

Trial on the Merits

December 2, 2013

                                          PAGE     VOL.

Arraignment ................................6       3

Opening Statement by Mr. Wilson ............7       3

WITNESS:                    DIRECT    CROSS     V. DIRE

CLIFTON CORLEY

    By Mr. Wilson        10 v3
    By Mr. Brooks                 45 v3
    By Mr. Wilson        60 v3
    By Mr. Brooks                 63 v3

                                          PAGE     VOL.

State rests  ..............................66      3

Defendant rests  ..........................67      3

Both Sides Close ..........................67      3

Reporter's Certificate ....................71      3

**ALPHABETICAL INDEX OF WITNESSES**

|                  | DIRECT  | CROSS   | V. DIRE |
|------------------|---------|---------|---------|
| Corley, Clifton  | 10 v3   | 45 v3   |         |
| Corley, Clifton  | 60 v3   | 63 v3   |         |

**INDEX OF EXHIBITS**

Use is indicated as follows:
J - Jury      R - Record Only      D - Demonstrative
W/D - Withdrawn    ID - Identification Only    C- Court

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | USE |
|---------|-------------|---------|----------|-----|
| SX 1 | DVD | 22 v3 | 22 v3 | J |
| SX 2 | DIC 24 form | 42 v3 | 42 v3 | J |

(Proceedings occurring in open court,

commencing at 2:47 P M.  Defendant present.)

THE BAILIFF:  All rise.

(The jury enters.)

THE COURT:  Thank you.  Everyone may be seated.  Let the record reflect that all parties are present.

Does the state wish to come forward and read the information?

MR. WILSON:  Yes, Your Honor.  Thank you.

Members of the jury.  In the name and by the authority of the State of Texas, now comes the Criminal District Attorney of Collin County, State of Texas, and presents in and to the County Court at Law Number Two of Collin County, state aforesaid, that one, Mellannise Henderson-Love, hereinafter styled the defendant, heretofore on or about the 1st day of December, 2012, in the County of Collin and the State of Texas, did then and there operate a motor vehicle in a public place while the defendant was intoxicated, against the peace and dignity of the state.

Signed the Criminal District Attorney of Collin County, State of Texas.

THE COURT:  What says the defendant?

MR. BROOKS:  If it please the court, members

of the jury, the defendant pleads not guilty.

THE COURT: Thank you.

The state wish to make an opening statement?

MS. SINGLETARY: Yes, Your Honor.

THE COURT: You may proceed.

**OPENING STATEMENT**

MR. WILSON: May it please the court. Counsel. Members of the jury.

Nothin'. I've had nothing to drink tonight. That's the story that the defendant told the officer around 12:47 A M on December 1st, 2012. But the facts as you will hear them through testimony and as you will see them through the presentation of video evidence will paint a very different picture for you.

You're going to meet Officer Corley of the Richardson police department. He's going to tell you about how around 12:47 A M, December 12th -- or, December 1st, 2012, he was driving down the street. He was going to provide backup for another officer.

You'll hear testimony from him saying that it's a rare thing that these police officers, when they are en route to provide backup for another officer, it's a very rare thing for them to pull off and get diverted and wind up taking care of some other situation rather than providing backup to the requesting officer. But in this

case, Officer Corley is going to tell you that he observed driving facts that made him concerned about the safety of the officer that was up the road ahead and concerned for himself. And so he initiated a traffic stop on the defendant.

When he approached the defendant's car, you're going to hear testimony that he smelled a strong odor of alcohol coming from her breath, that he saw watery eyes, that he heard slurred speech. When he asked her for her driver's license and her proof of insurance, took an exceptionally long time for her to produce those documents. He had to ask her a second time for the insurance.

After observing the various factors that he observed at that point in time, Officer Corley asked the defendant to step out of her vehicle, to perform a battery of field sobriety tests, in order to determine whether she would be safe to continue driving on the roads that night.

Officer Corley gave her some simple instructions to perform a test called the horizontal gaze nystagmus test. You will see on video and you will hear the words from the defendant that will show you that this defendant had an extremely difficult time following a simple set of instructions, to follow a stimulus with her eyes, without moving her head. After minutes of trying to get the defendant to follow the simple instructions, the

officer observed what he needed to observe. He moved on to ask the defendant to perform another couple of tests, the walk-and-turn and the one-leg stand.

The defendant refused to perform those simple tests, tests that the officer will tell you that only take a few minutes to perform, and the reason is because the defendant was consumed with her need to go to the bathroom. Rather than take a few minutes to perform the tests and then be able to move on and go to the restroom as she said that she so desperately needed to do, she engages in the back and forth with the officer that winds up taking much longer time than would have been necessary had she just performed those tests.

Now, after that, the officer felt like he had all the information he needed to place the defendant under arrest for driving while intoxicated. He takes her to the Richardson city jail. And while at the jail, he asked the defendant for a specimen of her breath. You will see on video, you will hear from the words the defendant said, that she refuses to provide that specimen of her breath. She was given the opportunity, even though she said that she had consumed no alcohol at all that night, she was given the opportunity to provide a specimen of her breath, and she refused. And you will find out that a warning, a statutory warning, that the officer read to her

made her well aware of the consequences of that refusal, 180 days, driver's license suspension. But even with that consequence looming, she still refused.

And I believe that when all is said and done today, you're going to have all the evidence that you need to believe beyond a reasonable doubt that this defendant is guilty of the offense of driving while intoxicated.

THE COURT: Thank you, counsel.

Mr. Brooks, would you like to make your opening now or reserve?

MR. BROOKS: We'll reserve our right.

THE COURT: All right. Call your first witness.

MR. WILSON: State calls Officer Corley.

THE COURT: Officer Corley. Sir, would you please raise your right hand and be sworn in.

(The court swears the witness.)

THE COURT: Thank you. State may proceed.

MR. WILSON: Thank you, Your Honor.

**CLIFTON CORLEY,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. WILSON:

Q. Officer, will you please introduce yourself to the jury and state your name for the record.

A.    My name is Officer Clifton Corley with the Richardson police department.

Q.    And, Officer Corley, how long have you been an officer with the Richardson police department?

A.    About eight and-a-half years.

Q.    Are you a certified peace officer?

A.    Yes, sir.

Q.    How long have you been certified peace officer?

A.    About eight of those years.

Q.    And what current duties do you perform with the Richardson P D?

A.    The duty I'm assigned now is routine patrol which includes traffic stops, answering calls for service, and so forth.

Q.    Are you a field training officer as well?

A.    Yes, sir.

Q.    What duties do you have as a field training officer?

A.    As a field training officer, I will take new officers that are coming to the street and show them the basic training that they will need to continue to a successful career as a police officer.

Q.    Describe to the jury the training and education that you have to undergo in order to become a certified peace officer.

A.     To become a police officer, I was hired by the city first and then the city put me through an academy to become certified by the state.  It's an academy that's about six months long.  Once we graduate that police academy, we go to our city's, what we call a mini academy where we undergo another 45 days of training.

Once that occurs, we complete that successfully, we move on to our field training officer, who we do about three months of field training, and then that field training officer, or a series of, will determine if we are suitable to continue.

Q.     Are you certified to perform the standardized field sobriety tests?

A.     Yes, sir, I am.

Q.     How long have you had that certification?

A.     About eight and-a-half years.

Q.     Have you undergone any refreshers during that eight and-a-half year time span?

A.     I have undergone two refreshers, the last one being about a year and-a-half ago.

Q.     Over the span of your career with the Richardson police department, would you say you have performed few or many D W I stops?

A.     I would say -- I would call it many.  About 50 or so.

Q.   Now, I'd like to direct your attention to December 1st of 2012.  What were your duties that night?

A.   Again, I was on basic patrol that night.  It was an evening shift.  Working the east side of Richardson.

Q.   And so were you patrolling the east side of Richardson at about 12:47 A M that night?

A.   Yes, sir.

Q.   And is that area a public place?

A.   Yes, sir.

Q.   Is it in Collin County, Texas?

A.   Yes, sir.

Q.   What did you observe?

A.   About that time, I was actually dispatched to back up another officer on east Renner Road.  While traveling to that location, about 12:45 or so in the morning, fairly light traffic, on my way to back up this officer, I noticed a black 2003 Lexus E S 300 sedan.  First noticed it weaving within its lane a little bit.  I decided that my priority at the time was to get to my back-up officer so I began to go around the vehicle.

Q.   Officer, I'm going to stop you right there.  You mentioned that your priority was to respond to the officer who requested backup.  Why is it important, why did you make that your priority?

A.   When an officer calls for backup, they either

have something that they feel is in danger or they need assistance with.  So I want to get to that officer as quickly as I can safely do so to make it a safer environment for them or provide assistance if needed.

Q.    Did you see any other traffic offenses being committed while you were en route to provide backup?

A.    I did note that I -- I witnessed a red light being run at some point on my way to that -- to back up the officer.

Q.    And how did you respond to seeing the red light being run?

A.    I didn't believe that it was such a violation that I needed to disregard the backup and make that traffic stop.

Q.    And now let's move forward to, you were talking about the Lexus E S 300 that you observed weaving in its lane.  Tell us more, explain to the jury more about what you observed with that car?

A.    What first caught my attention, again, this was another vehicle that was on the roadway as I'm trying to get to the back-up officer.  I noticed this vehicle was swerving in its lane to some degree.  I remember making the decision, I'm going to go around this vehicle to get to the other officer I'm trying to assist.

Q.    And was that other officer -- where was that

officer located in relation to where your vehicle and the Lexus were located?

A.   At the first time I saw them, approximately three-quarters or so of a mile ahead.

Q.   So on the same street then?

A.   Yes.

Q.   And were they within -- I guess within sight?

A.   They were becoming within sight.  I don't remember if I could actually see the officer at the time that I first noticed the vehicle.

Q.   And what happened as you were -- you said that you were about to try to pass the Lexus.  What happened as you attempted to pass?

A.   The Lexus was in the right lane, stayed in the right lane until I began to pass in the left lane.  This is a two-lane road, two lanes going the eastbound direction. I was passing the Lexus on the left side and, just as I began to approach, the Lexus came over into the left lane without signalling, causing me to -- I had to brake hard and swerve a bit to the left to avoid a collision.

Q.   So when you say the vehicle came over, can you provide a little bit more detail as to what you mean by the vehicle came over?

A.   It seemed to me as if it was possibly a quick lane change.  Again, without signalling.  It was to such a

close proximity to me, I felt like there was going to be a collision if I didn't avoid it.

Q. Did the vehicle actually cross over the dividing lines?

A. I believe they came -- they came -- the left wheels came all the way over the dividing line. I believe about half of the vehicle came into the left lane.

Q. And was there any -- any objects or other things in the lane of traffic that would have created some emergency that the driver of the Lexus had to avoid?

A. Not that I noticed, no, sir.

Q. And so what happened after you hit your brakes and steered to avoid the collision?

A. At that point, I decided I wanted to reassess the driver. I pulled in behind the Lexus to determine if this was a possible intoxicated driver. I observed the Lexus, again, to continue to swerve within its lane. At one point, it drifted where the left wheels did drive up on the reflectors. I believe they just crossed over the reflectors into the left lane before drifting back into the right lane. I watched the Lexus, the left rear turn signal turn on for several seconds. The vehicle did not get into the left lane. And then the rear signal went back off. At about this time is when I can see the other officer's overhead lights ahead of me.

Q. And so did you initiate a traffic stop at that point?

A. Yes, I did.

Q. Why?

A. Several reasons. I believe I may have -- may have had an intoxicated driver in front of me, which is a danger to itself -- danger to the public, danger to me, and my major concern was that I had an officer stopped in the right lane about a quarter mile ahead of us.

Q. Is that why you chose to not overlook this particular person as you overlooked the red light runner earlier?

A. Yes, sir.

Q. Let's talk about your approach. How did you approach the vehicle and make contact with the driver?

A. Once we made the traffic stop, the driver stopped in that right lane. I approached on the driver's side, to her window, as she was still sitting in the vehicle.

Q. How many people were in the vehicle?

A. She was the only occupant of the vehicle.

Q. And was she the one driving?

A. Yes, sir.

Q. So was that person operating a motor vehicle?

A. Yes, sir.

Q. How did you identify the driver?

A.    I asked for her driver's license which she did end up providing me and that's how I identified her.

Q.    And what was the name that you saw on the driver's license?

A.    It was Mellannise Henderson.

Q.    Do you see that individual in the courtroom today?

A.    Yes, sir, I do.

Q.    Will you please point her out and identify an article of clothing she's wearing.

A.    Yes, sir.  Be the female in the brown jacket with the gold scarf or shawl over her shoulders.

Q.    If I'm seated in position number one, my trial partner is position number two, which seat position would she be?

A.    She would be in four.

        MR. WILSON:  Your Honor, let the record reflect that this witness has identified the defendant.

Q    (By Mr. Wilson) All right.  Let's talk about the defendant.  What did you observe from her upon your initial contact?

A.    Upon first speaking with her, I noticed she had kind of watery glazed-over eyes.  Slurred speech as I was speaking with her, and I did notice a strong odor of alcoholic beverage coming from the vehicle.

Q. Was it coming from the vehicle or did you notice it coming from her breath?

A. At that point, as she sat in the car, I couldn't make that determination.

Q. And you said that you asked her for her driver's license. Did you ask her to provide any other information?

A. I asked for her proof of vehicle insurance as well.

Q. And how did she respond to that request?

A. She began to look in her purse and throughout her vehicle for her driver's license for several seconds before eventually locating it and she handed me the driver's license only.

Q. She didn't hand you the proof of insurance?

A. Not initially, no, sir.

Q. What did you do when she didn't hand you the insurance?

A. I believe I asked her a couple more questions about whether it was her car and such, where she may be coming from, and then I once again asked her for her proof of insurance.

Q. And what happened then?

A. I believe she did provide me a copy of that.

Q. You said that you asked the defendant where she was coming from. How did she respond to that question?

A.    She told me she was coming from downtown Dallas.

Q.    And did she say why she was in downtown Dallas?

A.    Stated she was coming from work.

Q.    What line of work did she say she was in?

A.    She stated she was an attorney.

Q.    And did you have the opportunity to ask whether she had been drinking that night?

A.    Yes, sir, I did.  I asked her if she consumed any alcohol at all.

Q.    And what did she respond?

A.    She stated she had had none.

Q.    Did you ask the defendant anything about -- about the driving incident that you had just experienced with her?

A.    Yes, sir.  I asked her what had happened with her lane change.

Q.    And how did she respond to you?

A.    She -- she stated that she had seen some emergency lights ahead and thought that she wasn't sure what she needed to do, whether she needed to change lanes or not.

Q.    What else did you ask her about the traffic?

A.    I asked her if she had changed lanes and I asked her if she had seen my patrol vehicle behind her when she did, and she stated, no, she did not see the police car

behind her -- or, a vehicle behind her.

Q.    And what did you notice about her responses to your questions at this point in time?

A.    I'm not sure what you mean.

Q.    Well, how did her speech sound to you?

A.    Again, I continued to hear the slurred speech.

Q.    And did you ask the defendant to exit her vehicle?

A.    Yes, sir, I did.

Q.    Is your patrol vehicle equipped with a device capable of making a recording?

A.    An audio and video recording, yes, sir.

        MR. WILSON:  Your Honor, may I approach?

        THE COURT:  Yes, sir, you may.

Q    (By Mr. Wilson) Officer Corley, I'm showing you what has been marked as State's Exhibit 1.  You recognize State's Exhibit 1?

A.    Yes, sir.

Q.    What is State's Exhibit 1?

A.    This is a D V D copy of the audio and video recording from my patrol vehicle that night.

Q.    Does the D V D also contain a copy of the video and audio that was recorded from the intoxilyzer room?

A.    Yes, sir, it is.

Q.    And have you had the opportunity to watch both of

those videos?

A. Yes, sir, I have.

Q. Was the intoxilyzer room equipped with a device capable of making a recording as well?

A. Yes, sir.

Q. And have there been any alterations or deletions made to either of those two videos?

A. No, sir.

Q. Have you been able to watch those two videos today?

A. Yes, sir, I have.

Q. And would you say that they are a fair and accurate rendition of what you observed on December 1st, 2012?

A. Yes, I do.

MR. WILSON: At this point in time, state offers State's Exhibit 1, will tender to defense.

MR. BROOKS: No objection.

THE COURT: State's 1 is admitted.

Q (By Mr. Wilson) Officer, after you asked the defendant to exit the vehicle, were you able to smell any alcohol on her breath at that point in time?

A. Yes, sir, I was.

Q. Now, let's talk about standardized field sobriety tests. First off, I would just like to talk about them in

general.

Q.    What are standardized field sobriety tests?

A.    It's a series of three tests that we use to determine what kind of percentage we believe that a person may or may not be intoxicated.

Q.    Are they used all over the nation?

A.    Yes, sir, they are.

Q.    And what are these three tests?

A.    There's a horizontal gaze nystagmus, which is basically a testing of the involuntary jerking of the eyes. There's also a walk-and-turn exercise, and a one-leg stand. Both of those are a divided attention exercise.

Q.    And how are these various tests scored?

A.    They each have several clues that could be gained on each one, and once they reach a certain amount of clues, then we believe that that's the highest percentage that that person is intoxicated.

Q.    What is a clue?

A.    There are several clues.  With the horizontal gaze nystagmus, for example, if the eye begins to jerk at a certain spot where the stimulus is, then that will count as a clue, one for each eye.

Q.    And what's the decision point?

A.    A decision point is the point at which the officer decides that the person is indeed intoxicated.

Q.    So if a -- so basically, are you saying, then, that a decision point, is that based on the number of clues that the officer observes?

A.    Correct.

Q.    And does each particular test have a certain decision point associated with it?

A.    Yes, sir.

Q.    And when you reach that decision point, what does that indicate to you about the individual's level of intoxication?

A.    That there's a very, very high percentage that they are at least 0.8 [sic] on the blood alcohol content.

Q.    What was the environment like when you performed these tests for this defendant?

A.    It was actually a fairly mild day for December 1st.  I don't -- maybe a light wind.  It was dry as well.  It was nighttime.

Q.    What was the surface like?

A.    It's a relatively smooth concrete surface.

Q.    Was it flat or at an angle?

A.    It was pretty flat.

Q.    And was there any debris on that surface at all?

A.    Nothing major, no, sir.

Q.    And what about your -- the flashing lights on your patrol car at that time?

A.     We have the ability to turn off the front strobes on our vehicle and leave just the rear so that our vehicles can be seen from behind so that it doesn't affect any horizontal gaze nystagmus testing.  So I was able to turn the front ones off.

Q.     Why would the front strobe lights have an effect on horizontal gaze nystagmus?

A.     The strobing of the light can have an effect on the eyes, the involuntary jerking of the eyes.

Q.     But you turned those lights off for the defendant?

A.     Yes, sir.

Q.     Okay.  Let's talk about the horizontal gaze nystagmus test specifically.  Was that the first test that you conducted?

A.     Yes, sir.

Q.     And what is horizontal gaze nystagmus?

A.     Nystagmus is the involuntary jerking of the eyes. And in those tests we do are done on a horizontal plain, thus the name horizontal gaze nystagmus.

Q.     What causes it?

A.     There are some things that cause it but the most common is going to be a high level of introduction of alcohol into the body.

Q.     Is alcohol a depressant?

A.    Yes, sir.

Q.    So is a depressant something that can cause horizontal gaze nystagmus?

A.    Yes, sir.

Q.    Are there any other substances that cause horizontal gaze nystagmus?

A.    I'm sure there are.  I'm not familiar exactly which ones there would be but I believe there are.

Q.    Would they be things like inhalants or P C P's?

A.    Yes, sir.

Q.    Can something like caffeine cause horizontal gaze nystagmus?

A.    Not that I'm aware of.

Q.    How about stress?

A.    No, sir.

Q.    How about need to use the restroom?

A.    No, sir.

Q.    How about the wind or something like that?

A.    No, sir.

Q.    And you mentioned that this jerking of the eye is involuntary.  So is there -- when you say that, is there anything that a person can do to control that jerking movement?

A.    No, sir.

Q.    And when you talk about the jerking movement,

will you explain to you jury what exactly that really is.

A.    What you'll see with the involuntary jerking, it's a pretty small movement of the eye.  I'm not sure how else to explain it.  It's something that you will see, you have to see up close, and the eye makes a small movement, something like this (Indicating).

Q.    Do you see that sort of movement in a person who is not intoxicated or had one of these other inhalants or P C P?

A.    No, sir.

Q.    Did you attempt to perform the horizontal gaze nystagmus test on the defendant?

A.    Yes, sir, I did.

Q.    And before I go further with that, what's the decision point on the horizontal gaze nystagmus test?

A.    Once you have four clues of the six possible.

Q.    And how are those measured?

A.    I'm sorry?

Q.    How are those clues measured?

A.    Well, once you do -- perform the exercise, once you see the nystagmus, the required nystagmus, for each step, then you will count that as a clue.  And again, it's one for each eye.

Q.    So basically, are you saying, then, that there are three different things you're looking for, one for each

eye?

A.    Yes, sir.

Q.    Does that make the total six?

A.    Yes, sir.

Q.    Okay.  What are the preliminary steps you take before conducting the horizontal gaze nystagmus test?

A.    I will ask a series of questions regarding whether the person has had any brain trauma, been in any fights or car wrecks or anything that would cause trauma to the brain.  Another step I will do, I will check their eyes for equal pupil size, which could indicate brain trauma as well, and I will make sure that they had equal tracking, that both eyes can follow the stimulus.

Q.    Did you perform those preliminary steps on the defendant?

A.    Yes, sir, I did.

Q.    And what were the results?

A.    She had equal pupil size and was able to do equal tracking as well.

Q.    Did she have any head injuries or accidents that she related to you?

A.    No, sir.

Q.    So in your opinion, did you feel like the defendant was a good candidate for the H G N test?

A.    Yes, sir, I did.

Q.    Tell the jury the instructions for the test as you told the defendant that night?

A.    I will instruct the defendant to stand with their feet together and their hands down by their side.  I will instruct them to keep their head still and I will show them a stimulus, which in most cases, I usually carry this one pen.  It's a white pen with a black top.  I will ask if they can see this and they will indicate if they can or not.  Which she did.  She said she could see it.

I will instruct her that I will move the stimulus from side to side and, at the end of the test, up and down, and I will instruct them to follow with their eyes only without turning their heads.

Q.    Was the defendant able to follow those instructions?

A.    No, sir.

Q.    What kind of problems did you see with the following of the instructions?

A.    I noticed the defendant, after several times being asked, turned her head instead of just her eyes, she would follow the stimulus with her head.

Q.    How did you respond when she did that?

A.    I asked her -- reminded her again that she needs to keep her head still and follow with her eyes only.

Q.    And what happened when you reminded her?

A.    She again turned her head the next time I tried.

Q.    Did you try anything else to help the defendant out that night?

A.    Yes, after several times of reminding her that she is still moving her head, I asked her if she would like to actually physically hold her head with her hands to keep her head still, and she said she would.

Q.    What happened when you -- or, did she wind up holding her hands to her head?

A.    She did.  She did hold her hands together -- or, hold her head with her hands.

Q.    What happened when you tried to perform the test?

A.    Still continued to turn her head with the stimulus.

Q.    Did you have any other conversation with her about these instructions, about turning her head?

A.    It was actually over several minutes that I actually tried to get her to cooperate with this exercise, so, I mean, there were things that were said.

Q.    And how did she respond?

A.    I remember her telling me that she wasn't able to do it, she was not able to follow with just her eyes only.

Q.    Even despite all the difficulty the defendant had following the instructions, were you able to observe any clues during that test?

A.   Yes, sir.  I was able to get two of the clues for each eye, so a total of four clues.

Q.   And was the decision point reached?

A.   On that test, yes, sir, it was.

Q.   What four clues did you observe?

A.   I observed the lack of smooth pursuit, which is the first thing I would be looking for.  Basically, moving the stimulus across the eye, I'm looking for the eyes to roll, like a marble across a table just nice and smooth.  If that is -- if that doesn't occur, then we do have the clue of lack of smooth pursuit.  Whereas the stimulus moves, the eyes will jump to try to catch up with the stimulus.  I did notice that in both eyes.

Q.   And so --

THE COURT:  Just a moment.  I'm receiving an indication from one of the members of the jury that he needs assistance.

Bailiff, would you assist the juror, please.

(Sidebar conversation between the juror and the bailiff.)

(Sidebar conversation between the court and the bailiff.)

THE COURT:  All right.  Ladies and gentlemen, we're going to take a quick break for about 15 minutes.  All parties except for the panel remain in the

courtroom.

Bailiff, take charge of the panel.

*THE BAILIFF:* Yes, Your Honor. All rise.

*(The jury exits.)*

*THE COURT:* You may be seated. Take a quick break.

*(Recess at 3:19 P M, resuming at is 3:31 P M. Defendant present.)*

*THE BAILIFF:* All rise.

*(The jury enters.)*

*THE COURT:* Thank you. Everyone may be seated. Let the record reflect that all parties are back in the courtroom. The jury is back in the jury box. This witness is still under oath.

State, you may continue with your direct examination.

*MR. WILSON:* Thank you, judge.

Q (By Mr. Wilson) All right. Officer, so just to kind of recap, you had observed four clues for the H G N; correct?

A. Yes, sir.

Q. And now, you indicated earlier that you have performed about 50 D W I investigations; correct?

A. Give or take, yes, sir.

Q. Is the horizontal gaze nystagmus test designed so

that an average non-intoxicated person can perform the test without turning their head?

A.    Yes, sir.

Q.    And what does the turning of the head typically indicate to you when you're performing this test?

A.    It indicates that the person, for whatever reason, is unable to follow your directions.

Q.    Does that sometimes indicate to you the possibility of intoxication?

A.    It can be a symptom of intoxication, yes, sir.

Q.    And in your -- in all of your experience, have you run into anyone who had this kind of difficulty following the instructions for horizontal gaze nystagmus?

A.    From time to time, yes, sir, I have.

Q.    And I guess, what was the status of intoxication for those individuals?

A.    Just about everyone who has trouble following those directions is intoxicated.

Q.    Now, I'd like to move on and -- Are you familiar with the idea of divided attention?

A.    Yes, sir.

Q.    What does it mean?

A.    It's basically you're asking someone to follow your directions using their mind while performing a physical exercise at the same time.

Q.   Is driving a divided attention task?

A.   Yes, sir, it is.

Q.   And how does alcohol affect one's ability to perform a divided attention task?

A.   Alcohol will slow the decision-making process as well as the physical ability to do things, such as operate a motor vehicle.

Q.   Let's move on to the other tests in the standardized field sobriety test battery here.

Are you familiar with the walk-and-turn test?

A.   Yes, sir.

Q.   What is that test?

A.   Again, it's a divided attention test in which we will ask someone to walk a line, giving them a certain number of steps to turn and walk back.  During this, we're giving them a series of instructions to follow such as keeping their hands down by their side, touching heel-to-toe on the steps, turning like we ask them to, counting each step out loud.

Q.   Will you actually provide the instructions to the jury as you would normally provide those instructions to someone?

A.   Yes, sir, I can do that.  What I would do, and I would demonstrate this as well while I do this.  I would

ask the person to either stand on the line out there on the roadway or the surface or imagine a line from where they are, usually to my vehicle towards the camera.  I will have him put their left foot on that line, and then put their right foot also on the line touching heel-to-toe, with their hands down by their side.  So they're standing there like this, this is a starting position, and I will ask to them to keep the starting position while I explain and demonstrate the exercise.

What I will ask them to do is not begin the exercise until I tell them to.  I will ask them to take nine heel-to-toe steps -- heel-to-toe meaning you're actually touching heel-to-toe -- down the line.  Going to have them turn around by keeping their lead foot planted, which should be their left foot, and using their right foot to take the series of small steps to turn around.  And again, nine heel-to-toe steps back down this line.

While they're doing this, I ask them to keep their eyes down on their toes, count each step out loud, I ask them to keep their hands down by their side, and continue the exercise until they have completed the entire exercise, and not to stop.

Q.    Did you ask the defendant to perform the walk-and-turn test?

A.    I don't know that I asked her to perform the test

by name but I asked her -- I let her know that I did have some other exercises I wished her to perform.

Q.   How did she respond?

A.   She indicated she was not sure she could do anything else because she needed to urinate.

Q.   Did anything about her response seem out of the ordinary to you?

A.   I had to ask her -- at one point, she made it known that it's important to her, the most important thing to her right now was to go urinate, not to perform field sobriety exercises, and I found that a bit odd.

Q.   Why did you find that odd?

A.   I would think that someone, you know, who wished to show that they're not intoxicated would wish to perform the exercises for an officer.

Q.   And did the defendant ever perform the walk-and-turn test that night?

A.   No, sir.

Q.   Could you have forced the defendant to perform that test?

A.   No, sir.

Q.   All right.  Let's talk about the one-leg stand. What is the one-leg stand test?

A.   Again, it's another divided attention test in which we're asking someone to do a physical test while

following instructions.

Q.    And what are you looking for when you -- when you ask them to perform that test?

A.    Again, looking for them to follow directions, looking for their sense of balance, physical agility. Basically, we're asking them to stand on one foot for a period of time and continue to do so for 30 seconds.

Q.    And will you just -- I know you basically gave the instructions but will you provide the jury the specific instructions you would typically give for that test?

A.    Yes, sir, I can do that.  I will put them in a bit of a starting position while I give them instructions and I will demonstrate the exercise for them.  What I would do is have them put their feet together, hands down by their side, just to have them standing there.

When I tell them to begin, I will ask them to pick up their foot and their toe about six inches off the ground.  Keep that leg straight.  And I will give them the option of which leg, you can use whichever leg you feel more comfortable doing.  Keep that leg straight, six inches off the ground, with your hands down by your side, looking at your toe, as you're counting out loud one 1,000, two 1,000, three 1,000 and so on until I instruct them that they can put their foot down.

Q.    And how long do you usually have them stand in

that position?

A.    Thirty seconds.

Q.    Did you ask the defendant to perform the one-leg stand test?

A.    Again, I didn't ask her by name but that's one of the tests that I had intended for her to perform.

Q.    And did she ever perform the test?

A.    She stated she was unable to because she needed to urinate.

Q.    Based on your training and experience, about how long does it take someone to perform the combination of the walk-and-turn and the one-leg stand test?

A.    Less than five minutes.

Q.    And did you ever explain to the defendant that those tests don't take very long to perform?

A.    Yes, sir.  I explained to her several times that she stated she needed to urinate, if we could continue and get the exercises done, we could reach a conclusion and we could get her to a restroom.

Q.    Did the back and forth you had with the defendant wind up taking longer than five minutes?

A.    Yes, sir.

Q.    Let's talk about what happened after the standardized field sobriety tests.

What did you do after the defendant made it

clear that she would not perform the initial tests you were wanting her to perform?

A. Once I had determined that she was basically refusing to do the exercises, I placed her under arrest for driving while intoxicated.

Q. What happened next?

A. She was placed in the back of my patrol vehicle and taken to the Richardson police department to our intoxilyzer room.

Q. Did anything unusual happen on the way from the -- from the scene where you arrested the defendant over to the intoxilyzer room?

A. I don't recall anything unusual, no, sir.

Q. All right. Let's talk about what happened at the Richardson city jail. Once you arrived there, where did you take the defendant?

A. We have a room that's designated for the processing of intoxicated drivers; that's our intoxilyzer room. That's where I took her.

Q. And what do you -- What kind of instructions do you provide the defendants when you bring them in to the intoxilyzer room?

A. When I walk into this room, there is a straight line painted in this room on the floor which you will see it in the video and there is a black square that's

basically a one foot by one foot tile that is painted black while the rest of the floor is a white color. I'll instruct them to go stand on that black square.

Q. Did you give those instructions to this defendant?

A. Yes, sir.

Q. How did she comply?

A. She had set her shoes down near the square and she actually walked around a counter and began leaning at the counter and the wall.

Q. While you were in the intoxilyzer room, did you read the defendant the statutory warning?

A. Yes, sir.

Q. Did you provide the defendant with a copy of that warning?

A. Yes, sir, I did.

Q. Did she have the opportunity to read along with you.

A. Yes, sir.

MR. WILSON: Your Honor, may I approach the witness?

THE COURT: Yes, you may.

Q (By Mr. Wilson) Officer, I'm showing you what has been marked as State's Exhibit 2. Do you recognize State's Exhibit 2?

A.    Yes, sir, I do.

Q.    What is State's Exhibit 2?

A.    This is a state form D I C 24, it's a statutory warning.

Q.    Is this a true and accurate copy of the warning that you provided to the defendant?

A.    Yes, sir.

Q.    And there's some writing on this document.  What is that writing?

A.    The writing on the top, I've identified the defendant by her name that was on her driver's license, her driver's license number, her date of birth, date of arrest, time of arrest, the county of arrest.  And at the bottom, I -- I read the warning, I request a sample of -- a specimen of breath, which I checked the box for breath.  She refused the -- that specimen and refused to sign saying that she refused so I checked that box indicating that as well.

Q.    And is this your handwriting on the document?

A.    Yes, sir.

Q.    And aside from the State's exhibit sticker at the bottom, has anything been changed or altered or deleted from this document from when you originally saw it?

A.    No, sir.

        MR. WILSON:  Your Honor, at this time, I offer State's Exhibit 2, while tendering to defense.

MR. BROOKS: No objection.

THE COURT: State's Exhibit 2 is admitted.

Q    (By Mr. Wilson) Officer, what is the purpose of issuing the statutory warning?

A.    It is to provide the arrested person a warning for the consequences of failing to provide a specimen of their breath and/or blood.

MR. WILSON: Your Honor, may I have use of the projector, please.

THE COURT: Yes, sir.

Bailiff, would you dim the lights just slightly, please, sir.

THE BAILIFF: Yes, Your Honor.

Q    (By Mr. Wilson) Officer, I'd like to call your attention to the second paragraph here where my pen is indicating. Will you please read that paragraph to the jury.

A.    If you refuse to give the specimen, that refusal may be admissible in a subsequent prosecution. Your license, permit or privilege to operate a motor vehicle will be suspended or denied for not less than 180 days whether or not you are subsequently prosecuted for this offense.

Q.    Did you read that statement to the defendant?

A.    Yes, sir.

Q.    And so can you just explain to the jury, what are the practical implications of that provision in the statutory warning?

A.    Basically --

MR. BROOKS:  Your Honor, excuse me.  I'm going to object.  The document speaks for itself.

THE COURT:  Sustained.

Q    (By Mr. Wilson) Based on your experience, officer, can you tell the jury kind of what the -- what the practical implications are of a 180-day driver's license suspension?

MR. BROOKS:  Again, Your Honor, same objection.  Document speaks for itself.

THE COURT:  Overruled as to that question.

A.    Basically, the suspension of 180 days from the driver's license will disallow someone from operating a motor vehicle on a public roadway, which could, you know, cause all sorts of trouble getting to work --

MR. BROOKS:  Objection.  He's already answered the question, judge.

THE COURT:  What's your legal objection?  I'm sorry?

MR. BROOKS:  I'm sorry, judge.  Legal objection is asked and answered.

THE COURT:  Overruled.

A.    Basically, your inability to operate a motor vehicle on a public roadway could interfere with someone's ability to get to work, make them depend on public transportation or someone else to get -- take care of business throughout their daily lives.

Q    (By Mr. Wilson) And in general, based on your training and experience, what does the process of offering a breath specimen entail?

A.    They will -- In our police department, they are taken to a nearby room where there is an intoxilyzer machine.  This is a machine that you will blow in.  They will be observed by an intoxilator op -- intoxilyzer operator for a period of five minutes to be sure that they're not touching their mouth or altering their sample in anyway.  Once that is done, the observation period, they will provide two breath specimens and that machine will analyze them to determine the blood alcohol content.

Q.    You said a five-minute observation period.  Is it actually a 15-minute observation period?

A.    I apologize.  Yes, sir, it is 15.

Q.    And did you ask the defendant for a specimen of her breath?

A.    Yes, sir, I did.

Q.    How did she respond?

A.    She refused to provide the specimen.

MR. WILSON: Pass the witness.

THE COURT: Mr. Brooks.

MR. BROOKS: Thank you, judge.

**CROSS EXAMINATION**

BY MR. BROOKS:

Q. Officer, with respect to the statutory warning, that 180-day suspension, you're aware that the individual can get an occupational license to cover their needs for work and things of that nature?

A. Yes, sir.

Q. Now, also, with respect to the statutory warning, at the point in time where someone is being read that statutory warning, they are already under arrest; correct?

A. Yes, sir.

Q. Nowhere in that statutory warning does it say to them that if you pass this test, you will be released, does it?

A. No, sir.

Q. In fact, in the video that we're about to see, you don't state that to Ms. Henderson either, do you?

A. No, sir.

Q. So it serves no value to taking the test, she's already under arrest; correct?

A. That's up to her.

Q. Okay. But that bottom line is, she's already

under arrest.

A. Yes, sir.

Q. Now, earlier, you were asked some questions about different things that can cause nystagmus. Do you have any medical training?

A. No, sir, I do not.

Q. Do you have any paramedic training?

A. No, sir, I do not.

Q. So in terms of what can or cannot cause nystagmus, you don't have any personal knowledge based on medical experience to answer that question correctly, do you?

A. That is correct, yes, sir.

Q. Now, did you refresh your memory with anything today prior to testifying?

A. Yes, sir, I did.

Q. A copy of your police report?

A. Yes, sir.

Q. All right. Mind if I take a look at it, sir?

A. Yes, sir.

MR. BROOKS: May I approach, Your Honor?

THE COURT: Yes, sir, you may.

THE WITNESS: (Hands document to Mr. Brooks.)

THE COURT: Mr. Brooks, do you want the

lights to come back on or are you going to be referring to the exhibit?

MR. BROOKS: The lights can come back on, judge.

THE COURT: Bailiff.

MR. BROOKS: May I have just a moment, Your Honor?

THE COURT: Yes, sir. (Pause).

Q    (By Mr. Brooks) Now, at the start of your testimony, when you were asked how -- what you were doing or where you were en route to, I think you told us you were responding to an officer-in-need call?

A.    An officer backup, yes, sir.

Q.    Officer backup. And that you were asked, had you noticed anything else unusual before you saw the Lexus, I think you mentioned seeing a car run a red light?

A.    Yes, sir.

Q.    Okay. You weren't referring to Ms. Henderson's car, were you?

A.    No, sir, I was not.

Q.    And in fact, you testified that after you pulled her over and you told her why you pulled her over, she told you that she saw some emergency lights in front of her and she couldn't determine if she needed to go left or right?

A.    Yes, sir.

Q.    In fact, I think you stated there were emergency lights in front of her?

A.    Once we stopped the vehicles, yes, sir, there were.

Q.    And on the video, you agree with me that looking just at the video from that vantage point, you can't tell if those emergency lights are in the left lane or the right lane, can you?

A.    I don't believe from the video you can probably tell that, no, sir.

Q.    Let's talk about what happens after you first come in contact with her.  You said that you asked her for her license and proof of insurance.

A.    Yes, sir.

Q.    And it took her several seconds to get that.  Did you happen to notice what size purse she was pulling those items out of?

A.    I don't recall at this time, no, sir.

Q.    If it was a large purse, it wouldn't be unusual for a woman to have to fumble around inside her purse to find those items?

A.    No, sir.

Q.    So certainly that by itself would not be a sign of intoxication?

A.    By itself, no, sir.

Q.   In fact, when we looked at knowing that there are emergency lights in front of her as she stated, as you just now stated, she had to get over in response to those lights, that by itself is not a sign of intoxication, is it?

A.   By itself, no, sir.

Q.   Now, when you got behind her, you issued -- or, did you turn on your take-down lights?  Are they still called take-down lights?

A.   They are.  If I didn't use that, I did at least use a spotlight, one or the other.

Q.   And is that in and of itself a command, a non-verbal command?

A.   Yes, sir.

Q.   And it's a non-verbal command for that car to pull over?

A.   Yes, sir.

Q.   And the point in time where she notices that light, she has to begin to do some divided attention types of things; correct?

A.   Yes, sir.

Q.   She actually has to respond to your light, she has to slow down.  Correct?

A.   Yes, sir.

Q.   She has to make sure she slows down and parks in

an appropriately safe place?

A.   Yes, sir.

Q.   Correct?  And she did all of those things correctly?

A.   Yes, sir.

Q.   In fact, she did all of those things in a normal fashion?

A.   Yes, sir.

Q.   When you approach her, as you told her, you asked for her driver's license, and she produced her driver's license to you in a normal fashion?

A.   Yes, sir.

Q.   Okay.  It wasn't on the floorboard of the car or in the back seat or anything like that?

A.   No.

Q.   She reached in and pulled it out and gave it to you?

A.   Yes, she did give it to me, yes, sir.

Q.   So that's normal.

A.   Yes, sir.

Q.   Now, when she pulled over, that was because you wanted her to pull over; correct?

A.   Yes, sir, that is correct.

Q.   Now, at some point, you make the decision to ask her to get out of the car.

A.    Yes, sir.

Q.    And you asked her to get out of the car?

A.    That is correct.

Q.    And she responded to that?

A.    Yes, sir.

Q.    Normally?

A.    Yes, sir.

Q.    She doesn't stumble out of the car?

A.    No, sir.

Q.    She doesn't grab the door to climb her way out of the car?

A.    No.

Q.    She gets out of her car in response to your command; correct?

A.    Yes, sir.

Q.    Now, was she respectful with you from your first encounter with her, your first time speaking with her?

A.    Yes, sir, she was.

Q.    Did she remain respectful with you throughout your time with her?

A.    Yes, sir, she did.

Q.    Isn't it true a lot of times in these type of situations, the person that you take in custody becomes quite belligerent?

A.    Absolutely, yes, sir.

Q.    Or hysterical?

A.    Yes, sir.

Q.    And none of that happened here?

A.    That is correct.

Q.    Now, when she got out of the car, you told her where to stand?

A.    Yes, sir.

Q.    And she went and stood where you told her to stand?

A.    Yes, sir.

Q.    Now, while she's standing there, and she's standing there for -- it's more than a minute, probably several minutes, isn't it?

A.    Yes, sir.

Q.    She's not swaying or leaning up against her car or anything like that, is she?

A.    There was some slight swaying but no leaning up against the car, no, sir.

Q.    Can you see that slight swaying on the video?

A.    I don't know that you can, sir.

Q.    So for their purposes, the jury won't have any evidence of that on the video?

A.    Without looking at it again, I don't recall seeing any major swaying, no, sir.

Q.    You've looked at it before you got on the stand

and testified today?

A.    Yes, sir.

Q.    And you don't recall seeing it?

A.    Nothing major.

Q.    Now, the area that you were in, there was still some traffic going by -- going by you; correct?

A.    Yes, sir.

Q.    And it's not like you guys were the only ones on the road?

A.    Correct.

Q.    There wasn't heavy traffic but there was still traffic there?

A.    Correct.

Q.    What is the N H T S A student manual, officer?

A.    That is a manual that provides all the instructions to peace officers on how to perform field sobriety tests.

Q.    It's basically a peace officer's bible for how to perform field sobriety tests?

A.    Yes.

Q.    And in that -- is that the organization that certifies you to perform the H G N testing?

A.    Yes, sir, it is.

Q.    There are certain things that they ask you to do prior to performing the H G N test?

A.    Yes, sir.

Q.    One of the things they ask you to do is make sure that the subject is not facing passing traffic?

A.    Yes, sir.

Q.    And that's so as to not be a distraction as far as those headlights going back and forth; correct?

A.    Yes, sir.

Q.    To the same extent why you're supposed to take down your strobe lights?

A.    Correct.

Q.    And we know on this video, Ms. Henderson is facing the passing traffic?

A.    Correct.

Q.    They also ask you to do what's called a precheck.

A.    Yes, sir.

Q.    Are you telling this jury that on the video, they will see you doing a precheck of her eyes to determine whether they can track smoothly?

A.    Yes, sir.

Q.    That's on the video?

A.    Yes, sir.

Q.    Okay.  Now, going back to the N H T S A student manual, when's the last time you looked at that student manual?

A.    About six months ago, I believe.

Q.    And you're aware that in the manual, according to the manual, the H G N test is 77 percent accurate?

A.    Before you told me, I knew there was a percentage.  I don't recall exactly what the percentage was.

Q.    But it's not 100 percent?

A.    Correct.

Q.    And if I represent to you that in the manual, it says 77 percent, are you willing to accept that?

A.    Yes, sir, I am.

Q.    They also give you a percentage of the walk-and-turn and one-legged stand test.  Do you recall what those percentages are?

A.    I do not, no, sir.

Q.    But they're not 100 percent either --

A.    That is correct.

Q.    -- do you recall that?

A.    Yes, sir.

Q.    And they recommend that in order to make a determination as to whether or not someone is intoxicated, that you perform all three of those tests?

A.    Yes, sir.

Q.    And in that manual, it also says that even with all three of those tests, the accuracy of that battery of tests is 80 percent --

A.    Yes, sir.

Q.    -- you recall that?

A.    Yeah, I do, yes, sir.

Q.    So even all three of those tests together is not a 100 percent validation or verification someone is intoxicated beyond their normal mental and physical faculties, according to the N H T S A manual; correct?

A.    That is correct, yes, sir.

Q.    Now, Ms. Henderson told you that she needed to use the bathroom.

A.    Yes, sir.

Q.    Did she also tell you that she was only two miles from home?

A.    She did indicate that it was pretty close, yes, sir.

Q.    And you had her driver's license so you were able to verify if she was telling the truth or not?

A.    Yes, sir.

Q.    And you verified that she was actually very close to her home?

A.    Yes, sir.

Q.    So you don't know if she got in a situation where, on the way home, she figured she could go ahead and make it and rather use a bathroom in her own private bathroom versus a public bathroom, do you?

A.    Correct.  Yeah, I have no way of knowing that.

Q.    Now, in terms of not being able to do the testing, if she had tried to do the one-legged stand test and lost control and peed on herself, you would've put that in your report as a sign of insobriety, wouldn't you?

A.    Yes, sir.

Q.    And the same thing if she tried to do the one-legged stand test and was unable to do it and started peeing while doing it, you would have put that as a sign of insobriety?

A.    Yes, sir.

Q.    She was kind of between a rock and a hard place in terms of having to use the bathroom or taking a chance of peeing on herself.

A.    That's understandable, yes.

Q.    And in fact you were so concerned about whether or not she was going to pee on herself that you called in another officer and you told him, I wanted you to come because I don't want her to pee in my car.

A.    Okay.

Q.    You remember that?

A.    I don't recall saying that, no, sir.

Q.    If it's on the tape, you wouldn't dispute that?

A.    No, sir, I would not.

Q.    So after you made the decision to arrest her,

she's put in your squad car -- was that someone else's squad car?

A.    That was mine, yes, sir.

Q.    She was put in your squad car, and, I guess, the other officer, at that point, inventories her car and prepares it to be impounded?

A.    Correct.

Q.    Now, the ride back to the police station, about how long would you say that ride took?

A.    I would guess between seven and 10 minutes.

Q.    And in the ride back, the two of y'all had a conversation?

A.    Yes, sir.

Q.    And that conversation never got ugly in anyway, did it?

A.    No, sir, did not.

Q.    She remained respectful with you?

A.    She did.

Q.    She asked you about what was the process going forward?

A.    Yes, sir.

Q.    And she -- the two of y'all talked about who the car was registered to, who might come pick it up?

A.    Yes, sir.

Q.    Now, isn't it true that she expressed some

concern to you about the inventory of her car?

A.    I don't recall that.  I'm certain it may have happened; I don't recall it.

Q.    Do you recall telling her that you know the other officer and you trust him?

A.    I don't recall saying that, but it's very possible.

Q.    If it's on the tape, it's on the tape.

A.    Yes, sir.

Q.    And do you recall her concern not being about personal items in the car but rather with items or files relating to clients of hers?

A.    Again, I don't recall, but if it's on the tape, yes, sir.

Q.    And if that's what's on the tape, that would indicate that she has -- was having a concern about maintaining the privacy of her clients' files; correct?

A.    Yes, sir.

Q.    Now, going back to the nystagmus, the manual tells you a certain way that that test is supposed to be performed and it's supposed to be 12 to 15 inches from the nose.

A.    Yes, sir.

Q.    Slightly above the eyes at 45-degree angle?

A.    Yes, sir.

Q.   This jury has no way of determining from the video that it's 12 to 15 inches from the nose, can they?

A.   Not perfectly accurately, no, sir.

Q.   And they can't determine whether or not the pen is being held at the correct 45-degree angle?

A.   No, sir.

Q.   Isn't it true, officer, also that the manual sets out that some people have what's called natural nystagmus?

A.   Yes, sir.

Q.   But you don't have any testing or preliminary testing to determine whether or not she had natural nystagmus?

A.   I'm not qualified to do that, no, sir.

MR. BROOKS:  Pass the witness.

MR. WILSON:  Your Honor, may we approach?

THE COURT:  Yes, sir.

(Sidebar conversation between the court and counsel off the record.)

THE COURT:  You may proceed.

MR. WILSON:  Thank you, judge.

**REDIRECT EXAMINATION**

BY MR. WILSON:

Q.   Officer Corley, are you familiar with the validation studies that are included in the NHTSA handbook?

A.   I have read them but it has been some time.

Q.    Would it help if I refresh your recollection?

A.    Yes, sir.

MR. WILSON:  May I approach the witness, Your Honor?

THE COURT:  Yes, sir, you may.

Q    (By Mr. Wilson) Sir, if you'll just read this page here to yourself, silently.

Has your recollection been refreshed?

A.    Yes, sir.

Q.    Are you familiar with the three validation studies undertaken between 1995 and 1998 in Colorado, Florida and San Diego?

A.    Yes, sir.

Q.    And is it true that the Colorado study came to the conclusion that when performed together, that the standardized field sobriety tests are about 93 percent accurate?

A.    Yes, sir.

Q.    And that the Florida test yielded a result that said the field sobriety tests were about 95 percent accurate?

A.    Yes, sir.

Q.    And that the San Diego test stated that the field sobriety tests had about a 91 percent level of accuracy in showing that someone would be at least a .0 -- .08 level of

alcohol concentration or greater?

A.   Yes, sir.

Q.   And you're not -- you have no medical training; is that correct?

A.   Correct.

Q.   Where does the information about what can cause horizontal gaze nystagmus, where does that information come from?

A.   The only information I read has been in the N H -- the NHTSA manual there.

Q.   And is this provided to you by the State of Texas?

A.   Yes, sir.

Q.   Is it provided to all police officers in the State of Texas?

A.   Yes, sir.

Q.   When it came to the statutory warning, does the statutory warning include any language about an occupational driver's license?

A.   No, sir.

Q.   So on the face of it, if all you have in front of you is the information provided in the statutory warning, there's no way to know that you can go get an occupational driver's license; is that correct?

A.   On the face of that, no, sir.

Q.    Based on your experience and all of the D W I investigations that you have conducted, have you ever run into individuals who are both respectful and intoxicated?

A.    Yes, sir.

Q.    And would you say that there are slight nuances that you've been trained to see that aren't going to always show up on video?

A.    Yes, sir.

Q.    And when it comes to the passing lights, why is it that under ideal conditions you don't have someone face passing traffic when performing the H G N test?

A.    Under ideal conditions, if the traffic is heavy enough and cars are going by, the eyes can tend to follow the lights as it goes across.

Q.    But does that cause an individual's head to turn?

A.    No, sir.

Q.    And what was traffic like that night?

A.    It was light.

MR. WILSON:  Pass the witness.

THE COURT:  Anything further, Mr. Brooks?

MR. BROOKS:  Yes, Your Honor.  Just a couple of questions.

**RECROSS EXAMINATION**

BY MR. BROOKS:

Q.    In reference to what you were just asked as far

as standing on the side of the road and the traffic going back and forth.

A.    Yes, sir.

Q.    Because of what you do for a living, your eight years of doing this, you're used to standing on the roadside where vehicles are going past you; is that a fair statement?

A.    Yes, sir.

Q.    You have no reason to expect that Ms. Henderson would be used to being in that situation, would you?

A.    No, sir.

Q.    And the battery of tests that we talked about, there are still other tests that could have been administered in terms of field sobriety testing, such as counting backwards from A B C, from Z through B, or B through T; correct?

A.    Correct.

Q.    You could have done that.  And that's perfectly acceptable test, isn't it?

A.    It's not a standardized test but I believe it could be acceptable, yes, sir.

Q.    And you utilized that test before?

A.    I believe early on in my career, I did.  It's nothing I used recently.

Q.    What about counting backwards?

A.    It's not something I generally use, no, sir.

Q.    Have you used that test before?

A.    I have but it's been several years.

Q.    And going back to when you and Ms. Henderson are talking about the inventory, she had the foresight to ask you if she was going to get a copy of that inventory, didn't she?

A.    Yes, sir.

MR. BROOKS:  I don't think I have any other questions at this time, Your Honor.

THE COURT:  Any further questions of this witness from the state?

MR. WILSON:  No, Your Honor.  Witness may be excused by the state.

THE COURT:  You want to reserve this witness, Mr. Brooks, or is he released?

MR. BROOKS:  Subject to recall, judge.

THE COURT:  Sir, you're free to go.

THE WITNESS:  All right.  Thank you.

THE COURT:  Call your next witness.

MR. WILSON:  Your Honor, at this time, the state has no more witnesses to call but I request permission to publish State's Exhibit 1.

THE COURT:  Permission granted.

*(DVD published on the overhead screen.)*

MR. WILSON: Your Honor, that concludes the state's publishing of the in-car video portion of State's Exhibit 1.

Now publishing the intoxilyzer room portion of the State's Exhibit 1.

THE COURT: My understanding is this next portion is about seven minutes; is that correct?

MR. WILSON: About six, Your Honor.

THE COURT: Proceed.

(DVD published on the overhead screen.)

MR. WILSON: Your Honor, that concludes the state's publishing the State's Exhibit 1.

THE COURT: Mr. Brooks, is there anything of any value past this point on the video?

MR. BROOKS: No, Your Honor.

THE COURT: All right. Lights, please.

State, call your next witness.

MR. WILSON: At this time, Your Honor, members of the jury, the state rests.

THE COURT: What says the defense?

MR. BROOKS: May we have a moment, Your Honor?

THE COURT: Yes, sir.

MR. BROOKS: Step to the conference room?

THE COURT: Yes, sir.

(Recess in place at 4:54 P M, resuming at 4:55 P M. Defendant present. Jury present.)

MR. BROOKS: At this time, if it please the court, members of the jury, the defense rests.

THE COURT: All right. Both sides close?

MR. BROOKS: Defense close.

MR. WILSON: State closes.

THE COURT: Lady and gentlemen of the jury, that's all the evidence you're going to hear in this case.

At this point, I note for the court and the record that it's four minutes till 5:00. That's all of the evidence but we still have to have what's called the jury conference here on the charge, the instructions that you're going to receive. I've been busily working on that in between running the court. I have them ready but I have to give the attorneys a copy and give them a chance to look at it, see if they have any requests for instructions.

We're here to serve you. So I'm going to let you go to the jury room and quickly take a consensus. If you want to stay and work, we'll stay here and work through the evening until you arrive at a verdict. If you want to go home, we will break now. I'll ask that you come back tomorrow morning, 9:00 o'clock.

Both sides will -- whether you stay or go,

both sides are going to give a closing argument. It will be about 15 minutes long, telling you what they think the evidence has shown. Then you'll be able to start your deliberations. So you still got at least 15 minutes of argument per side, that's a half hour, probably 15 minutes of looking at the jury charge, and I have to read it to you by law. You're looking at at least an hour before you're going to be able to start your deliberations. All right?

So I will follow your lead. If y'all want to, as a group, come back tomorrow, then we'll -- you'll be done and start deliberating by 10:00 o'clock. Or if you want to stay, then we'll stay. So at this time, I'm going to pass out the jury charge.

Bailiff, take charge of the jury.

And decide amongst yourselves if you want to stay or come back tomorrow morning.

Counsel, approach.

*(The jury exits.)*

*THE COURT:* Please look over the proposed jury charge. We'll stand in recess for 10 minutes while y'all look that over and the jury decides what they want to do.

*(Recess at 4:57 P M, resuming at 5:07 P M.*
*Defendant present.)*

*THE BAILIFF:* All rise.

*(The jury enters.)*

THE COURT: Thank you. You may be seated. Let the record reflect that all parties are present, the jury is back in the courtroom.

Lady and gentlemen of the jury, it's come to my attention that you collectively have decided that you prefer to go home tonight and then reconvene tomorrow at 9:00 A M. Is that correct?

THE JURORS: Yes, sir.

THE COURT: All right. Now, I didn't mention this earlier because it's very rarely that it comes up. But I believe one of the jurors might have been taking notes.

THE JUROR: Yes, sir.

THE COURT: The law in Texas on that is, you can take notes if the judge allows, and I do allow it. But you cannot share them with anyone else. And you cannot have them when you go back and deliberate. So you can use them, give them to the bailiff tonight, he'll secure them in an envelope. He'll give them back to you tomorrow for you to review if you would like before you go deliberate.

The reason the law doesn't allow you to take them back there, we don't want somebody relying on your note taking instead of what they heard and saw in the courtroom just in case your notes are incorrect.

*(Jury Not Present)*

THE JUROR: Yes, sir.

THE COURT: Okay. So, bailiff, collect any notes and mark them in an envelope, keep them separate.

No one is going to look at your notes. We'll return them to you tomorrow.

Remember my instructions. Don't begin discussing this case with anybody. We're almost at the end. I don't think you're going to hear more than 30 minutes of proceedings tomorrow. I'll come in, read you the charge. We'll keep working on this so we're not wasting any of your time. Each side will take 15 minutes and then you'll be deliberating. All right. Thank you.

Bailiff, take charge of the courtroom --

THE BAILIFF: Yes, Your Honor.

THE COURT: -- or the panel.

THE BAILIFF: All rise.

THE COURT: See everyone back here in the morning at 8:45. And collect the notes, bailiff.

THE BAILIFF: Yes, sir.

(Adjourned at 5:10 P M. Resuming December 3, 2013, in Volume 4.)

STATE OF TEXAS        )

COUNTY OF COLLIN      )


     I, Marigay Black, Official Court Reporter in and for the County Court at Law Number Two, County of Collin, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     Signed this 26th day of March, 2014.


                              /S/  Marigay Black

                              MARIGAY BLACK, Texas CSR 351
                              Official Court Reporter
                              County Court at Law Number Two
                              Suite 10344
                              2100 Bloomdale Road
                              McKinney, Texas 75071
                              Tel:  972-548-3823
                              FAX:  972-548-3828
                              Expiration:  12/31/2014
                              mblack@co.collin.tx.us

REPORTER'S RECORD
VOLUME 4 OF 5 VOLUMES
TRIAL COURT CAUSE NO. 002-80051-2013
COURT OF APPEALS CASE NO. 05-14-00025-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE COUNTY COURT |
| | ) | |
| VS. | ) | AT LAW NUMBER TWO |
| | ) | |
| MELLANNISE HENDERSON | ) | COLLIN COUNTY, TEXAS |

_____

**TRIAL ON THE MERITS**

_____

On the 3rd day of December, 2013, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Barnett Walker, Judge Presiding, and a jury, held in McKinney, Collin County, Texas.

Proceedings reported by computerized stenotype machine.

**A P P E A R A N C E S**

**Mr. Justin B. Wilson**
SBOT NO. 24080521
**Ms. Geeta Yadav Singletary**
SBOT NO. 24060862
Office of Greg Willis, District Attorney
Suite 100
2100 Bloomdale Drive
McKinney TX 75071
Telephone:  972-548-4323
Facsimile:  972-548-3622

                              Attorneys for The State of Texas


**Mr. Kevin Brooks**
SBOT NO. 03070735
Attorney at Law
Suite 2475
325 N. Paul
Dallas TX 75201
Telephone:  214-922-0212
Facsimile:  214-922-0294

                              Attorney for The Defendant

VOLUME 4

Trial on the Merits

December 3, 2013

|  | PAGE | VOL. |
|---|---|---|
| Charge Conference ........................... | 4 | 4 |
| Charge Read to the Jury ..................... | 7 | 4 |
| Closing Statement by Mr. Wilson ........... | 13 | 4 |
| Closing Statement by Mr. Brooks ........... | 18 | 4 |
| Closing Statement by Mr. Wilson ........... | 22 | 4 |
| Jury Note Received ........................ | 29 | 4 |
| Verdict ................................. | 36 | 4 |
| Punishment Phase .......................... | 38 | 4 |
| Both Sides Close .......................... | 39 | 4 |
| Sentencing ............................... | 39 | 4 |
| Reporter's Certificate .................... | 43 | 4 |

(Proceedings occurring in open court,

commencing at 9:02 A M. Defendant present.)

THE COURT: Court calls 002-80051-2013, State of Texas versus Mellannise Henderson-Love.

Let the record reflect the jury is outside the courtroom. All parties are present.

When we concluded yesterday, I gave both sides a copy of the proposed jury charge and asked that you look it over.

Does the state have any requests for changes or additions?

MR. WILSON: Your Honor, first off, I just wanted to clarify that, would you like it to state Mellannise Henderson throughout the jury charge or change it to Mellannise Henderson-Love?

THE COURT: Well, the court doesn't have a preference. I used Mellannise Henderson only because that's how it was styled on the information itself.

MR. WILSON: The state has no objection then.

Secondly, Your Honor, the state requests that in the application paragraph, bullet point number three, since no evidence was presented in regard to an alcohol concentration, we ask that the alcohol concentration paragraph be removed from the jury charge.

THE COURT:  Any objections by the defense?

MR. BROOKS:  Yes, Your Honor.  I would objet to that.  I believe what's in there is following the statute.

THE COURT:  Well, it follows the statute. Why would it be necessary to put in?  The jury couldn't find her -- there's not going to be any evidence, the state having rested and closed, there's no evidence of an alcohol concentration, so why isn't that just unnecessary language?

MR. BROOKS:  Okay.

THE COURT:  All right.

MR. WILSON:  Nothing further from the state.

THE COURT:  I'll strike paragraph three.

Any requests from the defense?

MR. BROOKS:  Yes, judge.  I don't -- and you may have put it in here and I just missed it.  Any reference to the verdict having to be unanimous.

THE COURT:  Page three, counsel, the third paragraph from the bottom, the last sentence.  Your verdict must be unanimous and signed by the presiding juror.

MR. BROOKS:  Thank you, sir.

THE COURT:  And does your client wish the information to read Mellannise Henderson or Mellannise Henderson hyphen Love?

THE DEFENDANT:  Mellannise Henderson is

fine, Your Honor.

THE COURT: All right. And you acknowledge that you're the same Mellannise Henderson that was stopped on this day?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Anything further from either side?

MR. WILSON: No, Your Honor.

MR. BROOKS: No, sir.

THE COURT: Bailiff, I'm going to print -- do you want a fresh copy with the change with the missing paragraph, counsel?

MR. BROOKS: No, sir, that's not necessary for me.

THE COURT: Does the state want one?

MR. WILSON: Yes, Your Honor, please.

THE COURT: Okay.

(Unrelated docket matters heard, after which the following proceedings were had, commencing at 9:40 A M. Defendant present.)

THE BAILIFF: All rise.

(The jury enters.)

THE COURT: Everyone may be seated.

Bailiff, the notes fell off on to the floor.

Lady and gentlemen of the jury, let the

record reflect that all parties are present. The jury is back in the courtroom.

At this time, bailiff, would you please pass out a copy of the jury charge.

*THE BAILIFF:* Yes, Your Honor.

COURT'S CHARGE

*THE COURT:* The jury charge is your instructions on how to proceed with your deliberations but before I read that to you, as I'm required to do by law, I want to also instruct you one more time on one other part of your duties.

In continuing to discharge your responsibilities as jurors, you will continue to observe all the instructions that have previously been given to you. These instructions are given to you because your conduct is subject to review, the same as that of the witnesses, the parties, the attorneys and myself. If it should be found that you have disregarded any of these instructions, it will be jury misconduct, and it may require another trial by another jury.

If any of you observe one or more of your number violating any of my instructions, you shall immediately warn the violator and caution him or her not to do so again.

Now, please listen carefully as I read the

charge to you. The original will be delivered to you by the bailiff for you to write your verdict on it. You may take that copy back with you if you would like or you may just take the official copy that has my signature back.

"Members of the jury: The defendant, Mellannise Henderson, stands charged with the misdemeanor offense of driving while intoxicated in a public place in Collin County, Texas on or about December 1st, 2012. To this charge, the defendant has pleaded not guilty.

"Our law provides that a person commits an offense if the person is intoxicated while driving or operating a motor vehicle in a public place.

"A public place means any place to which the public or a substantial group of the public has access, and includes but is not limited to streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities and shops.

"The word intoxicated means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances or any other substance into the body, or having an alcohol concentration of 0.08 or more.

"The term alcohol concentration as used herein means the number of grams of alcohol per 210 liters

of breath.

"The term motor vehicle means a device in, on or by which a person or property may be transported or drawn on a highway except for a device used exclusively on stationary rails or tracks.

"Now, if you find and believe from the evidence beyond a reasonable doubt that on or about the --" should read -- "on or about December 1st, 2012, in Collin County, Texas, Mellannise Henderson did then and there operate a motor vehicle in a public place, while the said Mellannise Henderson was intoxicated by, one, not having the normal use of her mental faculties by reason of the introduction of alcohol into the body, or, two, not having the normal use of her physical faculties by reason of the introduction of alcohol into the body, then you will find the defendant guilty as charged.

"Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will find the defendant not guilty.

"You are instructed that the law allows the defendant to testify in her own behalf but the fact that she did not do so is not a circumstance against her and shall not be considered as evidence of guilt or proof of any other matter. You shall not consider, discuss or even refer to the fact that the defendant did not testify, nor

shall you draw any inference of guilt therefrom.

"All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined or charged with an offense gives rise to no inference of guilt at her trial. The law does not require a defendant to prove her innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

"The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt. And if they fail to do so, you must acquit the defendant.

"You are instructed that you are not to allow yourself to be influenced by what you may think or surmise the opinion of the court to be. The court has no right to indicate an opinion respecting any matter of fact involved in this case, or to indicate a desire respecting its outcome. The court has not intended to express an opinion upon any matter of fact in this case and if you've observed anything that you have or may have interpreted as

the court's opinion upon a matter of fact in this case, you must wholly disregard it.

"You are instructed that any statements of counsel made during the course of the trial or during argument that is not supported by the evidence or statements of law made by the counsel not in harmony with the law as stated to you by the court in these instructions are to be wholly disregarded.

"You are further instructed that you should not question the bailiff concerning testimony or the law of this case, nor should you discuss the case in his presence. If you have any questions, you should reduce them to writing to be signed by the presiding juror and present them to the court.

"If the jurors disagree as to the statement of any witness, they may, upon applying to the court, in writing, have read to them from the court reporter's notes that portion of such witness' testimony and only that portion on the point in dispute.

"You are instructed that the information is the means whereby a defendant is brought to trial in a misdemeanor prosecution. It is not evidence, nor can it be considered as such when passing upon whether the defendant is guilty or not guilty.

"During your deliberations in this case, you

must not consider, discuss nor relate any matters not in evidence before you.  You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence. You are to base your decision on the evidence presented and are not to be swayed by any sympathy, prejudice or bias.

"After you retire to the jury room, you should select one of your members as your presiding juror. It is their duty to preside at your deliberations and vote with you.  Your verdict must be unanimous and signed by the presiding juror.

"You are the exclusive judges of the facts proved, of the credibility of the witnesses, and the weight to be given their testimony.  But you must be governed by the law you receive in these written instructions.

"Suitable forms for your verdict are attached hereto.  Your verdict must be in writing and signed by your presiding juror.  Your sole duty at this time is to determine whether the defendant is guilty or not guilty under the information in this cause and you are to restrict your deliberations to that issue.

"Signed this the 3rd day of December, 2013. Barnett Walker, judge presiding.

"Verdict.  We, the jury, find the defendant

guilty of driving while intoxicated as charged."

If that is your unanimous verdict, the presiding juror will sign his or her name where it says signature and print the name where it says printed name.

"Or, we, the jury, find the defendant not guilty."

If that's your unanimous verdict, then the presiding juror will sign his or her name where it says signature and print the name where it says printed name.

I noted we had two typographical errors. I will fix those and I will sign the official copy for you to take it back and for you to write your verdict on.

At this time, each side wants to do a 15-minute closing. They're going to highlight what they believe the evidence has shown in this case.

Under the laws of the State of Texas, the state has the right to go both first and last so they can split their time if they so choose.

The state may proceed.

**CLOSING STATEMENT**

*MR. WILSON:* Thank you, judge. May I use the projector, please?

*THE COURT:* Yes, sir.

*MR. WILSON:* May it please the court.

*THE COURT:* Yes.

MR. WILSON: Counsel. Members of the jury.

It's been my pleasure to represent the State of Texas to you over the last two days, and as the judge said, since I represent the State of Texas, I have the burden of proof. And it is something that I -- a burden that I embrace. And also as the judge said, I get the opportunity to speak to you twice. Here in a little bit, Mr. Brooks, counsel for defense, is going to come up here and make his final argument, and then I will be back to make my final argument on behalf of the state.

First off, though, I want to go through a few things that you'll find in the jury charge, just make them a little bit more clear to you.

So, first, I want to remind you that the standard that you are to use to evaluate the defendant is the average non-intoxicated person. Remember that yesterday, during voir dire, we talked about how you collectively are the average non-intoxicated person. And it is that standard that you will apply to the defendant when determining whether or not she had the normal use of her mental or physical faculties.

Another thing I want you to remember is that the standardized field sobriety tests that you heard so much about yesterday are designed so that the average non-intoxicated person can perform them successfully on

roadsides all throughout the country.

Next, you'll see on page two some of these definitions. You'll notice that while yesterday we talked about three definitions, you only really have to worry about two of those today. That's because no evidence was presented as to alcohol concentration since the defendant refused to provide a sample of her breath.

So you can basically think of the definitions and process them the following way like I've got on the board. Ask yourself the first question: Do I believe beyond a reasonable doubt that the defendant did not have the normal use of her physical faculties due to the introduction of alcohol into her body while she was driving? If the answer to that question is yes, the state is entitled to a verdict of guilty. If the answer is no, you can move on to the next question.

Do I believe beyond a reasonable doubt that the defendant did not have the normal use of her mental faculties due to the introduction of alcohol while she was driving? If the answer to that question is yes, the state is entitled to a verdict of guilty. Only if your answer to both of those questions is no, only then, will you find that the defendant was not guilty.

Next, you will see also on page two that all persons are presumed innocent. The thing is, though,

there's nothing in this jury charge that says all people are presumed to be honest. You are the ones who determine the credibility of all witnesses and all parties involved in this case. You determine the credibility of Officer Corley yesterday, you also determine the credibility of the defendant.

Another thing, just to remind you, sympathy cannot be considered and the law applies equally to everyone. And, you know, the defendant, she seems like a nice person, she's an attorney, but your feelings about attorneys, whether they are positive or negative, should have no bearing on today's case and on your deliberations.

And finally, we talked a little bit yesterday about beyond a reasonable doubt. And unfortunately, you know, our state legislature did not give you a clear-cut definition, but we talked about a few things as to what that standard -- what that burden of proof is not. And it's not a -- it doesn't mean beyond all possible doubt and it's not a 100 percent standard.

And, Mr. Campbell, I believe yesterday I asked you yesterday about this puzzle and pointed out that when we've got the puzzle together on the board, you knew beyond a reasonable doubt that that was a picture of a shark, even though there aren't 100 percent of the puzzle pieces there. And I want you all to remember that as you

make your deliberations and determine whether or not you believe beyond a reasonable doubt that the defendant is guilty of driving while intoxicated.

Now I'm going to turn the floor over to Mr. Brooks. When I get back up here, make my final argument, and after that, you should have everything you need to believe beyond a reasonable doubt the defendant is guilty.

THE COURT: Thank you, counsel.

Mr. Brooks.

MR. BROOKS: Thank you, judge.

THE COURT: Mr. Brooks, did you want to use the monitor as well?

MR. BROOKS: Yes, sir.

THE COURT: It looks like it's stuck half way up and down. Going up into the ceiling there.

(Equipment set up.)

THE COURT: Sorry for the delay. You'll get your full time, counsel.

MR. BROOKS: Thank you, sir.

THE COURT: I'm going to try to turn it off and bring it back up. If we can't get it working, I'll have the bailiff take the jury to the courtroom across the hallway and you can do your closing in that courtroom so that you can have access to the technology that you want to

use.

You may proceed, counsel.

**CLOSING STATEMENT**

*MR. BROOKS:* Thank you, sir.

Good morning, ladies and gentlemen. I know yesterday when we started, we had told y'all we expected this to be a one-day trial. We tried. We almost got there. So I apologize for that. Hopefully, we'll get this thing finished today.

I want to talk to you about some of the things we talked about during voir dire, and one of the things we talked about during voir dire was the various different burdens of proof we have in our criminal justice system. And we talked about how the lowest burden of proof is reasonable suspicion. And that proof of burden is the burden of proof I believe that Officer Corley used to arrest Ms. Henderson that night.

We talked about how the burden of proof, reasonable suspicion, is the lowest burden of proof but the highest burden of proof that you have to apply to this case as far as beyond a reasonable doubt, how that is the highest burden of proof. We talked about the lowest versus the highest.

We also talked about how not guilty obviously includes innocent but it doesn't always -- but

it's not limited to that. We talked about how that is because you have to find beyond a reasonable doubt a not-guilty basically believing that the state has not proven this case beyond a reasonable doubt. Not guilty goes back to the central question for a jury in a criminal case. And the question is not whether or not the defendant is guilty, but the question is, does the evidence presented to me prove beyond a reasonable doubt that the defendant is guilty? That's the question for the jury.

I want to talk about some of the things that you saw yesterday and let's start with the video. If you recall the officer testified that he was trying to go around her and she almost hit him. Well, if you look at that video again -- and I'm going to ask that you please look at that video again -- you'll see that that confrontation is not nearly as dramatic as he tried to make it. When you look at that near miss, as we call it, you'll see that that near miss is something that, unfortunately, each and every one of us has had happen to us driving down the street, whether it's from inattention, distraction, not paying attention to a blind spot, that very thing is the same thing that each and every person in this courtroom has had happen.

Now, that leads him to pull her over. He asks her if she saw him, she says that she didn't. And the

reason she didn't, she thought she saw in front of her emergency lights. Well, the officer came in here yesterday and corroborated that, in fact, there were emergency lights in front of her. She told you -- told him she was trying to decide, she couldn't tell where they were, she needed to move over to the left or to the right. And he admitted to you that based upon that vantage point, you couldn't tell if those emergency lights were in the left or the right lane. So the officer corroborated what she was seeing.

Now, he also decided that he needed to give her field sobriety tests. Let's look at the field sobriety tests that were given. The H G N test, you have no way of knowing if that test was being done correctly. He let you know and he admitted that, based upon that video, you can't tell if he's at the proper angle, you can't tell he's at the proper distance, but you do know from his own testimony that she's not supposed to be facing the road as she was facing the road. And the reason she's not supposed to be facing the road is the same reason he has to turn the strobe lights off. Distraction. So you know part of that testing was being done incorrectly. The other parts you don't know if they are being done incorrectly, if they are being done correctly.

She told the officer with respect to the other tests that she needed to use the bathroom. And

apparently he believed her in terms of needing to use the bathroom because if you listen, if you watch on the video, he tells to the other officer that arrives there, that he doesn't want her to pee in his car. You can hear him. He also admitted yesterday that if she had peed doing any of the physical tests, he would put that down as a sign of intoxication. And he also admitted yesterday on the stand that at that point, she was between a rock and a hard place.

Now, they then go to the video room, and he wants to tell you that he instructed her to stand in the box, that she did that incorrectly. Well, look at that part of the videotape. There is no instruction on where to stand. I think it's kind of interesting when you look at that video that, yes, she is standing against the wall but, guess what? The officer himself is standing and bracing himself on the podium. So she's not doing anything different than what he is doing.

The other thing that I want you to consider is that there were two officers out there and yet only one officer testified. The other officer, I'm assuming, I have to assume, was available, could have come in and corroborated what Officer Corley told you.

Now, they're going to stand up and they're going to tell you that I had equal subpoena powers, I could

have subpoenaed Officer Corley to come in here and do that. But remember as the judge told you yesterday, I don't have a burden. It's not my job to corroborate what Officer Corley testifies to. So why would you expect me to subpoena him? That's not my job. That's their job.

So when you look at all the facts and everything that was brought before you yesterday in terms of reasonable doubt, you see how we get to this statement. A perfectly valid and lawful arrest can led to a perfectly valid and lawful not-guilty. And that's the verdict I'm going to ask you to return.

THE COURT: Thank you, counsel.

Mr. Wilson. You still have time remaining. You wish to use the overhead?

MR. WILSON: Yes, please, Your Honor.

THE COURT: All right.

**CLOSING STATEMENT**

MR. WILSON: May it please the court. Counsel. Members of the jury.

Nothin'. I had nothing to drink tonight. That's the story that the defendant expects you to believe. But you've seen the facts. You've heard the testimony. You know that the facts and the evidence as they were presented to you paint a very different picture.

First off, let's break down what happened

that night and we'll begin with the defendant's driving. You saw that the defendant almost hit Officer Corley. Yesterday when we were watching that video, I heard an audible gaff come from the jury box. You know it was something that was close. Defense counsel just said that we all are victims of people who nearly swerve into our lanes due to inattention, due to distractions, also due to intoxication.

In addition to that, after the near collision, you saw that the defendant was weaving, still weaving, in her lane. You saw that she -- her car even ran over those reflector bumps in the middle of the road. She had that time when she turned on her turn signal briefly but yet failed to change lanes.

And then, as you were told, the officer was concerned enough to divert himself from responding to a back-up request. You heard testimony from Officer Corley yesterday saying that when another officer requests you to arrive for backup, it means something important is going on that he needs your assistance for. Officer Corley ignored someone who ran a red light but he didn't ignore this defendant because he felt like her driving violations were serious enough that they warranted his full attention.

He even asked her if she was trying to change lanes and her answer was, I don't know if I was

trying to change lanes. Someone who -- the average non-intoxicated person who has the full use of his or her mental faculties would be able to answer a "yes" or "no" to that question, not, "I don't know."

Let's move on to the next stage, the initial contact that the officer made with the defendant. Took her a long time to find her driver's license. He had to ask her twice to produce her insurance card. Smelled the strong odor of alcohol coming from the car. He saw -- he heard slurred speech. Saw watery eyes. All signs of intoxication. And yet she still says that she had nothing to drink.

Officer saw all of these signs of possible intoxication so he asked her to step out of the vehicle. And he performed the horizontal gaze nystagmus test. The first of a three-part battery that go along with the standardized field sobriety tests.

Now, defense counsel just said that you don't know whether or not the officer performed these tests to the exact letter of the rule book. Well, what I say to you is that first off, on the video, there are some things that you just can't tell. You can't tell whether he held the stimulus 15 inches above her eye level, you can't tell, you know, those little nuances like that. But what you can rely on is that Officer Corley has been a certified peace

officer for eight years. He has performed over 50 D W I stops. He is a field training officer for the Richardson police department. He is an experienced police officer and he knows what he is doing.

What is clear from the video is that the defendant was not able to follow the very simple instructions given to her. First off, Officer Corley asks her to keep her hands by her side. You'll notice if you look at the video again, she went from behind her back to in front of her back and had to be asked a couple of different times before she finally put her hands by her side. And then you all saw the absolutely egregious inability to follow the simple instruction of moving her eyes independently from her head. She had to resort to holding her head still with her own hands. You know, you heard over and over again the officer having to ask her, follow the stimulus with your eyes, not your head, not your head. And eventually at some point in time, she said, I can't do that. Someone who has the normal use of her mental faculties would be able to move her eyes independently from her head. That's a strong indication of intoxication.

Even in spite of all of those difficulties following the instructions, the officer was still able to observe the four clues that reach that decision point that

he talked about yesterday. And remember that these clues, this standard of -- standard eye movement is completely involuntary. There are only a few things that cause that. And she told the officer that she did not have any head injuries and not been involved in any sort of accidents. It was alcohol that caused that staggered eye movement.

Next, we get to the other standardized field sobriety tests which she refused to perform. And I don't have to remind you the kind of back and forth that occurred. Officer testified that these field sobriety tests could have been performed in about five minutes. Then she could have been on her way, using the restroom, and they would have been over. But instead, she refused to perform, and yet somehow she still claimed she had nothing to drink and she told the officer that, you know what, in spite of how she had to use the bathroom so bad that she could not perform those divided attention tasks that are part of the other standardized field sobriety tests. Yet she says that she is safe to drive which we all heard is a divided attention task.

Next, we have that inescapable smell of alcohol. The officer asked her, why do I still smell the strong odor of alcohol on your breath? And her response was, I don't know why. He then asked her, did someone spill a drink on you? I don't know. You think somebody

with the normal use of their mental faculties would be able to give a "yes" or "no" answer to the question, did somebody spill a drink on you? She said, I don't know.

Next, we get to the intoxilyzer room. Officer Corley, sure, yes, it is not on video when he asked her to stand in that black box, but he testified yesterday that he did deliver that instruction to her. And what you saw, you saw her shoes were nearby the black box and she was leaning against the counter. Officer Corley could prop -- could lean against the podium if he so chose. He wasn't under arrest. He wasn't having to follow another officer's instructions.

And then the reason why we don't have any evidence about alcohol concentration is because the defendant chose to -- she refused to provide a specimen. And even in spite of having that 180-day driver's license suspension, you heard testimony yesterday, you saw a copy blown up on the big screen of that statutory warning, nowhere on its face does it say that there's the possibility of getting an occupational driver's license. So for all intents and purposes, that was not communicated to her. You can't assume that she knew that that was an option, though she can request a hearing at a later date. What you have to know is that she was facing 180-day suspension. That means that from December -- January,

February, March, April, May, all of those months, license suspended; not until June would she get it back. And she even said on the video that she had a trial that following week that she was preparing for. She faced the possibility of not being able to legally drive to that trial. All for the -- all because she didn't want to provide a specimen of her breath, even though she said it, she had nothing to drink that night.

I think the evidence is clear. This defendant is guilty of driving while intoxicated, and I ask you to find her guilty on the jury charge.

THE COURT: Thank you, counsel.

I've corrected the jury charge that I read to you. There was two words that we repeated on page one, and at the bottom of page one, I corrected how the reading of the date appeared. Nothing else has been changed.

Any objections to those changes by the prosecution?

MR. WILSON: No, Your Honor.

THE COURT: Any objection by the defense?

MR. BROOKS: No, Your Honor.

THE COURT: Lady and gentlemen of the jury, you now have had all the evidence presented to you, you heard closing argument on both sides. The case is officially turned over to you. You can just leave those

copies of your jury instructions in your chair or on the railing. We'll pick them up.

This is the copy, your official copy. I've signed it. I'm turning it over to the bailiff to give you.

When you're doing your deliberations if, for some reason, one of you has to exit the room, leave the room, for whatever reason, go to the bathroom, take a phone call, you have to suspend your deliberations. No discussions on this case can take place unless all six of you are in the room together.

The case is officially turned over to you. We await your decision.

Thank you.

*THE BAILIFF:* All rise.

*(The jury exits.)*

*THE COURT:* Note for the record that the juror that was taking notes has left his notes in the courtroom in the sealed envelope.

Everyone may be seated.

*(Recess at 10:14 A M, resuming at 10:25 A M. Defendant present.)*

*THE COURT:* Back on the record in cause number 002-80051-2013. State of Texas versus Mellannise Henderson-Love.

Note for the record that the jury is not in

the courtroom but all parties are present.

We've received a note from the jury. It reads as follows: Dated 12-3-13 at 10:21 A M. Texas V M Henderson. We, the jury, respectfully request a copy of State's Exhibit A, comma, D V D for our review. Signed, David Christopher, foreman.

The court intends to just have the bailiff take back all of the admitted items.

Any objection to that from the state?

*MR. WILSON:* No, Your Honor.

*THE COURT:* Any from the defense?

*MR. BROOKS:* No, sir.

*THE COURT:* All right. So ordered.

Now, we may run into a situation. I don't know whether or not that D V D is formatted to play on a D V D player or if it requires the use of a computer. So I've asked the bailiff to see if it would play on the D V D player. If it does not, there is no mechanism in the jury room for them to view it. We would be -- either have to do one of two things: We would have to --

*THE BAILIFF:* (Shakes head.)

*THE COURT:* The bailiff just walked in. It will not play on the D V D player.

We will have to take a clean computer, meaning one that doesn't have any files on it, and let them

*(Jury Not Present)*

play it on the laptop there in the jury deliberation room.

The downside to doing that is that you have six people huddled around a very small 14, 15-inch screen while trying to watch the video. The other option is to bring them back into the courtroom, allow them to play it on the giant in-court screen. The problem with that, though, is all parties have to be in here, the state would have to be in here in order to play the video. That would mean the defense attorney, his client would also be allowed to be in the courtroom, entitled to be in here.

I would order the courtroom sealed. We've done this in the past. And I will order all parties not to make any outward gestures, to say anything, not make any facial gestures because you must remember that, technically, this jury is in the deliberation state.

What recommendations would the state like to offer in that respect?

*MR. WILSON:* State recommends that we play the video for the jury here because they may not be able to understand that there is -- how to view the video on full screen. There's also a microphone input from the officer's in-car microphone that has a lot of noise but does not capture anything that is being said between the defendant and the officer when they're out on the roadway. And so all that microphone does is just make it difficult to hear

*(Jury Not Present)*

what's being said between the officer and the defendant. And so I turned that microphone input off during playback yesterday. So that way, it wouldn't interfere with the discussion between the officer and the defendant.

THE COURT: What says the defense?

MR. BROOKS: Judge, I would like to suggest that we bring the jury in here, have everything set up for them to view and we can vacate the courtroom and let the bailiff start it and then exit the courtroom.

THE COURT: Well, again, are you going to be able to set it up before you hit play for the jury to see or do you have to do anything in between that?

MR. WILSON: I think the bailiff could expand it to full screen presentation and turn off that problem microphone.

The other thing is that during playback in trial, I switched -- I guess once the defendant was placed in the patrol car, I switched from camera one to camera two, but I think the bailiff could handle that very easily.

THE COURT: I'm not going to involve this on the bailiff to try to handle. I'm going to allow both parties to be in here. There's too many things that could be important to either side or both that the jury saw before that they may wonder why they're not seeing or hearing now because the bailiff is trying to run a program

*(Jury Not Present)*

that the prosecution was running as far as switching microphones, switching views, in-car camera views and things of that nature, so I'm going to allow both sides to be present. But I'm going to order the courtroom sealed.

Bailiff, lock the front door so that no one comes into the courtroom.

THE BAILIFF: Yes, Your Honor. Judge, I have the video.

THE COURT: Give it to the prosecution.

THE BAILIFF: Yes, sir.

THE COURT: Play the video the same way you did yesterday during trial for the jury.

I'm ordering that all parties not say anything, make any outward facial, you know, gestures or anything else to this jury while they're in here. Just play the video.

I'll ask the bailiff to ask the members of the jury if they need to see the video again or maybe portions of the video again. And based on their response, we'll either play it again or they'll go back into deliberation.

Any objection from the state?

MR. WILSON: None, Your Honor.

THE COURT: Any from the defense?

MR. BROOKS: No, Your Honor.

(Jury Not Present)

THE COURT:  Bailiff, is the door locked?

THE BAILIFF:  Yes, Your Honor.

THE COURT:  All right.  Queue up the video.

Bring the jury in.

THE BAILIFF:  Yes, sir.

(Equipment is set up.)

THE BAILIFF:  All rise.

(The jury enters.)

THE COURT:  Bailiff, prepare to dim the lights, please.

THE BAILIFF:  Yes, Your Honor.

THE COURT:  Members of the jury -- everyone may be seated -- you are officially in deliberation at this time.  No one has the right to communicate with you.  Due to technical limitations, we cannot give you this D V D and let you play it back in deliberation rooms because it requires a computer to play it.  It's not one that can be played on a D V D player.  So I either have to give you a clean computer with a 14 and-a-half inch screen, the six of you huddle around to try to see it on the screen, or we can bring you back into the courtroom and play it for you on the larger screen.  I've chosen to do option B.

All parties -- it requires that the prosecutor be here because the technology of this video allows whoever is playing it to switch microphones and to

*(Jury Not Present)*

switch camera views.  Sometimes you can see someone using the camera that shoots outside of the vehicle, sometimes there's a camera that's inside the vehicle and it can be shot.  Someone has to manipulate those options.

The state introduced the video.  I'm going to let them play it in same exact manner, same camera views, same audio, same microphones as you saw yesterday.

Once it's been played, I'll have the bailiff go up to you and meet you in the hallway.  You can let the bailiff know if there's a section you need to see again or listen to again and we will bring you back in and let you see it or hear it as many times as necessary.  But no one can communicate with you at this point.

I'm ordering the defendant, the defense attorney, the prosecution, to say nothing during the playing of this video and make no facial gestures.

At this time, the state will play the video.

*(DVD published on the overhead screen.)*

*THE JUROR:*  Your Honor.  Your Honor.

*THE COURT:*  Pause the video.  Take the jury out in the hallway.  Somebody was calling my name.  See what they want.

*THE BAILIFF:*  All rise.

*(The jury exits.)*

*THE COURT:*  You may be seated.

*(Recess at 10:58 A M, resuming at 10:59 A M. Defendant present.)*

THE COURT: Bailiff has told me that that's all the portion of the video that the jury wished to see. The jury is outside the courtroom. They will continue their deliberations. And we'll stand in recess.

*(Recess at 10:59 A M. resuming at 11:28 A M. Defendant present.)*

THE BAILIFF: All rise.

*(The jury enters.)*

THE COURT: Thank you. Everyone may be seated. Let the record reflect the jury is back in the courtroom. All parties are present.

Members of the jury, it's come to my attention that you've reached a unanimous verdict. If in fact that's the case, would the presiding juror please hand that verdict to the bailiff.

Thank you, bailiff.

THE BAILIFF: Yes, sir. (Hands documents to the court.)

THE COURT: Mr. David Christopher, you're the presiding juror? Would you please stand and read the verdict aloud.

The defendant please rise.

*(The bailiff hands documents to the juror.)*

*(Jury Not Present)*

THE JUROR: Your Honor, the State of Texas versus Mellannise Henderson. We, the jury, find the defendant guilty of driving while intoxicated as charged.

THE COURT: Thank you. You may have a seat.

Members of the jury, as we stated to you earlier, in every criminal case, the defendant enjoys the exclusive right to determine who will do their punishment if they're found guilty. In this case, Ms. Henderson-Love has chosen to have the court administer the punishment. I'll do that in the second part of this trial.

This concludes your duty to the county. I make it a practice to come back and thank the jury after every trial, also to answer any questions you may have about the process, and to see if there's any constructive critique you can give us on how we can make this a better process for the next jury. Thank you very much for your service to the county.

Bailiff, would you please take the jury back. I'll be back in less than 30 seconds.

THE BAILIFF: Yes, Your Honor. All rise.

(The jury exits.)

THE COURT: Thank you. You may be seated.

Does either side intend to offer any evidence or testimony in the punishment phase?

MR. WILSON: Not from the state, Your Honor.

MR. BROOKS: Not from the defense, Your Honor.

THE COURT: None?

MR. BROOKS: No, sir.

THE COURT: I'll go thank the jury. They sometimes want to talk to the attorneys -- or maybe not want to, maybe not the best way to describe it. Willing to. So I'll ask them if they want to take the time to talk to the attorneys and see if they have anything to offer, any insight. I'll be back momentarily.

(Recess at 11:30 A M, resuming at 11:52 A M. Defendant present.)

PUNISHMENT PHASE

THE COURT: All right. Back on the record in cause number 002-80051-2013. State of Texas versus Mellannise Henderson-Love. The jury having returned a verdict of guilty, now move to the punishment phase.

Does the state want to offer any testimony or evidence in regard to punishment?

MR. WILSON: No, Your Honor.

THE COURT: Does the defense wish to offer any evidence or testimony with regard to punishment?

MR. BROOKS: Other than to reurge that Ms. Henderson filed her application for community supervision saying she has no prior felony convictions.

(Jury Not Present)

THE COURT: All right. Thank you.

Both sides rest and close?

MR. WILSON: State closes.

MR. BROOKS: Defense closes.

THE COURT: Have you reached an agreement or do you want to be heard with regard to punishment?

MR. WILSON: We have reached an agreement, Your Honor.

THE COURT: Who wants to recite the agreement?

MR. WILSON: I'll be happy to, Your Honor.

THE COURT: Proceed.

MR. WILSON: The agreed punishment is going to be $900 fine, 90 days in jail, probated for 12 months, D W I education, Victim Impact Panel, substance abuse education plus conditions -- or, substance abuse evaluation plus conditions, no alcohol, mandatory breath and blood, 24 hours community service, and one-time donation of $50 to Crime Stoppers.

THE COURT: How much to Crime Stoppers?

MR. WILSON: Fifty dollars.

THE COURT: Ms. Henderson-Love, the jury having found you guilty, the court now will assess your punishment. I see no evidence of any prior convictions in any state or federal, therefore, I'm going to follow the

*(Jury Not Present)*

agreement.

I'm sentencing you to 90 days in the Collin County jail, however, that will be suspended and you'll be on probation, community supervision, for a period of 12 months. I'm going to order you to pay a $900 fine plus court costs. Complete a D W I education course, a Victim Impact Panel class, you'll have to take a substance abuse evaluation and comply with recommendations that come out of that evaluation. If asked to provide a sample of your breath or blood by your probation officer or any law enforcement officer, you'll have to do that; otherwise, it will constitute a violation of your probation. You are ordered to pay $50 to the Collin County Crime Stoppers, and you are prohibited from consuming any alcohol, even in the privacy of your own home, while you're on probation over the next 12 months.

Do you have any questions for the court?

*THE DEFENDANT:* I do not, Your Honor.

*THE COURT:* Okay. Ms. Henderson-Love, as I was telling the jury, this is one of those offenses that doesn't require mens rea. Good people often find themselves guilty of this type of an offense because by the mere nature of how D W I works, the more alcohol you consume, the less able you are to evaluate your own condition.

*(Jury Not Present)*

I would ask and hope that you look at that video and not concentrate on the fact that you were found guilty of this offense, but be thankful for the fact that no one was hurt.

I assure you that people like the Dallas Cowboy football player who killed his best friend would love to be in your shoes instead of his own. You couldn't see the officer's car. You were obviously unaware it was there. You're obviously a very-well educated woman: You're a high school graduate, a college graduate, a law school graduate. The officer had to tell you 21 times according to my count, hold your head still, do you know what that means, and you said, I don't understand. So I believe you may have had quite a bit to drink that night and that's why he could smell the strong odor of alcohol on your breath.

But once again, this isn't the type of offense that requires a person to be a bad person. It's not like you intended to do anything wrong. I wish you the best of luck.

Anything else from either side?

MR. WILSON: Not from the state, Your Honor.

MR. BROOKS: No, Your Honor.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: If you'll just have a seat,

*(Jury Not Present)*

we'll have the officer do the fingerprinting and do the judgment and sentencing, and you'll be on your way.

You live in Collin County; correct?

*THE DEFENDANT:*  I do, judge.

*THE COURT:*  All right.

*(Adjourned at 11:57 A M.  End of proceedings.)*

*(Jury Not Present)*

STATE OF TEXAS        )

COUNTY OF COLLIN      )


     I, Marigay Black, Official Court Reporter in and for the County Court at Law Number Two, County of Collin, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     Signed this 26th day of March, 2014.


                              /S/  Marigay Black

                              MARIGAY BLACK, Texas CSR 351
                              Official Court Reporter
                              County Court at Law Number Two
                              Suite 10344
                              2100 Bloomdale Road
                              McKinney, Texas 75071
                              Tel:  972-548-3823
                              FAX:  972-548-3828
                              Expiration:  12/31/2014
                              mblack@co.collin.tx.us

**AFFIRM; and Opinion Filed December 2, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00025-CR

### MELLANNISE HENDERSON, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law No. 2**
**Collin County, Texas**
**Trial Court Cause No. 002-80051-2013**

## MEMORANDUM OPINION

Before Justices O'Neill, Fillmore, and Chief Justice Thomas, Retired[1]
Opinion by Justice O'Neill

Appellant Mellanise Henderson appeals her conviction for driving while intoxicated following a jury trial. She was sentenced to ninety days' confinement in the Collin County Jail and was assessed a $900 fine. The court suspended imposition of the sentence and placed appellant on twelve months' probation. In seven issues, appellant challenges the sufficiency of the evidence to support her conviction, the administration of a field sobriety test, error during jury deliberations, error in the charge, and failure to give *Miranda* warnings. We affirm the trial court's judgment. Because the issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

---

[1] The Honorable Linda Thomas, Chief Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired, sitting by assignment.

BACKGROUND

On November 30, 2012 and into the early morning hours of December 1, 2012, appellant was driving home after working late. Officer Clifton Corley of the Richardson Police Department was on his way to assist an officer who had requested backup. Corley noticed a black Lexus sedan "weaving within its lane a little bit," but decided that his priority was to provide backup to the officer who had requested help. But when he began to go around the vehicle to pass, the vehicle "came over into the left lane without signaling," and Corley "had to brake hard and swerve a bit to the left to avoid a collision." Corley decided to "reassess the driver" for possible intoxication. The vehicle continued to swerve. Although the left turn signal was on, the vehicle did not change lanes. The vehicle also drifted on and off the reflectors dividing the lanes. Corley then saw that the officer who had requested assistance was stopped in the right lane a short distance ahead. Corley initiated a traffic stop to avoid any danger to that officer, to himself, and to other drivers.

Appellant, who was driving the black Lexus sedan, pulled over and complied with Corley's requests to produce her license and insurance card. Corley "noticed she had kind of watery glazed-over eyes," as well as "slurred speech as I was speaking with her." He noticed "a strong odor of alcoholic beverage coming from the vehicle." Appellant denied that she had consumed any alcohol. She explained she had seen the emergency vehicle ahead that Corley planned to assist, and was attempting to determine if she needed to change lanes to avoid it. Corley continued to hear appellant's slurred speech, and asked her to exit the vehicle. Appellant complied. Corley was then able to smell alcohol on her breath.

Corley attempted to administer the horizontal gaze nystagmus (HGN) field sobriety test. Appellant was unable to follow the instructions for the test, following the stimulus by moving her head instead of following it with her eyes. Corley reminded her several times not to move

her head. When these reminders were unsuccessful, he asked if she would like to hold her head still with her hands to keep it from moving. She said she would, but still turned her head with the stimulus. Despite appellant's difficulty in following the instructions for the test, Corley was able to observe a total of four clues from the HGN test, enough to reach a decision point from which he could conclude that appellant was intoxicated. Corley also testified that the inability to follow the instructions for the HGN test, in his experience, could also indicate intoxication.

Corley testified that the flashing lights on his patrol car could affect the outcome of the HGN test. He also explained that under ideal conditions, a person performing an HGN test should not be facing traffic, because "if the traffic is heavy enough and cars are going by, the eyes can tend to follow the lights as [they go] across." He testified that he turned off the lights on his patrol car, but conceded that he did not conduct the test with appellant facing away from traffic. On cross-examination, Corley admitted that there was traffic going by. On redirect examination, however, he explained that the passing traffic would not "cause the individual's head to turn" as appellant's did during the test.

Corley testified that there are other field sobriety tests, including the walk-and-turn test and the one-leg stand test. He advised appellant that he had some other exercises he wanted her to perform. Appellant "indicated she was not sure she could do anything else because she needed to urinate." Corley explained that the tests would not take very long to perform, and if appellant would continue "we could reach a conclusion and we could get her to a restroom." Corley testified that this discussion took longer than the two tests would have taken. He explained that when appellant did not perform the additional tests, he arrested her for driving while intoxicated.

Corley then took appellant to the Richardson city jail, to a room designated for the processing of intoxicated drivers. He instructed appellant to stand on the black square painted on

the white floor. Instead of standing on the square, appellant placed her shoes on it and walked over to lean against a counter and a wall. Corley gave appellant a copy of the written warning regarding intoxilyzer testing, and then read the warning aloud to her. He requested a specimen of appellant's breath. She refused, and also refused to sign the warning.

On cross-examination, Corley testified that appellant was respectful to him at all times and not belligerent. Appellant did not stumble getting out of the car, and complied with his instructions about where to stand for the field sobriety tests. Corley also conceded that if appellant had lost control and urinated during the one-legged stand test, he would have included it in his report as a sign of insobriety. He agreed that she "was kind of between a rock and a hard place in terms of having to use the bathroom or taking a chance" of urinating during the tests.

Corley was the only witness at trial. During his testimony, two video exhibits were admitted into evidence without objection and played for the jury. The first of these videos was taken from Corley's patrol car starting at the time he observed appellant's car swerving and including the administration of the HGN test; the second was of appellant in the processing room at the Richardson jail. During jury deliberations, the jury requested a copy of the first of these videos. A note sent by the jury foreperson stated, "[w]e the jury respectfully request a copy of State's Exhibit A, DVD, for our review." The trial court first determined that the exhibit could not be played on the DVD player in the jury room. The trial court then explained that the jurors could crowd around a small computer screen in the jury room, or could watch the video on the large screen in the courtroom. Counsel for the defense and for the State both agreed the jury should watch the video in the courtroom. Counsel for the State explained that when the video was shown to the jury during trial, he had turned off one microphone input from the patrol car to enable the conversation between Corley and appellant to be heard, and also "switched from camera one to camera two" once appellant was placed in the patrol car. The trial court therefore

–4–

allowed counsel for both parties to be present in the courtroom during the playback for the jury, and instructed counsel for the State to "[p]lay the video the same way you did yesterday during trial for the jury." He also instructed, "I'm ordering that all parties not say anything, make any outward facial, you know, gestures or anything else to this jury while they're in here. Just play the video." He then asked for objections. Neither party raised any, and the video was played.

The jury reached a unanimous verdict of guilty. This appeal followed.

## ANALYSIS

A person commits the offense of driving while intoxicated if the person is intoxicated while operating a motor vehicle in a public place. TEX. PENAL CODE ANN. § 49.04 (West Supp. 2014). "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body" or "having an alcohol concentration of 0.08 or more." *Id.*, § 49.01(2) (West 2011). Only the first of these definitions, known as the "impairment theory," is relevant here. *See Crouse v. State*, 441 S.W.3d 508, 513 (Tex. App.— Dallas 2014, no pet.) (explaining that impairment theory and "per se" theory, based on alcohol concentration, are two alternative methods for State to prove intoxication).

### A. Sufficiency of the evidence

In her fifth and sixth issues, appellant challenges the sufficiency of the evidence to support the jury's verdict. Although appellant's issues challenge the factual sufficiency of the evidence, we apply only one standard, for legal sufficiency, to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). "Accordingly, when reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S.

–5–

307, 318–19 (1979)). Direct and circumstantial evidence are treated equally, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Our review of all of the evidence includes evidence that was properly and improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury is the exclusive judge of witness credibility and the weight to be given the testimony. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). It is also the exclusive province of the jury to reconcile conflicts in the evidence. *Id.*

Appellant argues the evidence is insufficient because (1) her conviction was based on Corley's improper administration of the HGN test; (2) Corley did not conduct any other field sobriety tests, even though appellant did not refuse to complete them but only expressed her desire to go to the restroom first; (3) she promptly cooperated with Corley's requests to pull over, provide her license and insurance, and exit the car; (4) she explained to Corley that she was trying to determine if she needed to change lanes to accommodate the emergency vehicle ahead, and so had an explanation for the swerving Corley witnessed; (5) she was respectful to Corley and followed his commands during Corley's investigation, and was not visibly swaying; and (6) there was no testimony outside of the flawed HGN test to establish that she did not have normal use of mental or physical faculties by reason of the introduction of alcohol into her body.

The State in turn argues that appellant's "poor driving, physical symptoms, inability to follow basic instructions, and refusal to take a breath test" were sufficient to support her conviction for driving while intoxicated. In addition, the jury heard and saw video evidence of appellant's condition at the time of the offense. As a general rule, the testimony of a peace officer that a person is intoxicated provides sufficient evidence to establish the element of intoxication. *See Annis v. State*, 578 S.W.2d 406, 407 (Tex. Crim. App. 1979); *Watkins v. State*, 741 S.W.2d 546, 549 (Tex. App.—Dallas 1987, pet. ref'd). Corley testified that appellant was

weaving within her lane and nearly struck his car when swerving into his lane. He testified that appellant had slurred speech and watery eyes and that he smelled alcohol on her breath. He testified that she was unable to follow simple instructions, and that she refused further field sobriety tests, discussing her need to go to the restroom for a longer period of time than the tests would have taken. Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude the evidence was sufficient to support appellant's conviction for the offense of driving while intoxicated. We overrule appellant's fifth and sixth issues.

## B. Evidentiary rulings

We review the trial court's decisions to admit or exclude evidence for abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007).

### 1. Probable cause

In her first issue, appellant complains that there was no probable cause to arrest her. She asserts that probable cause was lacking because Corley administered, incorrectly, only one field sobriety test. Although lack of probable cause is typically made in connection with a motion to suppress specific evidence,[2] appellant does not point to any evidence that should have been excluded for lack of probable cause, or to any objection she made at trial on that basis. "[T]he failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence." *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002). And even if she had preserved her complaint, Corley's decision to arrest appellant was made on more than the results of the HGN test, as we have discussed.

Probable cause for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably

---

[2] *See, e.g., Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997) (appellant moved to suppress evidence of drug possession where no probable cause for arrest).

trustworthy information are sufficient to warrant a prudent person as believing that an offense has been or is being committed. *Tex. Dep't of Pub. Safety v. Gilfeather*, 293 S.W.3d 875, 880 (Tex. App.—Fort Worth 2009, no pet.) (en banc op. on reh'g) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Corley testified that appellant's erratic driving raised concern for the officer requesting assistance as well as others on the road. He testified to the smell of alcohol on appellant's breath, her glassy eyes and slurred speech, and her inability to follow instructions. Similar signs of intoxication have been held to provide sufficient probable cause to arrest for DWI. *See Learning v. State*, 227 S.W.3d 245, 249 (Tex. App.—San Antonio 2007, no pet.) (also noting that article 14.01(b), Texas Code of Criminal Procedure, permits warrantless arrest by police officer for offense committed in officer's view). Had appellant objected, the trial court would not have abused its discretion by admitting Corley's testimony regarding probable cause to arrest appellant. We overrule appellant's first issue.

### 2. *Miranda* **warnings**

In her seventh issue, appellant contends "the case should have been dismissed for failure to Mirandize [her] after she was in police custody." It is undisputed that appellant was not given *Miranda* warnings until after she had been arrested and had refused to give a specimen of her breath. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A traffic stop, however, does not constitute "custody" for *Miranda* purposes. *State v. Stevenson*, 958 S.W.2d 824, 828 (Tex. Crim. App. 1997) (citing *Berkemer v. McCarty*, 468 U.S. 420 (1984)). Performance of field sobriety tests alone does not give rise to custody. *Id.* at 829. An officer may detain a person in order to gather information in the course of a roadside investigation before placing the person in custody under *Miranda*. *See Lewis v. State*, 72 S.W.3d 704, 707–713 (Tex. App.—Fort Worth 2002, pet. ref'd) (collecting cases).

After appellant's arrest, Corley drove her to the Richardson jail and read her the warnings regarding a breath sample. She refused to give a breath sample. This refusal was admissible evidence. TEX. TRANSP. CODE ANN. § 724.061 (West 2011). Corley then gave appellant *Miranda* warnings and asked if she would talk with him then. She refused, and he did not ask any other questions. "Police requests that suspects perform sobriety tests and directions on how suspects are to do the tests do not constitute 'interrogation;' neither do queries concerning a suspect's understanding of her rights." *Jones v. State*, 795 S.W.2d 171, 176 (Tex. Crim. App. 1990); *see also Gassaway v. State*, 957 S.W.2d 48, 50 (Tex. Crim. App. 1997) (sobriety tests of counting and reciting alphabet not testimonial in nature; defendant's Fifth Amendment rights not implicated).

Appellant concedes that she did not complain in the trial court about the lack of *Miranda* warnings. She argues, however, that we may consider the complaint because it is a pure issue of law and an injustice would be avoided. Although her initial brief did not specify any evidence that should have been excluded, she argues in her reply brief that custodial interrogation began when she was refused the right to leave to use the restroom. She specifically argues that statements regarding "taking of the breathalyzer" were "impermissibly used." But the court in *Jones* noted that "[i]n Texas, we have held that asking a suspect in custody whether he will take a blood alcohol test or repeatedly asking a suspect to give a breath sample are not 'interrogations.'" *Jones*, 795 S.W.2d at 174 n.3. Corley's reading of the statutory warning and his request that appellant provide a breath sample did not constitute custodial interrogation. *See Morris v. State*, 897 S.W.2d 528, 532 (Tex. App.—El Paso 1995, no pet.) (even though appellant was in custody, officer's reading of statutory warning and request for breath and blood samples did not constitute custodial interrogation). We overrule appellant's seventh issue.

## C. Jury charge

In her second issue, appellant complains the trial court erroneously submitted "two issues" to the jury on the impairment theory of intoxication. She argues that the charge "suggested to the jury there were two alternate means of committing the offense." She also contends that the trial court erroneously included the per se theory in the definition of intoxication.

In reviewing this complaint, we first determine if the charge given was erroneous. *See Posey v. State*, 966 S.W.2d 57, 60 (Tex. Crim. App. 1998). The trial court's judgment will not be reversed for error in the charge unless the error was calculated to injure the rights of the defendant or unless it appears from the record that the defendant has not had a fair and impartial trial. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006). Where, as here, no objection is made to the error in the charge, appellant must show "egregious harm" to warrant reversal. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988).

The charge included the following paragraphs:

> The word *"intoxicated"* means not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body, or having an alcohol concentration of 0.08 or more.
>  . . .
> Now, if you find and believe from the evidence beyond a reasonable doubt that on or about December 1, 2012, in Collin County, Texas, **MELLANNISE HENDERSON** did then and there operate a motor vehicle in a public place while the said **MELLANNISE HENDERSON** was intoxicated by:
>
> 1.     not having the normal use of her mental faculties by reason of the introduction of alcohol into the body; **OR**

–10–

> 2.	not having the normal use of her physical faculties by reason of the introduction of alcohol into the body;

> Then you will find the defendant guilty as charged.

Appellant complains that the trial court allowed "two separate questions" on the impairment theory of intoxication.[3] She cites *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010), for the proposition that there are only two alternative methods for proving intoxication, the impairment theory and the per se theory. She correctly argues that these methods of proof are not alternate means of committing the offense. *See State v. Barbernell*, 257 S.W.3d 248, 256 (Tex. Crim. App. 2008) (per se and impairment definitions of "intoxicated" are purely evidentiary matters that do not "create two different manners and means of committing DWI"). She concludes, however, that the trial court's charge impermissibly created an alternate method of committing the offense.

A similar contention was rejected in *Bradford v. State*, 230 S.W.3d 719, 722–23 (Tex. App.—Houston [14th Dist.] 2007, no pet.). In *Bradford*, the appellant argued the jury's verdict was not unanimous because some jurors may have found loss of mental faculties, while others may have found loss of physical faculties. *See id.* at 722. The court explained that the appellant was charged with a single criminal act or offense, driving while intoxicated. *Id.* at 722. There were no separate criminal acts on which the jury could disagree. *Id.* at 723. The court also explained that the "physical versus mental ability, as a component of the impairment theory," was "not a separate element of the offense." *Id.* In *Zamora v. State*, No. 14-08-01084-CR, 2010 WL 456941, at *2 (Tex. App.—Houston [14th Dist.] Feb. 11, 2010, no pet.) (not designated for publication), the court cited *Bradford* and further explained, "[t]herefore, whether loss of both

---

[3] Appellant's initial argument appears to be based on the contention that the statutory definition of intoxication uses the word "and," not "or," in describing the impairment theory; her brief quotes the definition as "not having the normal use of mental **and** physical faculties." (Emphasis added). The statute, however, uses the word "or," not "and." *See* TEX. PENAL CODE ANN. § 49.01(2)(A) ("Intoxicated" means: (A) not having the normal use of mental **or** physical faculties . . . ." (Emphasis added)). In her reply brief, she correctly quotes the statute.

faculties or just one has been proven does not affect whether the offense itself has been committed." The trial court's disjunctive submission in the application paragraph of the charge tracked the statutory definition of intoxication and was not erroneous. *See Benn v. State*, 110 S.W.3d 645, 649 (Tex. App.—Corpus Christi 2003, no pet.) (where jury charge tracked statutory definition of intoxication, it was accurate statement of law and was not erroneous).

Appellant also complains that the per se definition of intoxication was included in the jury charge. At trial, the State requested that the per se definition be omitted from the charge because appellant had refused the breath test. Appellant objected, arguing that the definition as given followed the statutory language. In accordance with appellant's objection, the trial court did not change the definition. A defendant may not complain of a charge that she requested. *Trejo v. State*, 280 S.W.3d 258, 259 (Tex. Crim. App. 2009). In addition, the per se definition was a correct statement of the law, tracking the statutory definition. *See* TEX. PENAL CODE ANN. § 49.01(2)(B). Because the per se definition was included in the abstract portion of the charge, not the application paragraph, and because it correctly stated the law, there is no reversible error. *See Crenshaw v. State*, 378 S.W.3d 460, 466–67 (Tex. Crim. App. 2012). We overrule appellant's second issue.

### D. Replay of video

In her third and fourth issues, appellant contends the trial court erred by allowing the State "to replay and control the enhancement aspects of the video" for the jury, and complains that the State's control of the video "was tantamount to added evidence." Appellant contends that a new trial is required under Rule 21.3(f), Texas Rules of Appellate Procedure. This rule provides in part that a defendant must be granted a new trial "when, after retiring to deliberate, the jury has received other evidence." *See In re M.A.F.*, 966 S.W.2d 448, 450 (Tex. 1998) (rule requires new trial if other evidence received by jury after retiring to deliberate, and evidence is

–12–

detrimental to accused). In *In re M.A.F.*, a new trial was required where during the jury's deliberations in a murder trial, jurors reviewing evidence found a marijuana cigarette in the pocket of the juvenile defendant's jacket. *Id.* at 449. The supreme court reversed the conviction because the jury received new, adverse evidence after retiring to deliberate. *Id.* at 451. Under Rule 23.1(f), the effect of the evidence on the jury is not a consideration; the controlling factor is the character of the evidence in light of the issues before the jury. *See Carroll v. State*, 990 S.W.2d 761, 762 (Tex. App.—Austin 1999, no pet.).

Assuming error was preserved,[4] the replaying of a video already admitted into evidence without objection and seen by the jury did not constitute receipt of other evidence for purposes of Rule 21.3(f). In *Thomison v. State*, No. 11-10-00368-CR, 2012 WL 5989193, at \*3 (Tex. App.—Eastland Nov. 29, 2012, no pet.) (mem. op., not designated for publication), the jury "inadvertently received the State's copy of the jury charge, which included the prosecutor's notes in the margin." The appellant requested a mistrial and asserted the ground in a motion for new trial; both requests were denied by the trial court. *Id.* On appeal, the court explained that in most cases under Rule 21.3(f), "the evidence that has been considered detrimental contained new information that damaged the defendant because it has not been admitted during the trial." *Id.* In contrast, the State's copy of the charge was an exact copy of the court's charge that had been submitted to the jury for deliberations. The State's counsel's notes "did not add additional facts; they were merely shorthand for what had been alleged." *Id.* at \*4. The jurors "likely did not know who had made the notes," and the notes were "not biased or inflammatory." *Id.*

---

[4] Appellant did not offer any objection at trial when given the opportunity to do so by the trial court. She argues, however, that in "exceptional circumstances" we may consider her complaint on appeal, citing opinions from several federal appellate courts in civil cases. *See, e.g., Batiansila v. Advanced Cardiovascular Sys., Inc.*, 952 F.2d 893, 896 (5th Cir. 1992) (although appellate court usually refuses to consider issues not raised before trial court, appellate court will make exception when new issue raises pure question of law, and failure to consider would result in miscarriage of justice). We note that Rule 21 includes its own provisions about presenting motions for new trial in criminal cases. *See* TEX. R. APP. P. 21.2 (when motion for new trial required); 21.6 (time to present motion). There is no indication that appellant sought a new trial or a mistrial on this basis in the trial court.

Therefore, the trial court did not abuse its discretion in denying appellant's motion for new trial. *Id.*

As in *Thomison*, there was no new information given the jury here. The video was admitted into evidence without objection; was played in its entirety for the jury; and it was played again at the jury's request, again without objection. The trial court was required to "furnish[ ] to the jury upon its request any exhibits admitted as evidence in the case," and was thus required to provide the video when the jury requested it. TEX. CODE CRIM. PROC. ANN. art. 36.25 (West 2006); *see also Parker v. State*, 745 S.W.2d 934, 936–37 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (article 36.25 is mandatory; trial court's refusal to comply with jury's request to view videotape that had been introduced into evidence was fundamental error). Appellant and her counsel were present when the video was replayed. Appellant does not contend there was anything new, added, or different in the replaying, and did not seek to offer evidence of any difference to be considered by the trial court. She did not object, move for a mistrial, or seek a new trial. We overrule appellant's third and fourth issues.

## CONCLUSION

Having overruled appellant's seven issues, we affirm the trial court's judgment.

/Michael J. O'Neill/
————————————————
MICHAEL J. O'NEILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

140025F.U05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MELLANNISE HENDERSON, Appellant

No. 05-14-00025-CR V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2, Collin County, Texas
Trial Court Cause No. 002-80051-2013.
Opinion delivered by Justice O'Neill, Justices Fillmore and Chief Justice Thomas, Retired, participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of December, 2014.